No. 18-2944

# In the United States Court of Appeals for the Seventh Circuit

———————————————

BARBARA KAISER and ANTON KAISER,

*Plaintiffs-Appellees*,

v.

JOHNSON & JOHNSON and ETHICON, INC.,

*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the Northern District of Indiana
No. 2:17-cv-114 (Hon. Philip P. Simon)

———————————————

## BRIEF OF APPELLANTS

———————————————

Stephen D. Brody
Jason Zarrow
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
sbrody@omm.com

Amy M. Pepke
BUTLER SNOW LLP
Crescent Center
6075 Poplar Ave., Suite 500
Memphis, TN 38119
(901) 680-7200
amy.pepke@butlersnow.com

February 1, 2019

Lisa S. Blatt
R. Stanton Jones
William C. Perdue
Stephen K. Wirth
Samuel F. Callahan*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
lisa.blatt@arnoldporter.com

*Admitted outside the District of Columbia;
practicing law in D.C. under the supervision of
Firm principals who are D.C. Bar members.*

*Counsel for Johnson & Johnson and
Ethicon, Inc.*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __18-2944__

Short Caption: __Kaiser v. Johnson & Johnson__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Johnson & Johnson

    Ethicon, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

    Beck Redden LLP, Arnold & Porter Kaye Scholer LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.

Attorney's Signature: __s/ Lisa S. Blatt__      Date: __January 15, 2019__

Attorney's Printed Name: __Lisa S. Blatt__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____   **No** __✗__

Address: __601 Massachusetts Ave., NW__

         __Washington, DC 20001__

Phone Number: __(202) 942-5000__      Fax Number: __(202) 942-5999__

E-Mail Address: __lisa.blatt@arnoldporter.com__

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2944

Short Caption: Kaiser v. Johnson & Johnson

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Johnson & Johnson

Ethicon, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

Beck Redden LLP, Arnold & Porter Kaye Scholer LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.

Attorney's Signature: /s/ R. Stanton Jones          Date: January 30, 2019

Attorney's Printed Name:  R. Stanton Jones

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** __✕__

Address:  601 Massachusetts Ave., NW

Washington, DC 20001

Phone Number:  (202) 942-5000          Fax Number:  (202) 942-5999

E-Mail Address:  stanton.jones@arnoldporter.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __18-2944__

Short Caption: __Kaiser v. Johnson & Johnson__

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Johnson & Johnson

   Ethicon, Inc.


(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

   Beck Redden LLP, Arnold & Porter Kaye Scholer LLP


(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.


Attorney's Signature: __s/ William Perdue__          Date: __January 15, 2019__

Attorney's Printed Name: __William Perdue__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __X__

Address: __601 Massachusetts Ave., NW__

__Washington, DC 20001__

Phone Number: __(202) 942-5000__          Fax Number: __(202) 942-5999__

E-Mail Address: __william.perdue@arnoldporter.com__

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2944

Short Caption: Kaiser v. Johnson & Johnson

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Johnson & Johnson

Ethicon, Inc.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

Beck Redden LLP, Arnold & Porter Kaye Scholer LLP

(3)   If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

        Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.

Attorney's Signature: s/ Stephen K. Wirth    Date: January 15, 2019

Attorney's Printed Name: Stephen K. Wirth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ✕

Address: 601 Massachusetts Ave., NW

Washington, DC 20001

Phone Number: (202) 942-5000    Fax Number: (202) 942-5999

E-Mail Address: stephen.wirth@arnoldporter.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2944

Short Caption: Kaiser v. Johnson & Johnson

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Johnson & Johnson

   Ethicon, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

   Beck Redden LLP, Arnold & Porter Kaye Scholer LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.

Attorney's Signature: /s/ Samuel F. Callahan          Date: January 15, 2019

Attorney's Printed Name: Samuel F. Callahan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __✕__

Address: 601 Massachusetts Ave., NW

   Washington, DC 20001

Phone Number: (202) 942-5000          Fax Number: (202) 942-5999

E-Mail Address: sam.callahan@arnoldporter.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>18-2944</u>

Short Caption: <u>Kaiser v. Johnson & Johnson</u>

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

 **[   ]**   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

 <u>Johnson & Johnson</u>

 <u>Ethicon, Inc.</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 <u>O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC</u>

 <u>Beck Redden LLP</u>

(3) If the party or amicus is a corporation:

 i) Identify all its parent corporations, if any; and

  <u>Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.</u>

 ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

  <u>Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.</u>

Attorney's Signature: <u>s/ Stephen D. Brody</u>   Date: <u>9/13/18</u>

Attorney's Printed Name: <u>Stephen D. Brody</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** <u>X</u> **No** <u> </u>

Address: <u>1625 Eye Street, NW</u>

   <u>Washington, DC 20006</u>

Phone Number: <u>202 383 5167</u>   Fax Number: <u>202 383 5414</u>

E-Mail Address: <u>sbrody@omm.com</u>

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2944

Short Caption: Kaiser v. Johnson & Johnson

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [  ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Johnson & Johnson

   Ethicon, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

   Beck Redden LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.

Attorney's Signature:  s/  Jason Zarrow          Date: 9/18/18

Attorney's Printed Name:  Jason Zarrow

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:  1625 Eye Street, NW

      Washington, DC 20006

Phone Number:  202 383 5196          Fax Number:  202 383 5414

E-Mail Address:  jzarrow@omm.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-2944

Short Caption: Kaiser v. Johnson & Johnson

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Johnson & Johnson

Ethicon, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

O'Melveny & Myers, LLP; Tucker Ellis LLP; Ice Miller LLP; Butler Snow LLP; Thomas Combs & Spann PLLC;

Beck Redden LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

Appellant Johnson & Johnson has no parent corporations and no corporation owns 10% or more of its stock.

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson.

Attorney's Signature: /s/ Amy M. Pepke    Date: January 29, 2019

Attorney's Printed Name: Amy M. Pepke

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ☒

Address: 6075 Poplar Avenue, Suite 500

Memphis, TN 38187-1443

Phone Number: 901-680-7324    Fax Number 901-680-7201

E-Mail Address: amy.pepke@butlersnow.com

rev. 01/15 GA

## TABLE OF CONTENTS

RULE 26.1 DISCLOSURE ................................................................. i

TABLE OF AUTHORITIES ........................................................... xi

JURISDICTIONAL STATEMENT .................................................. 1

ISSUES PRESENTED .................................................................... 1

INTRODUCTION ........................................................................... 2

STATEMENT OF THE CASE......................................................... 4

    A.   Regulatory Background ........................................................ 4

    B.   The Prolift Pelvic Floor Repair System ........................... 8

         1.   Prolift's Development ................................................ 8

         2.   Prolift's Warnings................................................... 10

         3.   FDA Clearance......................................................... 11

         4.   Post-Marketing Developments.............................. 12

    C.   Pretrial Proceedings ......................................................... 13

    D.   Evidence Presented at Trial............................................ 14

         1.   Mrs. Kaiser's Prolapse and Surgery ..................... 14

         2.   Mrs. Kaiser's Post-Surgery Medical History ......... 16

         3.   Prolift's Purported Risks ....................................... 17

    E.   Verdict and Post-Trial Proceedings ............................... 18

SUMMARY OF ARGUMENT ....................................................... 19

STANDARD OF REVIEW............................................................. 21

ARGUMENT ................................................................................. 21

I.   Ethicon is Entitled to Judgment as a Matter of Law ......... 21

    A.   Plaintiffs' Design-Defect Claim Fails as a Matter of Law .......................... 21

         1.   Plaintiffs' Design-Defect Claim Is Preempted....................... 21

         2.   Plaintiffs Failed To Introduce Evidence of a Safer Alternative Design ................................. 27

         3.   Plaintiffs Failed To Prove that Prolift was Unreasonably Dangerous ................................. 31

    B.  Plaintiffs' Failure-to-Warn Claim Fails as a Matter of Law ....................... 34

        1.  Plaintiffs Failed to Show that Prolift Was
            Unreasonably Dangerous ..................................................... 34

        2.  Prolift's Warnings Were Adequate ...................................... 34

        3.  Plaintiffs Failed To Establish that Prolift's Warnings
            Caused Kaiser's Injuries ...................................................... 37

II.  Ethicon is Entitled to a New Trial.......................................................... 38

    A.  Ethicon Was Entitled To Present Evidence of its Compliance with
       FDA's Regulatory Process ................................................................ 39

    B.  Ethicon Was Entitled to Jury Instructions on Two Indiana
       Presumptions ................................................................................... 46

        1.  Ethicon Is Presumptively Not Liable Because It
            Complied with FDA's Regulatory Process ............................ 47

        2.  Ethicon Is Presumptively Not Liable Because Prolift Was
            "State of the Art".................................................................... 48

III. Ethicon is Entitled to Relief from the Damages Award ..................... 50

    A.  Ethicon's Compliance with FDA Regulations Precludes Punitive
       Damages ........................................................................................... 50

    B.  Plaintiffs Failed to Adduce Clear and Convincing Evidence To
       Support Punitive Damages .............................................................. 51

    C.  Compensatory Damages Were Excessive ..................................... 55

CONCLUSION........................................................................................... 58

CERTIFICATE OF COMPLIANCE............................................................ 59

CERTIFICATE OF FILING AND SERVICE ............................................ 60

APPENDIX

    Oral Ruling, November 28, 2017 (Transcript Excerpt, pp. 1-2, 34-40)..............A1

    Opinion and Order dated February 7, 2018 (R. 329) .........................A10

    Oral Ruling, March 8, 2018 (Transcript Excerpt, pp. 1640-48) .......................A27

    Opinion and Order dated March 16, 2018 (R. 407)............................A30

    Opinion and Order dated August 8, 2018 (R. 423).............................A39

    Amended Judgment dated August 21, 2018 (R. 427)..........................A84

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adams v. City of Chicago*,
   798 F.3d 539 (7th Cir. 2015) ................................................................. 55

*Aregood v. Givaudan Flavors Corp.*,
   904 F.3d 475 (7th Cir. 2018) ....................................... 27, 28, 29, 30

*Atterholt v. Robinson*,
   872 N.E.2d 633 (Ind. Ct. App. 2007) .................................................. 55

*Baker v. Heye-Am.*,
   799 N.E.2d 1135 (Ind. Ct. App. 2003) ............................................... 31

*Batchelor v. Procter & Gamble Co.*,
   2014 WL 6065823 (D.N.J. Nov. 13, 2014) ......................................... 45

*Becker v. Smith & Nephew, Inc.*,
   2015 WL 4647982 (D.N.J. Aug. 5, 2015) ............................................ 45

*Berman v. Cannon*,
   878 N.E. 2d 836 (Ind. Ct. App. 2008) ................................................. 56

*Besler v. Bd. of Educ.*,
   993 A.2d 805 (N.J. 2010) ..................................................................... 56

*Bourne v. Marty Gilman, Inc.*,
   452 F.3d 632 (7th Cir. 2006) ....................................................*passim*

*Brattain v. Methodist Health Group*,
   2006 WL 3498110 (Ind. Super. Ct. Oct. 5, 2006) .............................. 56

*Burke v. Deere & Co.*,
   6 F.3d 497 (8th Cir. 1993) ................................................................... 54

*Campbell Hausfeld/Scott Fetzer Co. v. Johnson*,
   109 N.E.3d 953 (Ind. 2018) ................................................................ 39

*Catt v. Skeans*,
   867 N.E. 2d 582 (Ind. Ct. App. 2007) ................................................. 56

*Clark v. Chrysler Corp.*,
   436 F.3d 594 (6th Cir. 2006) ............................................................... 52

*Collins v. Kibort*,
    143 F.3d 331 (7th Cir. 1998) ................................................ 39

*Deaton v. Robison*,
    878 N.E.2d 499 (Ind. Ct. App. 2007) .................................... 34

*Dolin v. GlaxoSmithKline LLC*,
    901 F.3d 803 (7th Cir. 2018) ................................................ 22

*Eghnayem v. Boston Sci. Corp.*,
    873 F.3d 1304 (11th Cir. 2017) ............................................. 46

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................. 4

*First Nat. Bank & Trust Corp. v. Am. Eurocopter Corp.*,
    378 F.3d 682 (7th Cir. 2004) ................................................ 36

*Fischer v. Johns-Manville Corp.*,
    512 A.2d 466 (N.J. 1986) .................................................... 54

*Frymire-Brinati v. KPMG Peat Marwick*,
    2 F.3d 183 (7th Cir. 1993) ................................................... 39

*Gresser v. Dow Chemical Co.*,
    989 N.E. 2d 339 (Ind. Ct. App. 2013) ............................. 47, 48

*Gross v. Gynecare*,
    2016 WL 1192556 (N.J. Super. Ct. App. Div. Mar. 29, 2016) .............................. 57

*Guilbeau v. Pfizer Inc.*,
    880 F.3d 304 (7th Cir. 2018) ...................................... 21, 22, 26

*Hammons v. Ethicon, Inc.*,
    190 A.3d 1248 (Pa. Super. Ct. 2018) .................................... 57

*Huskey v. Ethicon, Inc.*,
    848 F.3d 151 (4th Cir. 2017) ................................................ 46

*In re Bard IVC Filters Prods. Liab. Litig.*,
    289 F. Supp. 3d 1045 (D. Ariz. 2018) .................................. 46

*In re C.R. Bard, Inc.*,
    2018 WL 4212408 (S.D. W. Va. Sept. 4, 2018) ..................... 46

*In re Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*,
    2018 WL 6617375 (S.D. Ind. Dec. 18, 2018) ........................ 46

*In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
  MDL No. 2327 (S.D. W. Va.) ................................................................. 13

*In re Jobes*,
  529 A.2d 434 (N.J. 1987) ........................................................................ 52

*In re Levaquin Prod. Liab. Litig.*,
  700 F.3d 1161 (8th Cir. 2012) ............................................................... 55

*Indianapolis Athletic Club, Inc. v. Alco Std. Corp.*,
  709 N.E.2d 1070 (Ind. Ct. App. 1999) .................................................. 48

*Koske v. Townsend Eng'g Co.*,
  551 N.E.2d 437 (Ind. 1990) .................................................................... 31

*Kovach v. Caligor Midwest*,
  913 N.E.2d 193 (Ind. 2009) .................................................................... 37

*Kramer v. Catholic Charities of Diocese of Fort Wayne-S. Bend, Inc.*,
  32 N.E.3d 227 (Ind. 2015) ...................................................................... 40

*Lankston v. Ethicon, Inc.*,
  2016 WL 5843723 (S.D. W. Va. Oct. 4, 2016) ...................................... 38

*Lapsley v. Xtek, Inc.*,
  689 F.3d 802 (7th Cir. 2012) .................................................................. 30

*Lawson v. Sun Microsystems, Inc.*,
  791 F.3d 754 (7th Cir. 2015) .................................................................. 21

*Marion County Coroner's Office v. EEOC*,
  612 F.3d 924 (7th Cir. 2010) .................................................................. 55

*Maudsley v. State*,
  816 A.2d 189 (N.J. App. Div. 2003) ....................................................... 51

*McCracken v. Depuy Orthopaedics, Inc.*,
  2013 WL 12141334 (N.D. Ohio July 26, 2013) ..................................... 46

*McLane Co. v. EEOC*,
  137 S. Ct. 1159 (2017) ............................................................................ 44

*McMahon v. Bunn-O-Matic Corp.*,
  150 F.3d 651 (7th Cir. 1998) ........................................................... 28, 36

*McWilliams v. Novartis AG*,
  2018 WL 3637083 (S.D. Fla. July 31, 2018) ......................................... 51

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ......................................................................*passim*

*Mimms v. CVS Pharm., Inc.*,
  889 F.3d 865 (7th Cir. 2018) ................................................. 44

*Mitchell v. Baynes*,
  2005 WL 6728596 (Ind. Cir. Ct. Aug. 5, 2005) ..................................... 56

*Moss v. Crosman Corp.*,
  136 F.3d 1169 (7th Cir. 1998) ............................................... 33

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013) ................................................ 22, 23, 26

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*,
  477 A.2d 1224 (N.J. 1984) ................................................... 52

*Pavlova v. Mint Mgmt. Corp.*,
  868 A.2d 322 (N.J. App Div. 2005) ........................................... 54

*Phelps v. Sherwood Med. Indus.*,
  836 F.2d 296 (7th Cir. 1987) ................................................. 31

*Pickett v. Sheridan Health Care Ctr.*,
  610 F.3d 434 (7th Cir. 2010) ............................................... 21

*Piltch v. Ford Motor Co.*,
  778 F.3d 628 (7th Cir. 2015) ............................................... 30

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) ................................................ 22, 25, 26

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008) .....................................................*passim*

*Rowe v. Hoffman-La Roche, Inc.*,
  917 A.2d 767 (N.J. 2007) ................................................... 51

*Schultz v. Ford Motor Co.*,
  857 N.E.2d 977 (Ind. 2006) ......................................... 40, 45, 48, 50

*Susan Wakeen Doll Co. v. Ashton-Drake Galleries*,
  272 F.3d 441 (7th Cir. 2001) ............................................... 50

*Thompson v. City of Chicago*,
  722 F.3d 963 (7th Cir. 2013) ............................................... 44

*TRW Vehicle Safety Systems, Inc. v. Moore*,
    936 N.E.2d 201 (Ind. 2010) ................................................ 30

*United States v. Denberg*,
    212 F.3d 987 (7th Cir. 2000) .............................................. 44

*Vasquez v. Gloucester Cty.*,
    2014 WL 1599499 (D.N.J. Apr. 21, 2014) ........................... 51

*Wade v. Terex-Telelect, Inc.*,
    966 N.E.2d 186 (Ind. Ct. App. 2012) ....................... 40, 49, 50

*Weinberger v. Boyer*,
    956 N.E.2d 1095 (Ind. Ct. App. 2011) ................................ 55

*Westray v. Wright*,
    834 N.E. 2d 173 (Ind. Ct. App. 2005) ................................ 56

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
    808 F.3d 281 (6th Cir. 2015) .............................................. 22

*York v. Union Carbide Corp.*,
    586 N.E.2d 861 (Ind. Ct. App. 1992) .................................. 34

**Statutory and Regulatory Provisions**

7 U.S.C. § 136(bb) ................................................................... 47

21 U.S.C. § 360(k) .................................................................... 6

21 U.S.C. § 360c(a)(1)(A) ................................................ 4, 5, 48

21 U.S.C. § 360c(a)(1)(B) .............................................. *passim*

21 U.S.C. § 360c(a)(1)(C) ................................................ 2, 5, 39

21 U.S.C. § 360c(b)-(d) ............................................................ 5

21 U.S.C. § 360c(f)(1) ..................................................... 5, 6, 7

21 U.S.C. § 360c(f)(1)(A) ...................................... 6, 25, 39, 41, 43

21 U.S.C. § 360c(f)(1)(B) ......................................................... 6

21 U.S.C. § 360c(f)(1)(C) ......................................................... 6

21 U.S.C. § 360c(i) ..................................................... 7, 24, 26, 43, 51

21 U.S.C. § 360e(b)(1) ..................................................... 6, 25, 41

21 U.S.C. § 393(b)(2)(C) ............................................................................... 4

28 U.S.C. § 1291 .......................................................................................... 1

28 U.S.C. § 1332(a)(1) ................................................................................. 1

28 U.S.C. § 1407(a) ...................................................................................... 14

21 C.F.R. § 807.81(a)(3) ....................................................................... 8, 12, 24

21 C.F.R. § 807.87(e) .................................................................................... 7

21 C.F.R. § 807.100(a)(5) ................................................................... 7, 24, 26, 51

47 Fed. Reg. 2810 (Jan. 19, 1982) ................................................................ 12

53 Fed. Reg. 23856 (June 24, 1988) ............................................................. 11

81 Fed. Reg. 353 (Jan. 5, 2016) .................................................................... 13

Ind. Code § 34-4-2-1 .................................................................................... 34

Ind. Code § 34-6-2-146 ....................................................................... 31, 33, 34

Ind. Code § 34-20-2-1 ............................................................................. 27, 40

Ind. Code § 34-20-2-2 .................................................................................. 40

Ind. Code § 34-20-4-1 .......................................................................... 31, 39, 40

Ind. Code § 34-20-4-2 .................................................................................. 34

Ind. Code § 34-20-5-1 .................................................................. 19, 40, 44, 47, 48

N.J.S.A. § 2A:15-5.10 ................................................................................... 52

N.J.S.A. § 2A:15-5.14(a) ............................................................................... 55

N.J.S.A. § 2A:15-12(a) .................................................................................. 52

N.J.S.A. § 2A:58C-5 ..................................................................................... 50

**Other Authorities**

Fed. R. Evid. 401 ................................................................................. 39

Fed. R. Evid. 402 ................................................................................. 39

Fed. R. Evid. 403 ............................................................................. 43, 44

Ind. Evid. R. 301 ................................................................................. 40

FDA, *Refuse To Accept Policy for 510(k)s*, app'x A (Jan. 30, 2018) ............................ 7

Emergo Grp., *How Long it Take the US FDA To Clear Medical
    Devices via the 510(k) Process* (Mar. 2017) ............................................. 43

Jeffrey K. Shapiro, *Substantial Equivalence Premarket Review: The Right
    Approach for Most Medical Devices*, 69 Food & Drug L.J. 365 (2014) ......... 5, 7, 43

Restatement (Third) of Torts ........................................................... 30, 40

## JURISDICTIONAL STATEMENT

The district courts in the Southern District of West Virginia, where this case was filed, and the Northern District of Indiana, where it was transferred for trial, had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs-appellees Barbara and Anton Kaiser are citizens of Indiana. Defendants-appellants Johnson & Johnson and Ethicon, Inc. (together, "Ethicon") are New Jersey corporations with their principal places of business in New Jersey. The amount in controversy exceeds $75,000: the district court awarded $20,000,000 in damages. Final judgment was entered on August 21, 2018. Ethicon timely appealed on September 6, 2018. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether Ethicon is entitled to judgment as a matter of law on Plaintiffs' design-defect claim because (a) federal law prohibited Ethicon from unilaterally redesigning its device to comply with state law, (b) Plaintiffs failed to prove a safer alternative design, or (c) Ethicon's device was not unreasonably dangerous.

2.    Whether Ethicon is entitled to judgment as a matter of law on Plaintiffs' failure-to-warn claim because Plaintiffs failed to show that (a) Ethicon's device was unreasonably dangerous, (b) the warnings were inadequate, or (c) different warnings would have changed the decision of the implanting surgeon.

3.    Whether Ethicon is entitled to a new trial because the district court excluded evidence of Ethicon's compliance with FDA regulations and failed to

instruct the jury that, because Ethicon complied with FDA regulations and its device was state of the art, Ethicon is presumed not to be negligent.

4.     Whether Ethicon is entitled to relief from the damages award because (a) Ethicon's regulatory compliance foreclosed punitive damages, (b) there was no clear and convincing evidence to support punitive damages, and (c) compensatory damages were excessive.

## INTRODUCTION

From 2005 to 2012, Ethicon manufactured and marketed the Gynecare Prolift Pelvic Floor Repair System, a medical device designed to treat pelvic organ prolapse. A serious condition afflicting millions of women, pelvic organ prolapse occurs when pelvic muscles and tissues weaken, allowing organs like the bladder or uterus to drop into or even protrude out of the vagina. FDA classified Prolift as a Class II device. The agency thus determined that post-market regulatory controls were sufficient to "provide reasonable assurance of the safety and effectiveness of the device" and to avoid any "potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(B), (C)(ii)(II).

Plaintiff Barbara Kaiser suffered from severe prolapse until January 2009, when a surgeon successfully implanted Prolift, resolving her condition. Following a car accident several years later, however, Kaiser began reporting abdominal and pelvic pain, pain during intercourse, and problems urinating. In 2012, Kaiser and her husband sued Ethicon, alleging that Prolift's FDA-cleared design was defective and its warnings were inadequate. The jury awarded her $10 million in

noneconomic compensatory damages, and the district court upheld another $10 million in punitive damages.

This case should never have gone to a jury. Federal law prohibited Ethicon—without first obtaining new FDA clearance—from redesigning Prolift in the way Plaintiffs claim Indiana law requires. And even had federal law permitted Ethicon to unilaterally adopt a different design, Plaintiffs presented no evidence that any feasible safer design exists. Nor did Plaintiffs present evidence that Prolift posed risks beyond what ordinary pelvic-floor surgeons contemplated. Prolift's risks were well understood by surgeons generally and by Kaiser's surgeon in particular. Even today, her surgeon stands by his decision to use Prolift in Kaiser's surgery.

The jury, moreover, heard a grossly one-sided story. Even though Indiana law presumes that a manufacturer who complies with applicable safety regulations is not negligent, the district court barred Ethicon from presenting *any* evidence about the federal scheme regulating medical devices, including FDA's determination that Prolift was reasonably safe and effective. Plaintiffs exploited that erroneous ruling, repeatedly asserting that Ethicon hastily designed Prolift and rushed it to market without adequate testing.

At a minimum, the jury's outrageous damages award cannot stand. Applicable New Jersey law prohibits punitive damages altogether in cases involving devices that FDA has recognized as safe and effective—precisely what FDA did here when it cleared Prolift and classified it in Class II. And even were punitives theoretically available, New Jersey law requires clear and convincing evidence of

intentional wrongdoing. Ethicon's compliance with FDA regulations, not to mention its years of careful development and testing, foreclose any such finding. And the $10 million compensatory award is grossly excessive, as Kaiser's prolapse has never recurred and she has no long-term injuries beyond pain she treats with over-the-counter medications.

This Court should reverse.

## STATEMENT OF THE CASE

### A.    Regulatory Background

The Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976 ("MDA"), charges FDA with obtaining "reasonable assurance of the safety and effectiveness of devices intended for human use." 21 U.S.C. § 393(b)(2)(C). The statute "establishe[s] various levels of oversight for medical devices, depending on the risks they present" and the controls necessary to ensure the devices are safe and effective. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008). "Regardless of which category the FDA chooses, there must be a 'reasonable assurance of the safety and effectiveness of the device.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 134 (2000) (quoting 21 U.S.C. § 360c(a)(1)(A)(i), (B), (C)).

Class I covers low-risk devices, like bandages and examination gloves, for which "general controls"—such as labeling requirements and prohibitions on adulteration—are "sufficient to provide reasonable assurance of … safety and efficacy." 21 U.S.C. § 360c(a)(1)(A); *see Riegel*, 552 U.S. at 316.

4

Class II devices present intermediate risks such that "general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device," but "special controls"—such as performance standards and post-market surveillance—"provide such assurance." 21 U.S.C. § 360c(a)(1)(B). With special controls in place, Class II devices cannot "present[] a potential unreasonable risk of illness or injury." § 360c(a)(1)(C)(ii)(II). Class II encompasses the majority of devices, including the device at issue here. Jeffrey K. Shapiro, *Substantial Equivalence Premarket Review: The Right Approach for Most Medical Devices*, 69 Food & Drug L.J. 365, 377 (2014).

Class III devices—like replacement heart valves and pacemakers—are potentially high-risk devices that do not meet the standards for inclusion in Classes I or II. 21 U.S.C. § 360c(a)(1)(C); *Riegel*, 552 U.S. at 317. With two exceptions discussed below, Class III devices must, before commercial distribution, undergo "premarket approval," whereby the manufacturer provides FDA with extensive independent data "to provide reasonable assurance of … safety and effectiveness." 21 U.S.C. § 360c(a)(1)(C).

FDA must place all devices in one of these classes. For devices already on the market in 1976, FDA classifies the devices based on recommendations by panels of experts. § 360c(b)-(d). Pending classification, pre-1976 devices may remain on the market, subject only to general controls. *See* § 360c(a)(1)(A)(i). New, post-1976 devices are in Class III by default, unless and until FDA determines otherwise. § 360c(f)(1). FDA may determine otherwise by convening an expert classification

panel. § 360c(f)(1)(B), (C). Alternatively, FDA may determine that the new device is "substantially equivalent" to an existing post-1976 predicate device that FDA previously "classified in class I or II." § 360c(f)(1)(A). FDA makes this substantial equivalence determination through the "510(k) process," named after the original FDCA provision governing the required filing. *See* § 360(k); *Riegel*, 552 U.S. at 317.

As noted, Class III devices must undergo premarket approval before being commercially distributed, with "two important exceptions." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477 (1996). First, under a grandfathering provision, pre-1976 Class III devices "may remain on the market until the FDA promulgates … a regulation requiring premarket approval." *Riegel*, 552 U.S. at 317 (citing 21 U.S.C. §§ 360c(f)(1), 360e(b)(1)). Second, "to limit the competitive advantage grandfathered devices receive," *id.*, manufacturers may distribute new, post-1976 Class III devices pending FDA approval if the device is "substantially equivalent" to a grandfathered, pre-1976 Class III predicate device, 21 U.S.C. § 360e(b)(1)(B). The manufacturer makes this substantial-equivalence showing through a notification filed under § 510(k). *See Riegel*, 552 U.S. at 317.

The term "510(k)" thus can refer to two quite different processes. First, the term can refer to FDA's determination that a new device belongs in Class I or II—and therefore is not subject to premarket approval—because the device is substantially equivalent to a predicate previously placed in one of those classes. Second, the term can refer to FDA's determination that a new device that remains in Class III nevertheless may enter the market without premarket approval

because the device is substantially equivalent to a grandfathered Class III

predicate.[1]

In the Safe Medical Devices Act of 1990 ("SMDA"), Congress strengthened

the 510(k) process. The SMDA made clear that "substantial equivalence" is met only

where a new device either "has the same technological characteristics as the

predicate device," or "is as safe and effective as" the predicate and "does not raise

different questions of safety and effectiveness." 21 U.S.C. § 360c(i)(1)(A).

Manufacturers now must satisfy a 30-page checklist just to have 510(k)

notifications accepted for processing. FDA, *Refuse To Accept Policy for 510(k)s*, app'x

A (Jan. 30, 2018). Manufacturers often "present significant laboratory, animal,

and/or clinical data running to thousands of pages." Shapiro, *supra*, at 382.

Manufacturers also must submit proposed labeling and instructions for use. 21

C.F.R. § 807.87(e). The SMDA also made clear that manufacturers of new, post-1976

devices cannot avoid a default Class III classification unilaterally—a new device

does not qualify as "substantially equivalent" to an existing device unless and until

FDA "by order has found" it to be so. 21 U.S.C. § 360c(i)(1)(A); *see* 21 C.F.R.

§ 807.100(a)(5).

Once cleared by FDA, a device may not "be significantly changed or modified

in design, components, method of manufacture, or intended use" unless the

manufacturer obtains a new 510(k) substantial-equivalence determination from

---

[1]   Though not relevant here, "510(k)" also can refer to FDA's determination that a
new device is "substantially equivalent" to an unclassified pre-1976 device that is
awaiting classification. *See* 21 U.S.C. § 360c(f)(1).

FDA. 21 C.F.R. § 807.81(a)(3). "[C]hanges or modifications that require a [new] premarket notification" include "a significant change or modification in design, material, ... or manufacturing process" or any other "change or modification in the device that could significantly affect the safety or effectiveness of the device." *Id.*

## B.    The Prolift Pelvic Floor Repair System

### 1.    *Prolift's Development*

Pelvic organ prolapse is a serious medical condition afflicting millions of women. R. 384 at *97:2-5.[2] In severe cases, pelvic organs descend far into the vagina and even protrude through its opening, causing pain, loss of sexual function, and difficulty urinating or defecating. R. 390 at *510:8-511:15. Any form of prolapse can be "devastating" for a woman's quality of life. *Id.* at *511:14.

Doctors have long struggled to create a durable, low-risk treatment for prolapse. Historically, there were two surgical options: colporrhaphy and sacrocolpopexy. Colporrhaphy uses sutures and the patient's natural tissue to support the prolapsed organs. R. 390 at *511:24-512:7. This approach frequently fails: up to half of prolapses return, and patients often need several follow-up surgeries. R. 384 at *129:8-11; R. 390 at *512:8-19; Tr. 451:16-453:11. Sacrocolpopexy is an abdominal surgery that uses synthetic mesh for support. Tr. 317:5-12. This approach is more durable but also more dangerous. As of Kaiser's surgery, it required a large abdominal incision. Tr. 458:18-459:9. Both procedures

---

[2]    Pincites to deposition transcripts marked with an asterisk refer to internal transcript page-lines, rather than ECF pagination. All cited transcripts were in evidence at trial.

also carry other complication risks, including pelvic pain, pain during intercourse ("dyspareunia"), and urinary problems. Tr. 433:9-434:21, 438:20-440:25.

By the 1990s, pelvic-floor surgeons were seeking better treatment options—ideally one that was durable but did not require a large abdominal incision. Tr. 1144:8-1146:12; R. 390 at *512:8-513:15. Surgeons saw promise in synthetic mesh implanted through the vagina (or "transvaginally"). Tr. 1148:3-7. Some turned to an Ethicon product called Gynemesh PS—an uncut sheet of mesh composed of Prolene polypropylene, which is a material used for decades to make surgical sutures. Tr. 1151:4-1153:24. At first, surgeons developed their own approaches to implanting Gynemesh, manually cutting and shaping the mesh and devising various methods of attaching it inside the pelvis. Tr. 1175:23-1177:7; R. 383 at *536:14-537:15. These approaches were technically challenging, and the variation in surgeons' techniques made it difficult to systematically gauge their success. Tr. 1177:8-1178:8; R. 383 at *539:5-540:3.

Ethicon designed Prolift to make prolapse repair simpler and more consistent. The device came to market in 2005, consisting of pre-shaped pieces of Gynemesh, as well as inserter tools that facilitated placing the mesh through the vagina. Tr. 1175:2-22. Ethicon spent five years and tens of thousands of hours developing Prolift. Tr. 1131:23-1132:22. The design process started in 2000, when a team of nine preeminent pelvic-floor surgeons known as the "TVM group" began working alongside a team of Ethicon engineers. Tr. 1146:18-1147:14. For two-and-a-half years, the group met regularly to observe each other's surgeries, work in

9

cadaver labs, and discuss how to optimize the procedure. Tr. 1147:15-1150:3. The team unanimously chose Gynemesh as the best of several available meshes, R. 383 at *543:24-544:19, and decided that the mesh should be fixed in place using mesh "arms." Tr. 1150:4-1151:1.

The TVM surgeons and some 50 Ethicon employees then spent two more years and 20,000 hours creating the inserter tools and verifying the design's safety and efficacy. Tr. 1132:20-1133:3. Ethicon assembled more than 600 clinical data points from three studies. R. 390 at *522:7-15. Ethicon also relied on its years of experience with Gynemesh, data from multiple cadaver labs, input from outside consultants, and animal data. *Id.* at *515:2-517:6. As Ethicon's former medical director testified, the data gave "a very powerful indication that [Prolift] provided an alternative that was safe, efficacious, with low side effects, and therefore, produced a positive risk-benefit ratio that said the benefits far outweighed the risks." *Id.* at *556:6-12.

### 2. *Prolift's Warnings*

Pelvic-floor surgeons knew from their training, experience, professional education, and the medical literature that Prolift—like all pelvic-floor surgeries—posed risks of long-term pelvic pain, urinary problems, and dyspareunia. Tr. 433:9-434:21, 438:20-440:25. Ethicon supplemented this common knowledge with Prolift's instructions for use ("IFU"), a six-page document packaged with the device. R. 324-11. The IFU cautioned that "[u]sers should be familiar with ... techniques involving pelvic floor repair and nonabsorbable meshes," and that the "[p]otential adverse

10

reactions are those typically associated with surgically implantable materials." *Id.*
at 6. The IFU also described potential complications, including "infection
potentiation, inflammation, adhesion [and] fistula formation, erosion, extrusion,
and scarring that results in implant contraction." *Id.* While the IFU did not mention
dyspareunia expressly, its discussion of contraction, nerve damage, and erosion
were "synonymous" with dyspareunia in the eyes of trained surgeons. R. 390 at
*201:4-10; *see* R. 387 at *1320:22-1321:19; R. 391 at *966:16-968:24.

Ethicon also described Prolift's risks in its Surgeons' Resource Monograph, a
2007 document that the company distributed to pelvic-floor surgeons at its many
Prolift training events. Tr. 1431:4-1432:14. The Monograph specifically warned of
dyspareunia, mesh exposure, mesh erosion, and vaginal pain, and it summarized
then-available clinical data on the frequency of these complications. R. 415-3 at
9-12.

### 3.    FDA Clearance

In 2001, Ethicon submitted a 510(k) notification for Prolift's mesh
component, Gynemesh PS. FDA cleared that component in 2002 and classified it in
Class II, determining that Gynemesh was substantially equivalent to surgical mesh.
R. 378-21; R. 378-1 ¶¶ 32-33. In 1988, FDA had accepted a medical panel's
recommendation that all surgical mesh belonged in Class II because it had an
"established history of safe and effective use" and a "generally accepted satisfactory
level of tissue compatibility." 47 Fed. Reg. 2810, 2817 (Jan. 19, 1982); *see* 53 Fed.
Reg. 23856, 23858 (June 24, 1988); R. 378-1 ¶¶ 23-24.

Ethicon began marketing Prolift in 2005. Because Proflit's design used pre-cut pieces of Gynemesh—a mesh previously classified in Class II—and simply changed the implantation method, Ethicon did not believe that Prolift required a separate 510(k) notification. *See* 21 C.F.R. § 807.81(a)(3); R. 378-24 at 46. In 2007, however, after correspondence with FDA, Ethicon submitted a separate 510(k) notification for Prolift, and FDA cleared the device and classified it in Class II in 2008. R. 378-22; R. 378-23. In its notification, Ethicon described how Prolift paired pre-cut pieces of Gynemesh with a set of instruments to facilitate implantation. R. 378-22 at 37-41. The notification also described how the shape of the mesh and the insertion instruments were similar to those of two other prolapse-repair systems that FDA had previously cleared and classified in Class II. *Id.* Ethicon also submitted proposed IFU and provided clinical safety and effectiveness data gathered during Prolift's development. R. 378-22 at 67-74, 115-22. On May 15, 2008, FDA issued a letter clearing Prolift and classifying it in Class II based on its substantial equivalence to other lawfully marketed Class II devices. R. 378-23.

### 4.   *Post-Marketing Developments*

After launch, Prolift went on to be studied in more clinical trials than any other transvaginal mesh used in prolapse repair. Tr. 471:16-18. Many studies showed that the device provided a durable treatment that improved patients' quality of life. Tr. 471:5-473:16.

Ethicon also sought to improve the device. These efforts led to Prolift +M, a version of Prolift cleared by FDA in 2008 that used a mesh called Ultrapro, which is

partially absorbable into the body. Tr. 1169:2-15. While Ethicon officials hoped that Ultrapro would further reduce complications, research did not bear out that Prolift +M was meaningfully safer than Prolift. Tr. 1370:6-11; R. 392 at *158:9-159:7; R. 389 at *90:21-91:3.

In 2011, FDA convened an expert panel to advise on the safety and efficacy of transvaginal mesh. R. 378-24 at 57. Based on the panel's concerns, FDA ordered Ethicon and other mesh manufacturers to submit plans for conducting post-market studies on some of their products, including Prolift. *Id.*; R. 378-26. Ethicon submitted clinical data supporting a proposed plan for Prolift, but in April 2012 FDA found the proposal insufficient. R. 378-24 at 57-58; R. 378-27. Soon after, Ethicon informed FDA that it had decided to stop marketing Prolift and Prolift +M. R. 378-27. In 2016, FDA reclassified all mesh devices used for transvaginal prolapse repair in Class III. 81 Fed. Reg. 353, 359 (Jan. 5, 2016).

### C.    Pretrial Proceedings

On March 28, 2012, Plaintiffs sued Ethicon for injuries allegedly caused by Prolift, filing their action in the Southern District of West Virginia, where a multidistrict litigation had been established. R. 1; *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327 (S.D. W. Va.). The MDL court granted partial summary judgment to Ethicon, finding that the Indiana Product Liability Act ("IPLA") required consolidating Plaintiffs' various claims into a single claim that the product was unreasonably dangerous due to its design and warnings.

13

R. 156 at 5-6. The court also allowed Mr. Kaiser to maintain a derivative claim for loss of companionship. *Id.* at 6-7.

The MDL court then transferred the case to the Northern District of Indiana for trial under 28 U.S.C. § 1407(a). R. 157. The Indiana court resolved two remaining motions in limine. The court first excluded all evidence of Prolift's clearance through the 510(k) process on the concededly "counterintuitive" ground that the 510(k) process "does not speak to the safety of the device." A35; *see also* A3-A9 (oral ruling). The court also ruled that Indiana law did not require Plaintiffs to prove a safer alternative design to establish that Prolift's design was defective, even though this Court has repeatedly held otherwise. A20-A23.

### D.     Evidence Presented at Trial

#### 1.     Mrs. Kaiser's Prolapse and Surgery

The trial testimony established that Mrs. Kaiser had a history of medical issues before her Prolift surgery, including colitis, urinary problems, and a vaginal lesion. Tr. 585:1-589:7. By 2009, at age 60, she had developed a severe anterior prolapse—her bladder protruded through the opening of her vagina. Tr. 590:17-591:19. Her gynecologist referred her to pelvic-floor surgeon Dr. Gregory Bales. Tr. 590:19-20. After discussing her options with Bales, Kaiser had Prolift implanted in January 2009. R. 384 at *85:6-8. The device fixed her prolapse, which has never recurred. Tr. 1596:8-14, 1602:5-9.

Dr. Bales testified that before Kaiser's surgery, he had implanted some 100 Prolifts and had also used other transvaginal mesh. R. 395 at 115-16 [*11:23-13:04];

R. 384 at *93:24-94:8. Consistent with his extensive experience, Bales testified that as of Kaiser's surgery, he was well aware of Prolift's risks. It "was no secret" to him that Prolift's mesh, like any surgical mesh, could contract inside the body. R. 384 at *116:7-8. He knew that the device could cause long-term pelvic pain, dyspareunia, nerve damage, inflammation, infection, organ injury, erosion, and scarring. *Id.* at *118:2-21. He also knew that complications might necessitate removing the mesh. *Id.* at *149:23-150:3. He "always kept up with the medical literature" on products he used and was familiar with Prolift's Monograph. *Id.* at *113:17-132:14.

Bales conferred with Kaiser about all of Prolift's risks. *Id.* at *133:22-138:16. Knowing those risks, he recommended Prolift over other options because of its durability compared with native-tissue repair and because of its short recovery period relative to sacrocolpopexy. *Id.* at *129:22-132:14.

When pressed about whether additional information about Prolift's risks would have affected his recommendation, Bales equivocated: "I think that's a difficult question to answer. My sense is that had I had all the subsequent information about how some patients fared and how some complications occurred, it's probably safe to say that I may not have started using the Prolift." R. 395 at 119 [*22:10-15]. He later clarified, however, that "looking back" there was nothing that he "would have done differently with respect to Mrs. Kaiser's January 2009 surgery." R. 384 at *85:6-10. His subsequent decision to stop using Prolift was driven by the "medicolegal climate" surrounding transvaginal mesh; he "felt … more comfortable going back to my native tissue repairs and abdominal sacrocolpopexies,

15

understanding that … virtually the same complication risks … can still occur." *Id.* at *184:1-21

### 2.    *Mrs. Kaiser's Post-Surgery Medical History*

The trial testimony established that Kaiser's Prolift surgery was successful and that she reported no pain until more than two years afterward. In her follow-up with Bales two months after surgery, she reported feeling "great," with no urinary difficulty or pain. Tr. 610:21-24. Kaiser also saw several doctors in 2010 but reported no such symptoms. Tr. 1444:13-24.

In early 2011, Kaiser was in a car accident. Tr. 636:8-12. The next year, she began reporting abdominal pain, difficulty defecating, bladder leakage, and dyspareunia. R. 386 at *35:16-18, *38:11-41:18, *45:20-22. She did not report any serious pelvic pain. *Id.* at *43:17-44:8. She saw several doctors about these symptoms, several of whom diagnosed her with vaginal atrophy—a common post-menopausal condition that can cause burning, dryness, and dyspareunia. *Id.* at *47:21-49:4; Tr. 1459:23-1460:18. Three separate doctors prescribed estrogen—the "gold standard" treatment for atrophy. Tr. 1454:24-1455:13. Several doctors also diagnosed Kaiser with weak pelvic muscles, which frequently cause pelvic pain, and instructed her to perform regular physical therapy to strengthen those muscles. R. 386 at *69:2-74:1. But Kaiser did not use the prescribed estrogen, and tried the recommended exercises only a few times before abandoning them. Tr. 1455:14-17, 1466:8-16.

16

Throughout this period, most of Kaiser's doctors advised against surgery to remove the implanted mesh. R. 386 at *74:7-74:24. Another pelvic surgeon who examined Kaiser in October 2013, for example, told her that her symptoms likely were *not* caused by the mesh. *Id.* at *74:7-75:16, *89:13-90:10. A few weeks later, however, Kaiser saw yet another surgeon, who recommended surgery to excise the mesh. *Id.* at *94:24-96:17. Following that surgery, Kaiser continued to report pain. R. 395 at 58 [*31:17-32:02], 61 [*46:16-21].

### 3.     *Prolift's Purported Risks*

Plaintiffs' experts asserted that Prolift could cause pelvic pain, dyspareunia, and urinary problems. Their basic theory was that tissue surrounding the mesh could scar and contract, trapping nerves in the scar tissue and causing long-term pain. Tr. 658:13-659:7.

The experts disagreed, however, about which aspects of Prolift's FDA-cleared design caused these problems. They variously asserted that its shape (a precut piece of mesh with arms), its mesh material (which they characterized as insufficiently porous), its insertion method (using instruments to place the mesh through the vagina), or perhaps some combination of the three made Prolift's mesh stiffen after implantation, making contraction more likely. Tr. 334:19-337:16, 658:13-659:7. They also focused on the supposed lack of clinical testing before Prolift's release. Tr. 387:20-388:4. But no witness explained how Ethicon could have designed Prolift to avoid these risks while maintaining its effectiveness. And Plaintiffs' experts acknowledged that scarring and contraction occur any time foreign material is

implanted, including through sacrocolpopexy, which is frequently performed to this day. *E.g.*, Tr. 316:17-21, 433:9-11, 441:22-445:3.

Plaintiffs also suggested—mainly through cherry-picked internal emails— that Prolift was rushed to market and that the design team ignored known risks. *E.g.*, Tr. 382:9-386:7. Because of the court's pretrial ruling, Ethicon could not respond to this charge using evidence of Prolift's compliance with FDA requirements. Plaintiffs' experts also opined that Prolift's IFU inadequately warned of its dangers because, while it listed all the relevant complications, it did not warn doctors in enough detail about their frequency or severity. Tr. 607:11-608:11, 609:16-24.

### E.    Verdict and Post-Trial Proceedings

Ethicon moved for judgment as a matter of law during and after trial. R. 369; R. 380; R. 415. Ethicon argued that Plaintiffs' design-defect claim was preempted and that Plaintiffs failed to introduce evidence of a safer alternative design or that Prolift was unreasonably dangerous. R.381 at 17-23. Ethicon also argued that Prolift's warnings were adequate as a matter of law and that there was no evidence that a different warning would have changed Dr. Bales's recommendation. *Id.* at 8-17. Ethicon also contended that the record did not support Plaintiffs' claim for punitive damages. *Id.* at 2-8.

At the charge conference, Ethicon requested a jury instruction on Indiana's statutory presumption that a product is not defective and a manufacturer is not negligent if the product "was in conformity with the generally recognized state of

the art applicable to the safety of the product." Ind. Code § 34-20-5-1; *see*

Tr. 1626:11-1629:7. The court declined, citing insufficient evidence that Prolift was

state of the art. A28.

The jury returned a verdict for Plaintiffs based on both defective design and

inadequate warnings, awarding $10 million in compensatory damages and $25

million in punitive damages. Tr. 1765:1-24. The jury found for Ethicon on Mr.

Kaiser's consortium claim. Tr. 1765:19-20. After the verdict, Ethicon renewed its

motion for judgment as a matter of law and, in the alternative, sought a new trial or

remittitur of compensatory and punitive damages. R. 415; R. 416.

The court denied Ethicon's motions for judgment, a new trial, and remittitur

of compensatory damages. A83. But the court found the $25 million punitive-

damage award "excessive and unreasonable" and remitted it to $10 million—a 1:1

compensatory-to-punitives ratio. A40, A81. Plaintiffs accepted the remittitur,

R. 424, and the court entered final judgment, A84-A85. Ethicon timely appealed.

R. 428.

## SUMMARY OF ARGUMENT

The verdict in this case cannot stand for three overarching reasons.

*First*, Plaintiffs' design-defect and failure-to-warn claims fail as a matter of

law. The design-defect claim is preempted because it creates an actual conflict with

federal law, which prohibited Ethicon from redesigning Prolift without first

obtaining FDA clearance. Preemption aside, this Court has repeatedly held that

Indiana law requires evidence of a cost-effective, safer alternative design. Yet

19

Plaintiffs introduced no evidence of any alternative design for the device that would have prevented Kaiser's injuries, let alone one that was cost-justified. Plaintiffs also failed to present evidence that Prolift posed dangers not commonly understood by pelvic-floor surgeons, precluding the necessary finding that the device was "unreasonably dangerous."

Plaintiffs' failure-to-warn claim also fails. Even had Plaintiffs introduced evidence that Prolift was unreasonably dangerous, the record conclusively established that Ethicon warned Dr. Bales of any latent risks. Plaintiffs also failed to establish causation: no evidence showed that different warnings would have changed Bales's decision to recommend Prolift.

*Second*, even were Ethicon not entitled to judgment, it is certainly entitled to a new trial. The district court excluded all evidence of Ethicon's compliance with FDA's 510(k) process, which would have foreclosed any finding of negligence. The court also refused to instruct the jury on two plainly applicable Indiana presumptions, whereby a manufacturer is presumed not negligent if its product complied with federal safety regulations or is "state of the art." Individually, these errors prejudiced Ethicon's defense; together, they doomed it.

*Third*, at the very least, Ethicon is entitled to relief from the damages award. Applicable New Jersey law categorically bars punitive damages in cases involving devices, like Prolift, that FDA has recognized as safe and effective. Regardless, an award of punitive damages requires clear and convincing evidence of wrongdoing.

20

Plaintiffs did not and could not meet that standard. The $10 million compensatory award also is grossly disproportionate to Plaintiffs' modest, non-economic injuries.

## STANDARD OF REVIEW

This Court reviews *de novo* the denial of a motion for judgment as a matter of law. *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). The Court reviews the denial of a motion for a new trial and the refusal to remit damages for abuse of discretion. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440, 446-47 (7th Cir. 2010).

## ARGUMENT

### I.     Ethicon is Entitled to Judgment as a Matter of Law

### A.     Plaintiffs' Design-Defect Claim Fails as a Matter of Law

The design-defect verdict cannot stand for three independent reasons. *First,* the claim is preempted because federal law prohibited Ethicon from unilaterally redesigning Prolift in the way Indiana law purportedly requires. *Second*, Plaintiffs failed to prove the existence of a cost-justified safer design, or indeed any safer design at all. *Third*, Plaintiffs failed to prove that Prolift was unreasonably dangerous.

#### 1.     Plaintiffs' Design-Defect Claim Is Preempted

State law is preempted to the extent it "directly conflict[s]" with federal law, including where there is an "an actual conflict between state and federal law such that it is impossible for a person to obey both." *Guilbeau v. Pfizer Inc.*, 880 F.3d 304, 310 (7th Cir. 2018) (quotation marks omitted). The critical question for impossibility preemption is "whether the private party could *independently* do under federal law

what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (emphasis added). "Independently," the Supreme Court has made clear, means "unilaterally." *Id.* "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24.

These principles arise often in pharmaceutical cases. The Supreme Court has held, for example, that state-law failure-to-warn claims against generic drug manufacturers are preempted by FDA regulations prohibiting generic drug manufacturers from unilaterally changing their labeling. *Id.*; *see Guilbeau*, 880 F.3d at 317-18. Failure-to-warn claims against brand-name manufacturers are preempted as well where the federal requirements for a unilateral labeling change are unmet. *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 815 (7th Cir. 2018). The Supreme Court also has held that design-defect claims against generic manufacturers are preempted because "federal laws … prohibit manufacturers from unilaterally altering drug composition." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 490 (2013). The same goes for design-defect claims against brand manufacturers, because there too, "the ultimate availability to [patients] is contingent upon whether the FDA would approve the alternative design in the first place." *Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 299 (6th Cir. 2015). In each case, federal law forbade manufacturers from doing unilaterally what plaintiffs claimed state law required.

It is no answer that manufacturers can unilaterally comply with state and federal law simply by "choosing not to make [the product in question] at all." *Bartlett*, 570 U.S. at 488 (quotation marks and brackets omitted). "[I]f the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless." *Id.* (quotation marks omitted). The Supreme Court therefore has "reject[ed] this 'stop-selling' rationale as incompatible with [its] pre-emption jurisprudence." *Id.*

Under these principles, Plaintiffs' design-defect claim is preempted. Plaintiffs never specified how they believe Ethicon should have changed Prolift to satisfy Indiana law. Instead, Plaintiffs argued throughout trial that Ethicon should never have sold Prolift in any form. Plaintiffs' lead expert opined that *all* transvaginal mesh is inherently unsafe. Tr. 316:2-5, 317:14-20, 364:23-365:8. Plaintiffs told the jury that they would not "stand behind any plastic product going into a woman's pelvis." Tr. 224:15-16. And Plaintiffs' consistent refrain was that Ethicon "put[] out a product that had no clinical studies on it." Tr. 1659:20-21; *see also* Tr. 1649:12-17. This is precisely the kind of "stop-selling" theory that *Bartlett* categorically rejected. 570 U.S. at 488.

At times, Plaintiffs also suggested that Ethicon should have made unspecified changes to Prolift's shape or material. Plaintiffs' experts vaguely asserted that Prolift's mesh was insufficiently porous and that its arms caused the mesh to deform. *E.g.*, Tr. 336:18-337:1, 658:13-659:7. But Plaintiffs never explained how any alternative design would have avoided Kaiser's injuries. More importantly,

Plaintiffs never suggested that FDA had cleared any alternative design that would satisfy Indiana law. To the contrary, Plaintiffs' experts made clear that the only FDA-cleared alternative meshes discussed at trial—uncut Gynemesh or Ultrapro— would *not* satisfy Indiana law. Tr. 658:23-659:7 (Gynemesh causes "intense" and "chronic" inflammation); Tr. 466:13-19 (Ultrapro "wasn't safe"); R. 389 at *90:21- 91:3 (Ultrapro not safer than Gynemesh). Indeed, Plaintiffs' consolidated MDL complaint expressly alleges that *every* transvaginal mesh product ever cleared by FDA—including Gynemesh, Prolift, and Prolift +M—is dangerous and defective. R. 211 ¶¶ 18, 91, 116.

Plaintiffs' alternative-design theory thus fares no better than their stop- selling theory. FDA cleared Prolift as used in Kaiser's surgery in 2008. R. 378-23. FDA regulations therefore prohibited Ethicon from "significantly chang[ing] or modif[ying]" Prolift in its "design, components, [or] method of manufacture"— including making any "change or modification in the device that could significantly affect [its] safety or effectiveness"—without first submitting a new 510(k) notification. 21 C.F.R. § 807.81(a)(3). FDA regulations also barred Ethicon from "market[ing] the device" unless and "[u]ntil [Ethicon] receive[d] an order declaring [the] device substantially equivalent." § 807.100(a)(5); *see also* 21 U.S.C. § 360c(i)(1)(A). Simply put, had Ethicon unilaterally changed Prolift's shape and material—as Plaintiffs claim Indiana law required—without first obtaining FDA clearance, Ethicon would have violated federal law.

*Lohr*, on which the district court relied, A55-A56, is not to the contrary. The Supreme Court there held that the MDA's express-preemption clause did not encompass claims that a manufacturer defectively designed a Class III pacemaker that FDA cleared in 1982 as substantially equivalent to a grandfathered, pre-1976 predicate. *Id.* at 492-94. *Lohr* found "no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo," including "the possibility that the manufacturer … would have to defend itself against state-law claims of negligent design." A55-A56 (quoting *Lohr*, 518 U.S. at 494). While that observation may have shed light on the MDA's express-preemption clause, the inquiry for impossibility preemption is different. Again, courts evaluating impossibility preemption have one task: "identify[] the state tort duties and federal … requirements" and determine "whether the private party could independently do under federal law what state law requires of it," "without the Federal Government's special permission and assistance." *Mensing*, 564 U.S. at 611, 620, 623-24.

Moreover, *Lohr* addressed the pre-1990 statutory scheme, which Congress revamped in the SMDA. Before the SMDA, manufacturers could sell new devices if they in fact *were* substantially equivalent to an existing device, regardless of whether FDA had made that determination before launch. 21 U.S.C. §§ 360c(f)(1)(A), 360e(b)(1) (1988). Under the statutory scheme at issue in *Lohr*, therefore, federal law permitted manufacturers to unilaterally redesign their devices to comply with state law. Today, that is not the case; manufacturers now

must obtain FDA clearance *before* selling a new device as substantially equivalent to an existing device. 21 U.S.C. § 360c(i)(1)(A); 21 C.F.R. § 807.100(a)(5). Whatever Congress may have intended when enacting the MDA in 1976, the present-day pre-clearance requirement makes it impossible for manufacturers to significantly redesign their devices without obtaining FDA's permission first.

The district court skirted these principles on the ground that the Supreme Court announced them in "generic drug labeling cases." A56. But the Supreme Court articulated and relied on general preemption principles. As this Court has recognized, *Mensing* and *Bartlett* "turn[] what could otherwise be a complex impossibility analysis into a 'straightforward application of pre-emption law.'" *Guilbeau*, 880 F.3d at 311 (quoting *Bartlett*, 570 U.S. at 493). Nor does it matter that "Federal law specifically mandates the contents of the labels on generic drugs," which manufacturers "cannot get around." A56. The dispositive fact in *Mensing* and *Bartlett* was that federal law prohibits generic manufacturers from changing their labels "unilaterally." *Mensing*, 564 U.S. at 620 (quotation marks omitted); *Bartlett*, 570 U.S. at 490. Manufacturers' inability to comply with state law without prior FDA permission also was dispositive in the other pharmaceutical cases cited above. *Supra* p. 22. That fact is dispositive here too.

The district court believed that recognizing preemption here "would destroy state tort liability for any product subject to even the least rigorous federal regulatory scheme." A56-A57 (quotation marks omitted). Not so. As the court itself recognized, preemption here protects devices only from "design defect liability," and

26

even then, only "if the safer alternative design was not already pre-cleared by the FDA." A56. That result strikes a sensible balance. States are free to impose liability on device manufacturers based on inadequate warnings or a failure to adopt alternative designs that FDA has cleared. But states are not free to force manufacturers to stop selling FDA-cleared designs altogether or to adopt new designs that, under federal law, they cannot lawfully sell.

### 2. Plaintiffs Failed To Introduce Evidence of a Safer Alternative Design

Not only did federal law bar Ethicon from unilaterally adopting a safer alternative design—Plaintiffs failed to prove that a feasible safer design even existed. That failure forecloses the necessary showing that Prolift was "in a defective condition." Ind. Code § 34-20-2-1.

This Court has repeatedly held that, "[t]o demonstrate a design defect under Indiana law, the plaintiff must compare the costs and benefits of alternative designs and show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 488 (7th Cir. 2018) (quotation marks omitted). This Court thus upheld summary judgment for a goalpost manufacturer because the plaintiff did "not provide a basis on which a finder of fact could evaluate the frequency of injuries caused by goalposts, or calculate the extent to which risk would actually be reduced by the alternative designs, or justify the cost of those alternatives relative to the benefits of aluminum posts." *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 638 (7th Cir. 2006). This Court also upheld summary judgment for a popcorn

27

manufacturer because the plaintiffs "did not provide evidence of an alternative, cost-effective butter flavoring design that would have prevented [lung disease]." *Aregood*, 904 F.3d at 489; *see also McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657 (7th Cir. 1998) (affirming summary judgment on claim that pot made coffee too hot).

In each of these cases, experts asserted that the manufacturer could have made safer versions of the products: a goalpost that did not snap when torn down, 452 F.3d at 634; a flavoring without an agent known to cause lung disease, 904 F.3d at 488; or a pot that kept coffee cooler, 150 F.3d at 658. But in each case, judgment for the manufacturer was proper. That is because even assuming that these designs would have actually been safer, no evidence suggested that the safety improvements were "less expensive than the net costs of accidents." *McMahon*, 150 F.3d at 657. And without evidence of all relevant costs and benefits of an alternative design for the product, any finding of negligence rested on "mere speculation." *Bourne*, 452 F.3d at 639.

Plaintiffs' claim here has "the same fatal flaw." *Id.* at 638. Plaintiffs introduced no evidence of any safer alternative design at all, let alone its costs and benefits. No witness "calculate[d] the extent to which risk would actually be reduced by the alternative designs, or justif[ied] the cost of those alternatives relative to the benefits of [the current design]." *Id.*

Instead, Plaintiffs offered inconsistent, speculative theories of how Prolift was unsafe. Their experts variously asserted that Prolift's mesh was insufficiently

porous, that its arms caused the shape of the mesh to deform, that all transvaginal mesh was inherently dangerous, and that Prolift was not adequately tested. *E.g.*, Tr. 336:18-337:1, 364:23-365:8, 387:20-388:4, 658:13-659:7. These are exactly the sorts of "bottom line," "conclusory" assertions of defectiveness—devoid of cost-benefit analysis—that this Court has repeatedly held insufficient. *Aregood*, 904 F.3d at 488-89.

The trial record references only three theoretical alternative mesh designs: uncut Gynemesh, Ultrapro, and a category of meshes made out of polyvinylidene fluoride ("PVDF"). This testimony amounted to nothing. No witness suggested uncut Gynemesh is safer than Prolift. Dr. Daniel Elliott, Plaintiffs' main expert, did vaguely assert that Ultrapro, the mesh used in Prolift +M, was "theoretically … safer" than Gynemesh. Tr. 371:5-7. But he emphasized that he did not believe Ultrapro was *safe*. Tr. 466:13-19. Another of Plaintiffs' experts, Dr. Uwe Klinge, stated that Ultrapro was *not* safer than Gynemesh. R. 389 at *90:21-91:3. And while Klinge cited a study suggesting that one type of PVDF mesh caused better tissue reaction than polypropylene meshes, he admitted that no PVDF meshes were available for sale in the United States at the time of Kaiser's surgery. *Id.* at *188:16-189:1. Moreover, neither witness acknowledged that the TVM group decided against partially absorbable mesh (like PVDF mesh or Ultrapro) because it is insufficiently durable. Tr. 1154:2-12, 1163:4-1164:12.

The "mere existence of a safer product," moreover, "is not sufficient to establish liability." *Bourne*, 452 F.3d at 638. Plaintiffs needed proof that an

alternative design "would have prevented [Plaintiffs'] injuries"—and at a justified cost. *Aregood*, 904 F.3d at 489. The record contains no such evidence.

The district court reasoned that the Indiana Supreme Court in *TRW Vehicle Safety Systems, Inc. v. Moore*, 936 N.E.2d 201 (Ind. 2010), jettisoned any requirement to establish a cost-effective alternative design. A19-A20. *TRW* did no such thing. To the contrary, *TRW* relied on evidence of safer alternative designs, which were "used in other [products]" and were "technologically and economically feasible." 936 N.E.2d at 209-10. In a footnote, the court did reject the rigid approach of the Restatement (Third) of Torts, which makes an alternative design a formal "sub-element[]" of the standard of care for design-defect claims. *Id.* at 209 n.2. The court explained that the IPLA "did not adopt this analytical framework" and instead imposed "a negligence standard." *Id.* That approach is fully consistent with this Court's holdings, which have rooted the alternative-design requirement *in the negligence standard*. *E.g.*, *Bourne*, 452 F.3d at 637-39.

Moreover, this Court has repeatedly reaffirmed the alternative-design requirement in cases post-dating *TRW*. *Aregood*, 904 F.3d at 488; *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015). This Court has even cited *TRW* for the principle that "Indiana design defect law requires" plaintiffs to "demonstrat[e] a reasonable alternative design." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 816 (7th Cir. 2012). Under binding precedent, Plaintiffs failed to introduce evidence necessary to support their claim.

### 3.    Plaintiffs Failed To Prove that Prolift was Unreasonably Dangerous

Plaintiffs' design-defect claim independently fails because they did not show that Prolift was "unreasonably dangerous." Ind. Code § 34-20-4-1(2). "A product may be dangerous in the ordinary sense but not 'unreasonably dangerous' … under the IPLA." *Baker v. Heye-Am.*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003). An unreasonably dangerous product poses risks "beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." Ind. Code § 34-6-2-146.

Because this case involves a device used only by pelvic-floor surgeons, the district court properly instructed the jury that those surgeons are the relevant "community of consumers." Tr. 1744:20-25; A44. Plaintiffs thus needed to show that Prolift posed risks beyond those contemplated by ordinary pelvic-floor surgeons, taking into account their "reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior." *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 440 (Ind. 1990); *see Phelps v. Sherwood Med. Indus.*, 836 F.2d 296, 302 (7th Cir. 1987). Plaintiffs failed to do so.

Quite the contrary, Dr. Bales and several of Plaintiffs' own experts testified that all of Prolift's risks were universally understood by surgeons who used Prolift. Bales described it as "no secret" that Prolift's mesh could contract inside the body, just like any surgical mesh. R. 384 at *115:22-116:8. He knew that using Prolift could cause long-term pelvic pain, pain with intercourse, nerve damage,

31

inflammation, infection, injury to other organs, and scarring, *id.* at \*118:11-21, \*133:22-138:16, and understood that the mesh might need to be removed, *id.* at \*149:23-150:3. Dr. Elliott acknowledged that the risks of chronic pain, dyspareunia, urinary problems, inflammation, and contraction were known or reported in the literature before Kaiser's surgery. Tr. 438:7-445:18. Plaintiffs' pathology expert testified that pre-2005 medical literature recognized that implanting surgical mesh can cause inflammation and scarring, and that scar contraction around mesh can cause chronic pain. Tr. 857:1-858:6, 870:18-24.

In concluding that a reasonable jury could find that pelvic-floor surgeons "were not fully apprised of every risk associated with Prolift," the district court relied on two strands of testimony, A51, neither of which remotely shows that Prolift was unreasonably dangerous. First was Dr. Bales's statement that "we didn't—none of the surgeons originally implanting the Prolift probably were quite as appraised of all the possible risks." R. 395 at 119 [\*22:16-19]. But the trial testimony made clear that, at the time of Kaiser's surgery, Bales and other pelvic-floor surgeons were aware of the *possibility* of all relevant risks, if perhaps not their precise likelihood or severity. R. 384 at \*115:22-116:8, \*118:11-21, \*133:22-138:16; Tr. 438:7-445:18. And it is well established that "a user's knowledge of a general risk precludes recovery even if he did not know the extent or specific degree of that risk." *Bourne*, 452 F.3d at 636. In the goalpost case, for example, "[w]hether or not [the victim] knew the post could suddenly 'snap' and paralyze him, he should have known that it could fall and seriously injure him." *Id.* Likewise, "a family whose

32

child was killed by a BB gun could not prevail on the theory that, although they knew when they bought the gun that it could seriously injure him, they did not know it could kill." *Id.* (discussing *Moss v. Crosman Corp.*, 136 F.3d 1169, 1173-76 (7th Cir. 1998)). In order to be unreasonably dangerous, a product must "place users at risk of injuries *different in kind* from those that an average consumer might anticipate." *Moss*, 136 F.3d at 1175 (emphasis added). That principle forecloses liability here: pelvic-floor surgeons knew that Prolift, like all surgical mesh, sometimes scarred and contracted, causing long-term pelvic pain, dyspareunia, and urinary problems.

Second, the court cited Dr. Elliott's assertion that "whatever was known in the medical literature before 2009" was irrelevant because "not every doctor has access to the literature." Tr. 610:3-8; *see* A51. But the question is not whether *every* pelvic-floor surgeon comprehended Prolift's risks; it is whether *ordinary* pelvic-floor surgeons did. Ind. Code § 34-6-2-146. There was no dispute on this question. Elliott admitted that doctors generally "learn about risks and complications" from "multiple different sources," including "their own experience," "surgical guides or monographs," and "the medical literature." Tr. 436:18-437:8. Bales himself testified that he has "always kept up with the medical literature on the products [he's] using." R. 384 at *114:16-17; *see id.* at *114:13-115:14. Because the record compels the conclusion that Prolift was not unreasonably dangerous, Ethicon is entitled to judgment.

33

### B.    Plaintiffs' Failure-to-Warn Claim Fails as a Matter of Law

Ethicon also is entitled to judgment on Plaintiffs' failure-to-warn claim for three independent reasons. *First*, as explained, Plaintiffs did not show that Prolift was unreasonably dangerous. *Second*, Ethicon's warnings were adequate as a matter of law. *Third*, Plaintiffs did not show that Prolift's warnings caused Kaiser's injuries.

#### 1.    Plaintiffs Failed to Show that Prolift Was Unreasonably Dangerous

As explained with respect to Plaintiffs' design-defect claim, Plaintiffs failed to establish that Prolift was "unreasonably dangerous"—*i.e.*, that it posed risks beyond those contemplated by ordinary pelvic-floor surgeons. *Supra* Section I.A.3. Plaintiffs' failure-to-warn claim also required proof that Prolift was unreasonably dangerous. Ind. Code §§ 34-6-2-146, 34-4-2-1; *see Deaton v. Robison*, 878 N.E.2d 499, 501 (Ind. Ct. App. 2007). That claim thus fails for the same reasons as the design-defect claim.

#### 2.    Prolift's Warnings Were Adequate

Even if Prolift posed risks not commonly known to pelvic-floor surgeons, Ethicon filled that gap by warning surgeons of any unknown risks. Plaintiffs thus cannot make the necessary showing that Ethicon failed to give "reasonable warnings of danger about the product." Ind. Code § 34-20-4-2; *see York v. Union Carbide Corp.*, 586 N.E.2d 861, 872 (Ind. Ct. App. 1992).

Prolift's IFU instructed that "[u]sers should be familiar with surgical procedures and techniques involving pelvic floor repair and nonabsorbable meshes

before employing" Prolift. R. 415-2 at 3. The IFU warned about all potential complications that allegedly caused Kaiser's injuries, including "inflammation, adhesion [and] fistula formation … and scarring that results in implant contraction." *Id.* While the IFU did not expressly mention dyspareunia, its warnings about contraction, nerve damage, and erosion were "synonymous" with dyspareunia in the eyes of trained surgeons, R. 390 at *201:4-10, and Bales admitted that he knew Prolift could cause "[l]ong-term pain with intercourse," *i.e.*, dyspareunia. R. 384 at *134:10-11. Moreover, the Surgeons' Resource Monograph—which Bales was familiar with—specifically warned about the possibility of dyspareunia and vaginal pain. R. 415-3 at 9-11; *see* R. 384 at *113:17-115:14. The Monograph even summarized clinical data on the frequency of complications. R. 415-3 at 10-12.

Indeed, Plaintiffs effectively conceded in post-trial briefing that Ethicon warned Bales about the *possibility* of all relevant risks; they argued only that the company understated the *magnitude* of those risks. R. 421 at 3-4. The district court adopted this theory, ruling that the jury could find Prolift's warnings inadequate because the IFU insufficiently detailed the "frequency, severity and permanence of certain complications." A47.

That ruling was wrong on two levels. First, the court ignored the Monograph's particularized discussion about Prolift's risks and its data on the frequency of complications. R. 415-3 at 9-12. The Monograph explained that "early data" indicated that the incidence of dyspareunia "may be as high as 6-9%." R. 415-3 at 11; *see also id.* at 12 (summarizing studies on incidence of complications).

Because Bales was undisputedly familiar with the Monograph, Indiana law considers that document just as much a part of Prolift's warnings as the IFU. *See First Nat. Bank & Trust Corp. v. Am. Eurocopter Corp.*, 378 F.3d 682, 692 (7th Cir. 2004) (holding that helicopter manufacturer satisfied duty to warn pilots in light of "safety manuals" and other "information of the product's dangers … available in the public domain").

Second, the district court imposed too stringent a duty to warn. Ethicon's duty was "to warn of the hidden danger itself or the risks in a recognized danger that far exceed that contemplated by the ordinary consumer, not to educate the user as to the particular degree of harm that a known danger could inflict." *Id.* at 690. This Court thus has held, for example, that because consumers understand generally that coffee causes burns, a coffee maker need not provide "a detailed warning about the *severity* of burns that hot liquids can cause" or about "the *probability* that any given spill will produce a severe (as opposed to a mild or average) burn." *McMahon*, 150 F.3d at 656 (second emphasis added). That rule makes sense. Otherwise, a manufacturer could *never* establish the adequacy of its warning, since "[i]nsistence on more detail can make any warning, however elaborate, seem inadequate." *Id.* Here, because Ethicon warned Dr. Bales that the device could cause pelvic pain, scarring, contraction, and dyspareunia, its warnings were adequate as a matter of law.

36

### 3.   Plaintiffs Failed To Establish that Prolift's Warnings Caused Kaiser's Injuries

To prevail on their failure-to-warn claim, Plaintiffs also needed to prove that more robust warnings would have prevented Dr. Bales from recommending or implanting Prolift. *See Kovach v. Caligor Midwest*, 913 N.E.2d 193, 199 (Ind. 2009). But Bales testified that "looking back," there was nothing that he "would have done differently with respect to Ms. Kaiser's January 2009 surgery." R. 384 at *85:6-10. That testimony warrants judgment for Ethicon.

The district court disagreed, citing other testimony from Bales that it viewed as "clinching" the causation question. A46. When asked whether he would have "wanted to use Prolift" if told about certain risks, Bales responded: "I think that's a difficult question to answer. My sense is that had I had all the subsequent information about how some patients fared and how some complications occurred, it's probably safe to say that I may not have started using the Prolift." R. 395 at 119 [*22:07-15].

But Bales later "clarif[ied]" that the "subsequent information" that influenced him was *not*, as the court suggested, information about previously unknown risks. R. 384 at 184:1-3. Bales continued to believe Prolift was as safe as other options for prolapse repair. It was the "medicolegal climate"—the wave of transvaginal-mesh lawsuits—that counseled against its continued use. *Id.* at 184:14-15. When asked why he was "no longer assuming the risks related to Prolift," Bales explained:

I think over time we were seeing that some of the … risks to mesh use in general, not just the Prolift, but all the vaginal mesh products, there's a subset of complications that are difficult to deal with. In my personal experience, *it's been a very small number of patients*. … But I think in this medicolegal climate and stuff a lot of people are voicing concerns. I just felt for the purposes of my practice, I was more comfortable going back to my native tissue repairs and abdominal sacrocolpopexies, *understanding that … virtually the same complication risks*, except for the extrusion and the erosion, *can still occur*.

*Id.* at *183:23-184:21 (emphasis added); *see* R. 388 at *80:24-81:3 (surgeon who removed mesh explaining that Kaiser experienced no extrusion or erosion). "[T]he environment of prolapse surgery," Bales added, had been "poisoned in some way to … some of these [mesh] products." R. 384 at *185:6-12.

None of this testimony suggests that different warnings would have dissuaded Bales from using Prolift in 2009. Bales made clear that he stopped using Prolift because he ultimately determined that its risks, including litigation risks, outweighed its benefits. And as the MDL court here has held, "[e]vidence that the doctor later decided to use a different product *due to his own risk evaluation* is not sufficient" to establish causation in a failure-to-warn claim. *Lankston v. Ethicon, Inc.*, 2016 WL 5843723, at *4 (S.D. W. Va. Oct. 4, 2016) (emphasis added). The doctor must instead "testify that he would have changed his mind with adequate warning." *Id.* Dr. Bales did not do so. Ethicon is entitled to judgment on Plaintiffs' failure-to-warn claim.

## II.     Ethicon is Entitled to a New Trial

Even if Plaintiffs' claims did not fail outright, Ethicon at a minimum is entitled to a new trial on both claims. The district court improperly excluded all

evidence that FDA cleared Prolift through the 510(k) process, which would have been a centerpiece of Ethicon's defense. The court also refused to instruct the jury on two plainly applicable presumptions under the IPLA. Each of these errors warrants a new trial because each had a "significant chance" of "affect[ing] the outcome." *Collins v. Kibort*, 143 F.3d 331, 339 (7th Cir. 1998). "Collectively," they "presented the jury such a skewed picture that the verdict is unreliable and must be set aside." *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993).

## A.    Ethicon Was Entitled To Present Evidence of its Compliance with FDA's Regulatory Process

Under Federal Rules of Evidence 401 and 402, evidence is relevant and generally admissible if the evidence "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Here, 510(k) clearance is how FDA classified Prolift as a Class II device—that is, a device for which "special controls" are sufficient "to provide reasonable assurance of the safety and effectiveness of the device" and to avoid any "potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(B), (C)(ii)(II). FDA made that classification by finding that Prolift was "substantially equivalent" to an existing Class II device. § 360c(f)(1)(A)(ii); R. 378-23.

The fact that an expert federal regulatory agency had "reasonable assurance of [Prolift's] safety and effectiveness," 21 U.S.C. § 360c(a)(1)(B), is not just relevant to Plaintiffs' claims; it vitiates them. Both design-defect and failure-to-warn claims "are to be decided using a negligence standard," *Campbell Hausfeld / Scott Fetzer*

39

*Co. v. Johnson*, 109 N.E.3d 953, 957 (Ind. 2018), under which Plaintiffs had to establish that Prolift was "defective" and "unreasonably dangerous," Ind. Code § 34-20-4-1. For the design-defect claim in particular, Plaintiffs needed to show that Ethicon "failed to exercise reasonable care under the circumstances in designing the product." §§ 34-20-2-1, -2. Indiana courts recognize that "while compliance with statutory standards is not conclusive per se as to lack of negligence, it is certainly *evidence* of lack of negligence." *Kramer v. Catholic Charities of Diocese of Fort Wayne-S. Bend, Inc.*, 32 N.E.3d 227, 231 (Ind. 2015). "[E]vidence of compliance with government standards" thus is "relevant" and admissible in IPLA actions, so long as the standards in question "relate to the risk or product defect at issue." *Wade v. Terex-Telelect, Inc.*, 966 N.E.2d 186, 195 (Ind. Ct. App. 2012); *see also* Restatement (Third) of Torts: Prod. Liab. § 4 (similar).

Under the IPLA, moreover, if a product "complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved … or by an agency of the United States," then the manufacturer is entitled to "a rebuttable presumption that the product … was not defective and that the manufacturer … was not negligent." Ind. Code § 34-20-5-1. This presumption has "continuing effect even though contrary evidence is received." *Schultz v. Ford Motor Co.*, 857 N.E.2d 977, 984 (Ind. 2006) (quoting Ind. Evid. R. 301). Thus, once a manufacturer proves regulatory compliance, "the jury may infer"—*based on this fact alone*—that the design in question was not defective and the manufacturer was not negligent. *Id.* at 985.

Here, the jury could not draw that inference because it never heard that Prolift complied with FDA requirements. The district court principally reasoned that all regulatory evidence was irrelevant. A8 [*39:22-25], A36-A37, A61. While the court recognized that regulatory compliance would be relevant if the standards in question "sp[o]k[e] to safety," it reached the concededly "counterintuitive" conclusion that the 510(k) process "does not speak to the safety of the device." A35-A36.

That erroneous conclusion rests on a statement in *Lohr*, repeated in *Riegel*, that the 510(k) process "is focused on *equivalence*, not safety." A35 (quoting *Lohr*, 518 U.S. at 493; *Riegel*, 552 U.S. at 323). But those statements arose in a particular context and are not accurate as to *this* Class II device. Recall that the term "510(k) process" can refer to two types of substantial equivalence determinations. *Supra* pp. 5-7. First, it can refer to one of the transitional exceptions to the premarket-approval requirement for Class III devices under 21 U.S.C. § 360e(b)(1). There, FDA allows a new, post-1976 Class III device to enter and remain on the market without undergoing premarket approval because the device is substantially equivalent to a grandfathered, pre-1976 Class III device that also may remain on the market without premarket approval. *Lohr* involved this type of determination. 518 U.S. at 477, 480. Second, "510(k) process" can refer to one of the means by which a new, post-1976 device can avoid a default Class III determination under § 360c(f)(1)(A). There, FDA classifies the new device in Class I or II, not Class III, because the

device is substantially equivalent to another post-1976 device that FDA previously classified in Class I or II. This is the type of determination at issue here. R. 378-23.

This distinction matters for admissibility. The first type of 510(k) process—the one in *Lohr*—reflects concerns about "limit[ing] the competitive advantage grandfathered devices receive." *Riegel*, 552 U.S. at 317. FDA simply "compare[s] a post-1976 device to a pre-1976 device to ascertain whether the later device is no more dangerous and no less effective than the earlier device," so "[i]f the earlier device poses a severe risk or is ineffective, then the later device may also be risky or ineffective." *Lohr*, 518 U.S. at 493 (quotation marks omitted). FDA thus cleared the device in *Lohr* as substantially equivalent to a predicate that "ha[d] never been formally reviewed … for safety or efficacy." *Id.* at 493. That new device remained in Class III, but entered the market without undergoing the premarket approval necessary for FDA to obtain assurance that Class III devices are safe and effective. *Lohr* thus involved an "exception[] to the [premarket approval] requirement," 518 U.S. at 477, or "an exemption from federal safety review," *Riegel*, 570 U.S. at 323.

The 510(k) process here, by contrast, "is in no sense an exemption from federal safety review—it *is* federal safety review." *Riegel*, 552 U.S. at 323. Ethicon did not ask FDA to compare Prolift to a grandfathered, pre-1976 device, but to post-1976 devices previously classified in Class II. Prolift thus was not a Class III device that entered the market without undergoing the premarket approval necessary to provide FDA with assurance of its safety and effectiveness. Instead, by classifying Prolift in Class II, FDA determined that premarket approval was not necessary to

42

"provide reasonable assurance of [Prolift's] safety and effectiveness"—"special controls" were sufficient. 21 U.S.C. § 360c(a)(1)(B); *see* R. 378-23.

The district court thus was simply wrong to say that Prolift's 510(k) process "focused on equivalence and not safety." A36-A37. Where, as here, FDA compares the new device to a post-1976, Class II predicate device under § 360c(f)(1)(A), the 510(k) process focuses on both equivalence *and* safety—equivalence is *how* FDA obtains assurance that the device is safe.

The decision below is rife with misstatements about the regulatory scheme. For example, the district court stated that the SMDA "created a more tangential relationship between FDA clearance and the safety-focused [premarket approval] process." A33. Just the opposite: The SMDA significantly strengthened 510(k) review, making it *more* safety-focused, not less. *See* 21 U.S.C. § 360c(i). The district court also quoted *Lohr*'s statement in 1996 that 510(k) review "is completed in an average of only 20 hours." A36 (quoting 518 U.S. at 479). But "this figure no longer reflects reality." Shapiro, *supra*, at 394 n.106. Today, the average 510(k) review takes six months. Emergo Grp., *How Long it Take the US FDA To Clear Medical Devices via the 510(k) Process* 5 (Mar. 2017).

The district court's invocation of Rule 403 fares no better. Rule 403 authorizes district courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In "weighing the probative value of evidence against the

43

dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission." *United States v. Denberg*, 212 F.3d 987, 993 (7th Cir. 2000) (quotation marks omitted).

Here, the district court "necessarily abuse[d] its discretion" under Rule 403 because it "based its decision on an erroneous view of the law." *McLane Co. v. EEOC*, 137 S. Ct. 1159, 1168 n.3 (2017) (citation omitted). The meaning and effect of federal agency action like clearance under 510(k) is a question of law for a court to decide, and the court here wrongly conflated the 510(k) process in *Lohr* with the process used to clear Prolift.

Even if it did not constitute a legal error, the court's misapprehension of the 510(k) process led it to take "a too narrow view of the purpose and probative value" of this evidence from the outset. *Thompson v. City of Chicago*, 722 F.3d 963, 974 (7th Cir. 2013). The considered view of an expert federal agency that there is "reasonable assurance of [Prolift's] safety and effectiveness," 21 U.S.C. § 360c(a)(1)(B), would have been highly persuasive to the jury. Indeed, under the IPLA, that evidence alone would have sufficed to support a verdict for Ethicon. *See* Ind. Code § 34-20-5-1. The court barred Ethicon from presenting any regulatory compliance defense whatsoever, even though that defense is statutorily codified. "[A] district court abuses its discretion when it limits evidence in such a way that the litigant is effectively prevented from presenting [its] case." *Mimms v. CVS Pharm., Inc.*, 889 F.3d 865, 870 (7th Cir. 2018) (quotation marks omitted).

Compounding the prejudice, Plaintiffs exploited the court's ruling in closing arguments by repeatedly asking why Ethicon had not introduced an "industry standard" showing "that you can put a product out on the market with no clinical studies." Tr. 1653:7-9; *see also* Tr. 1728:8-12 ("Is there any standard that's been pulled up there that says: You don't have to study medical devices before you put them in women's vaginas?"). Absent the improper exclusion, Ethicon would have explained FDA does not require clinical trials when clearing a Class II device.

Of course, as the court noted, Plaintiffs might have responded by telling "Prolift's *whole* FDA story," including that Prolift "later received FDA scrutiny and was subsequently removed from the market." A37; *see* A62. But Plaintiffs' mere ability to respond did not give the court license to cut off Ethicon's regulatory compliance defense altogether. The ultimate question in this case was whether Ethicon acted reasonably in designing Prolift and crafting its warnings. A jury that heard the "whole FDA story"—including Ethicon's compliance with FDA requirements—would have found for Ethicon on that question.

The court's evaluation of the countervailing "danger[s]" of admitting 510(k) evidence was equally flawed. The court believed jurors might "erroneously conclud[e] that § 510(k) clearance proved safety." A37. But that would not have been "erroneous[]." Indeed, Indiana law *required* the court to instruct the jury that it "may" draw that very inference. *Schultz*, 857 N.E.2d at 984; *see infra* Section II.B.1. And while admitting 510(k) evidence might have necessitated "additional evidence and testimony from regulatory experts and Ethicon employees," that would not

have been a "needless" sideshow. A37. FDA clearance is a crucial part of Prolift's story. Without it, the jury could not fairly evaluate whether Ethicon acted reasonably.

Courts have divided on whether to admit 510(k) evidence in design-defect cases.[3] But the decisions excluding 510(k) evidence are wrong, and this Court should not follow them. All of them ultimately rely on *Lohr*, but none even acknowledges, much less persuasively addresses, that *Lohr* involved the inapposite circumstance of a Class III device that FDA cleared as substantially similar to a grandfathered, pre-1976 device. Uncritically repeating in case after case that "§ 510 is focused on *equivalence*, not safety," *Lohr*, 518 U.S. at 493, cannot transform that mantra into a correct statement of the law.

## B. Ethicon Was Entitled to Jury Instructions on Two Indiana Presumptions

The IPLA creates two rebuttable presumptions that product manufacturers are not negligent, but the district court failed to instruct on either one. That was reversible error.

---

[3] *Compare, e.g.*, *In re Cook Med., Inc., IVC Filters Mktg., Sales Practices & Prod. Liab. Litig.*, 2018 WL 6617375 (S.D. Ind. Dec. 18, 2018) (denying motion to exclude 510(k) evidence); *In re Bard IVC Filters Prods. Liab. Litig.*, 289 F. Supp. 3d 1045 (D. Ariz. 2018) (same); *McCracken v. Depuy Orthopaedics, Inc.*, 2013 WL 12141334, at *4-5 (N.D. Ohio July 26, 2013) (same), *with Eghnayem v. Boston Sci. Corp.*, 873 F.3d 1304, 1318-19 (11th Cir. 2017) (affirming exclusion of 510(k) evidence); *Huskey v. Ethicon, Inc.*, 848 F.3d 151, 160-61 (4th Cir. 2017) (same), *cert. denied*, 138 S. Ct. 107 (2017); *In re C.R. Bard, Inc.*, 2018 WL 4212408, at *5 (S.D.W. Va. Sept. 4, 2018) (excluding 510(k) evidence).

1.   *Ethicon Is Presumptively Not Liable Because It Complied with FDA's Regulatory Process*

The IPLA creates a rebuttable presumption that "the product that caused the physical harm was not defective and that the manufacturer … was not negligent" if the product "complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved by the United States … or by an agency of the United States." Ind. Code § 34-20-5-1(2). Prolift unquestionably complied with applicable regulations when FDA cleared it through the 510(k) process and classified it in Class II. But the district court foreclosed application of this presumption based on the same misconception that led it to erroneously exclude all 510(k) evidence: that the 510(k) process is unrelated to safety. A35. As explained, that is wrong—the 510(k) process speaks *squarely* to safety. *Supra* Section II.A.

Indiana courts have held that regulatory processes similar to 510(k) trigger the rebuttable presumption. In *Gresser v. Dow Chemical Co.*, an appellate court granted summary judgment to a pesticide manufacturer on design-defect and failure-to-warn claims under the IPLA based on unrebutted evidence that the pesticide complied with federal registration requirements. 989 N.E. 2d 339, 346 (Ind. Ct. App. 2013). EPA may register a pesticide only if it determines that the pesticide does not pose any "unreasonable risk to man or the environment." 7 U.S.C. § 136(bb). *Gresser* held that compliance with EPA requirements triggered the IPLA's presumption. 989 N.E.2d at 345-46.

47

Just as EPA in *Gresser* found the pesticide posed no "unreasonable risk," FDA here obtained "reasonable assurance" of Prolift's "safety and efficacy," 21 U.S.C. § 360c(a)(1)(A). That triggers the IPLA's presumption, requiring the trial court to instruct that, because Prolift complied with applicable federal regulations, the jury "may" infer that Prolift was not defective and Ethicon was not negligent, even if Plaintiffs introduced evidence to the contrary. *Schultz*, 857 N.E.2d at 985. Given the scant evidence of negligence, that instruction would have "undoubtedly benefited" Ethicon on both of Plaintiffs' claims. *Id.* at 987.

### 2.   Ethicon Is Presumptively Not Liable Because Prolift Was "State of the Art"

The IPLA also provides a rebuttable presumption that a product is not defective and the manufacturer was not negligent if the product "was in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, and labeled." Ind. Code § 34-20-5-1. State of the art means the "best technology reasonably feasible" at the time the product was designed or manufactured. *Indianapolis Athletic Club, Inc. v. Alco Std. Corp.*, 709 N.E.2d 1070, 1074 (Ind. Ct. App. 1999).

Ethicon presented ample evidence that Prolift was state of the art. Witnesses testified about the difficulties of pelvic prolapse repair, Tr. 433:9-23, 451:16-455:16, 459:15-22, and the benefits of transvaginal mesh over other treatments, R. 384 at *129:8-132:14. Before Prolift, surgeons used Gynemesh to fix prolapses, Tr. 1153:8-24, but lacked a standardized technique for doing so, Tr. 1177:8-1178:8; R. 383 at *539:5-540:3. And the TVM group unanimously chose Gynemesh as the mesh

component of Prolift precisely because it was the best mesh available at the time. R. 383 at *543:24-544:19. As one Ethicon medical officer testified, Prolift was "better … than anything … out there before." R. 387 at *1282:22-1283:1.

In ruling otherwise, the district court fixated on two red herrings. First, the court believed that limited testimony about Ultrapro "belie[d] any notion that Prolift was truly *the* state of the art at the time." A50. But, again, Plaintiffs' own experts deemed Ultrapro unsafe, and other testimony established that the TVM group considered and rejected partially absorbable mesh when designing Prolift. For that reason, the court's reliance on *Wade v. Terex-Telelect, Inc.*, 966 N.E.2d 186, was off-base. *Wade* held that no state-of-the-art instruction should be given when the defendant manufactured a version of the product without the alleged defect. *Id.* at 194-95. Not so for Ultrapro.

The district court also focused on "evidence that at the time Prolift first began to be marketed, defendants had not conducted any clinical trials of Prolift in humans." A50. But, again, Ethicon did not need clinical trials for FDA to clear Prolift and classify it in Class II through the 510(k) process. And the court cited no authority suggesting that clinical trials are necessary for a product to be state of the art.

At bottom, the court reasoned that, because Plaintiffs introduced *some* evidence that Prolift was not state of the art, the presumption is inapposite. A50-A51. That is mistaken. To the extent the parties genuinely disputed the issue, the court should have instructed the jury that "if" Ethicon proved that Prolift was state

of the art, then the jury "could find [Ethicon] not to have been negligent." *Schultz*, 857 N.E.2d at 987. All Ethicon needed to do to merit that instruction was introduce some "evidence … to support" that Prolift was the best available technology. *Wade*, 966 N.E.2d at 192. Ethicon did that in spades. *E.g.*, R. 387 at *1282:22-1283:1.

Without being told about the IPLA's presumptions, "the jury was misinformed about the applicable law." *Susan Wakeen Doll Co. v. Ashton-Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001). A new trial is therefore required. *Id.*

## III. Ethicon is Entitled to Relief from the Damages Award

Even if the verdict on liability could stand, the damages award cannot. Applicable New Jersey law bars punitive damages where FDA has recognized a medical device as safe and effective, which FDA did here when it cleared Prolift through the 510(k) process. Regardless, Plaintiffs have not remotely shown by clear and convincing evidence that Ethicon acted with malice or wanton disregard for patients. And the $10 million compensatory award is wildly excessive.

### A. Ethicon's Compliance with FDA Regulations Precludes Punitive Damages

The parties agree that the law of New Jersey, where Ethicon is located, governs Plaintiffs' claim for punitive damages. A75. Under the New Jersey Product Liability Act ("NJPLA"), punitive damages are categorically unavailable where a drug or medical device was "subject to premarket approval or licensure by [FDA]" or "generally recognized as safe and effective pursuant to conditions established by [FDA] and applicable regulations." N.J.S.A. § 2A:58C-5. This statute "carefully balance[s] the need to protect individuals against the need to protect an industry

with a significant relationship to our economy and public health." *Rowe v. Hoffman-La Roche, Inc.*, 917 A.2d 767, 774 (N.J. 2007). Courts applying New Jersey law thus routinely reject punitive-damages claims brought against drug and device manufacturers that have complied with FDA regulations.[4]

Here, federal law prohibited Ethicon from marketing Prolift without prior FDA permission. 21 U.S.C. § 360c(i)(1)(A); 21 C.F.R. § 807.100(a)(5). FDA also "generally recognized" Prolift "as safe and effective pursuant to conditions established by [FDA] and applicable regulations." As explained, when FDA cleared Prolift through the 510(k) process and classified it in Class II, FDA determined that "special controls" sufficed to "provide reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. § 360c(a)(1)(B). The NJPLA therefore "conclusively prohibits an award of punitive damages," and the award must be reversed. *Rowe*, 917 A.2d at 774.

## B.  Plaintiffs Failed to Adduce Clear and Convincing Evidence To Support Punitive Damages

Even if the NJPLA did not categorically bar punitive damages, "punitive damages are a limited remedy and must be reserved for special circumstances." *Maudsley v. State*, 816 A.2d 189, 209 (N.J. App. Div. 2003). New Jersey courts have long held that, "[t]o warrant a punitive award, the defendant's conduct must have

---

[4]   *E.g.*, *McWilliams v. Novartis AG*, 2018 WL 3637083, at *4 (S.D. Fla. July 31, 2018) (bisphosphonates); *Becker v. Smith & Nephew, Inc.*, 2015 WL 4647982, at *5 (D.N.J. Aug. 5, 2015) (hip implant); *Batchelor v. Procter & Gamble Co.*, 2014 WL 6065823, at *6 (D.N.J. Nov. 13, 2014) (hair product); *Vasquez v. Gloucester Cty.*, 2014 WL 1599499, at *3 (D.N.J. Apr. 21, 2014) (defibrillator).

been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another.'" *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1230 (N.J. 1984). The NJPLA codified this principle. *See* N.J.S.A. §§ 2A:15-5.10, 12(a). Plaintiffs seeking punitive damages cannot carry their burden "by proof of any degree of negligence including gross negligence." § 2A:15-5.12(a).

What is more, plaintiffs must prove their entitlement to punitive damages "by clear and convincing evidence," *id.*, a standard that "leaves no serious or substantial doubt about the correctness of the conclusions drawn from the evidence," § 2A:15-5.10. The evidence must be "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy." *In re Jobes*, 529 A.2d 434, 441 (N.J. 1987) (quotation marks omitted).

Here, Plaintiffs have not shown that Ethicon intentionally wronged them or behaved wantonly by any standard, let alone by clear and convincing evidence. To begin with, even if Ethicon's compliance with the 510(k) process did not bar punitive damages altogether, compliance with federal regulations—or even a good-faith attempt at compliance—is incompatible with "actual malice" or "wanton disregard." *E.g.*, *Clark v. Chrysler Corp.*, 436 F.3d 594, 603 (6th Cir. 2006). Regardless of precisely to what extent the 510(k) process speaks to safety—though, as explained, it speaks *squarely* to safety here—Ethicon's compliance with that regulatory process shows conscientiousness and good faith. No reasonable jury that heard about FDA's clearance and classification of Prolift could have awarded punitive damages. At a

52

minimum, the exclusion of the regulatory evidence mandates a new trial on punitive damages.

Even without the regulatory evidence, the jury had no basis for awarding punitives based on Prolift's design or warnings. As explained, there was insufficient evidence to show even by a preponderance that Ethicon was negligent. *Supra* Section I. *A fortiori*, Plaintiffs could not show by clear and convincing evidence that Ethicon was malicious or wanton.

As to design, the evidence established that Ethicon developed Prolift to meet a demonstrated need for a treatment more effective than colporrhaphy and less intrusive than sacrocolpopexy. Ethicon spent five years and 20,000 hours in close collaboration with pelvic-floor surgeons designing the device. The TVM group chose Gynemesh over other materials because the surgeons found it "the most suitable." R. 390 at *81:8. Ethicon amassed "over 600 clinical data points" from three studies, and relied on "several years of experience" with Gynemesh, as well as the opinions of outside consultants, to verify the device's safety. *Id.* at *515:6-516:2, *528:2-529:10. Even the district court acknowledged that it "may … well be very true" and "Ethicon certainly submitted evidence" that Prolift met an urgent medical need, improved on previous treatments, and was extensively tested. A76.

The district court nevertheless upheld the punitives award, reasoning that "Ethicon was aware of the dangers and problems associated with Prolift but chose to launch it anyway." A76. The court also faulted Ethicon for attempting to improve Prolift "with a new type of mesh." A77. But if this trial proved anything, it is that

there is no perfect, risk-free prolapse treatment. While Plaintiffs contend that

Prolift's risks outweighed its benefits, substantial evidence showed the opposite.

R. 390 at *523:9-10 ("[T]he overall risk-benefit analysis was that [Prolift] was a safe

and effective product."), *555:12-556:12 (similar); R. 384 at *144:7-10 (similar).

Punitive damages are "not appropriate where room exists for reasonable

disagreement over the relative risks and utilities of the conduct at issue." *Burke v.*

*Deere & Co.*, 6 F.3d 497, 511 (8th Cir. 1993); *Pavlova v. Mint Mgmt. Corp.*, 868 A.2d

322, 328-29 (N.J. App Div. 2005).

The court's reliance on scattered company emails fails for the same reason.

The court pointed, for example, to a 2008 email from Ethicon's marketing director

describing polypropylene mesh as the "best of a bad lot" and noting a need to

develop material more similar to human tissue. A77 (citing R. 395 at 3-4 [*552:16-

554:02]). But frank acknowledgments of a product's risks do not justify punitive

damages. Plaintiffs needed to show not just that Prolift posed risks, but that

Ethicon knowingly refused to mitigate "an *unnecessary* risk." *Fischer v. Johns-*

*Manville Corp.*, 512 A.2d 466, 480 (N.J. 1986) (emphasis added). If anything, these

internal communications underscore that Ethicon strove to improve the device and

encouraged discussion—open, honest, and sometimes negative—about its benefits

and risks. *E.g.*, R. 387 at *1288:5-13; R. 390 at *522:19-523:10.

As to Prolift's warnings, the record shows that Prolift's IFU and

Monograph warned about all potential complications that Plaintiffs alleged

here. *Supra* Section I.B.2. The district court focused on the fact that the IFU

did not reference dyspareunia, A77, but ignored the Monograph's specific warning about dyspareunia, R. 415-3 at 9-11. *See In re Levaquin Prod. Liab. Litig.*, 700 F.3d 1161, 1169 (8th Cir. 2012) (reversing punitive damages where package insert and Physician's Desk Reference warned of risk).

At a minimum, the punitive-damages award was grossly excessive. *See* N.J.S.A. § 2A:15-5.14(a) (authorizing courts to "reduce the amount of or eliminate the award of punitive damages" where "necessary" to ensure "that the award is reasonable in its amount").

## C.    Compensatory Damages Were Excessive

The proper measure of compensatory damages is "reasonable compensation," and while juries have discretion in awarding such compensation, that "discretion is not limitless." *Weinberger v. Boyer*, 956 N.E.2d 1095, 1112 (Ind. Ct. App. 2011). An award is excessive if it results from "prejudice, passion, partiality, corruption, or some other improper element." *Atterholt v. Robinson*, 872 N.E.2d 633, 645 (Ind. Ct. App. 2007). To determine whether an award is excessive, courts must consider "(1) whether the award is 'monstrously excessive,' (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is comparable to those in similar cases." *Marion County Coroner's Office v. EEOC*, 612 F.3d 924, 930-31 (7th Cir. 2010).

The $10 million compensatory award here is "monstrously excessive" because it can be explained only by "passion and prejudice." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). Kaiser claimed no economic damages. She manages

her pain with over-the-counter medication and in the two years before trial never visited a gynecologist. Tr. 735:11-736:12, 972:12-14. She elected not to pursue simple pain-reduction treatments recommended by her physicians. Tr. 1002:12-1003:12. Her own treating physician believed that mesh was not the primary cause of her complaints. R. 386 at *85:22-86:13. And the jury rejected Mr. Kaiser's consortium claims. Tr. 1765:19-20.

A $10 million award of noneconomic compensatory damages does not align with Indiana jury verdicts with comparable or more egregious injuries. *See Westray v. Wright*, 834 N.E. 2d 173, 176, 178 (Ind. Ct. App. 2005) (brain injuries, soft tissue injuries, bruises, scalp laceration, probable concussion, and PTSD—$1,020,000 awarded); *Mitchell v. Baynes*, 2005 WL 6728596 (Ind. Cir. Ct. Aug. 5, 2005) (traumatic brain injury, multiple rib fractures, disc damage, and dislocated shoulder—$639,000); *Berman v. Cannon*, 878 N.E. 2d 836, 839, 843 (Ind. Ct. App. 2008) (concussion, severe pain and numbness to the neck, shoulder and back, requiring use of cane—$882,019 for noneconomic damages); *Catt v. Skeans*, 867 N.E. 2d 582, 585 (Ind. Ct. App. 2007) (shoulder fractures requiring surgery and arduous physical therapy, and 35% permanent impairment—$721,268 for noneconomic damages); *Brattain v. Methodist Health Group*, 2006 WL 3498110 (Ind. Super. Ct. Oct. 5, 2006) (fractured pelvis and vertebrae, pulmonary contusion, hemothorax, and plaintiff died three days later—$600,000).

The district court looked to judgments in two other Prolift cases. A73. But because compensatory damages may encompass "no more than the amount that will

make the plaintiff whole," *Besler v. Bd. of Educ.*, 993 A.2d 805, 824 (N.J. 2010), the proper comparators are cases involving similar injuries, not the same defendant or product. The plaintiffs in those Prolift cases suffered far-more-severe injuries than Plaintiffs here. *See Gross v. Gynecare*, 2016 WL 1192556, at *14 (N.J. Super. Ct. App. Div. Mar. 29, 2016) (describing plaintiff's condition as "catastrophic" and "unusual"; "the only one that has been that severe"); *Hammons v. Ethicon, Inc.*, 190 A.3d 1248, 1286-87 (Pa. Super. Ct. 2018) (plaintiff underwent "three major surgeries but has no reasonable surgical or nonsurgical means of treatment"). And even so, the compensatory award here is two-to-three-times greater. *See Gross*, 2016 WL 1192556, at *1 ($3.35 million); *Hammons*, 190 A.3d at 1258 ($5.5 million). Indeed, the $10 million award is even greater than what Plaintiffs themselves requested. Tr. 1675:2-7 ("somewhere between 7 and $9 million").

The compensatory damages award must be remitted. And if the Court remits compensatory damages, it should remit punitive damages by a corresponding amount. *See* A81 (remitting punitive damages "to a 1:1 ratio").

## CONCLUSION

The judgment below should be reversed.

Dated: February 1, 2019

Respectfully submitted,

*s/ Lisa S. Blatt*
Lisa S. Blatt
R. Stanton Jones
William C. Perdue
Stephen K. Wirth
Samuel F. Callahan*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
lisa.blatt@arnoldporter.com

*Admitted outside the District of Columbia;
practicing law in D.C. under the supervision
of Firm principals who are D.C. Bar
members.*

Stephen D. Brody
Jason Zarrow
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
sbrody@omm.com

Amy M. Pepke
BUTLER SNOW LLP
Crescent Center
6075 Poplar Ave., Suite 500
Memphis, TN 38119
(901) 680-7200
amy.pepke@butlersnow.com

*Counsel for Johnson & Johnson and
Ethicon, Inc.*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation of Circuit Rule

32(c). The brief contains 13,997 words, excluding those parts of the brief exempted

by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface

and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and

Circuit Rule 32(b) because this brief has been prepared in a proportionately spaced

typeface using Microsoft Word 2010 in New Century Schoolbook 12-point font.


*s/ Lisa S. Blatt*
Lisa S. Blatt

**CERTIFICATE OF FILING AND SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25, I hereby certify that on

February 1, 2019, I electronically filed the foregoing Brief of Appellants via ECF,

and service was accomplished on counsel of record by that means.


s/ *Lisa S. Blatt*
Lisa S. Blatt

# APPENDIX

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

I hereby certify that the Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

s/ <i>Lisa S. Blatt</i><br>Lisa S. Blatt

## TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30 ................................. i

Oral Ruling, November 28, 2017 (Transcript Excerpt, pp. 1-2, 34-40)....................A1

Opinion and Order dated February 7, 2018 (R. 329)................................................A10

Oral Ruling, March 8, 2018 (Transcript Excerpt, pp. 1640-48)..............................A27

Opinion and Order dated March 16, 2018 (R. 407) ................................................A30

Opinion and Order dated August 8, 2018 (R. 423) ..................................................A39

Amended Judgment dated August 21, 2018 (R. 427) ..............................................A84

```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF INDIANA
 2                         HAMMOND DIVISION

 3   BARBARA KAISER, ET AL.,        )
                                    )
 4        Plaintiffs,               )
                                    )
 5   vs.                            )  2:17-CV-114
                                    )
 6   ETHICON, INC. and JOHNSON &    )
     JOHNSON,                       )
 7                                  )
          Defendants.               )
 8
                     TRANSCRIPT OF MOTION HEARING
 9                        November 28, 2017
                  BEFORE THE HONORABLE PHILIP P. SIMON
10                   UNITED STATES DISTRICT JUDGE

11   A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:

13                      THOMAS O. PLOUFF
                        Costello, McMahon, Burke & Murphy
14                      150 N. Wacker Drive, Suite 3050
                        Chicago, Illinois  60606
15                      (312) 541-9700

16                      JEFFREY M. KUNTZ, PHV
                        Wagstaff & Cartmell, LLP
17                      4740 Grand Avenue, Suite 300
                        Kansas City, MO  64112
18                      (816) 701-1100

19                      TIMOTHY E. JACKSON, PHV
                        Wexler Wallace, LLP
20                      55 West Monroe, Suite 3300
                        Chicago, Illinois  60603
21                      (312) 346-2222

22   FOR THE DEFENDANTS:

23                      JENNIFER L. STEINMETZ, PHV
                        Tucker Ellis, LLP
24                      950 Main Avenue, Suite 1100
                        Cleveland, Ohio 44113
25                      (216) 592-5000
```

```
1    A P P E A R A N C E S: (Continued)

2    FOR THE DEFENDANTS:

3                         MARY NOLD LARIMORE
                          Ice Miller, LLP
4                         One American Square, Suite 2900
                          Indianapolis, Indiana  46282
5                         (317) 236-2407

6

7    Proceedings reported by stenotype.  Transcript produced by
     computer-aided transcription.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   In other words, I'm excluding the FDA evidence.  What I find

2   relevant in this article is the fact that -- and I understand

3   you say they're mouthpieces for the industry.  I get all that.

4   Be that as it may, that's a matter for the jury to sort out.

5   The point remains that there are hundreds of surgeons who

6   believe that this device, in certain context, is a wonderful

7   device in fixing a real problem.  And if your expert is going

8   to be so, sort of, binary about it, then there's a consequence

9   to that.

10      So is there -- do I need to say anything else about this?

11          **MR. KUNTZ:**  No, I'm with you.

12          **THE COURT:**  Ms. Steinmetz, you understand where I'm

13   coming from?

14          **MS. STEINMETZ:**  Yes.

15          **THE COURT:**  All right.  Swell.

16      Let's talk about the FDA evidence.  I'm not going to hear

17   from you because I spent a lot of time on this.  What we're

18   talking about here are Docket Entry 245, which is the

19   plaintiffs' motion in limine to exclude the 510(k) evidence,

20   and Docket Entry 248, which was the defendant's motion to admit

21   the FDA evidence.  So these are the, sort of, competing

22   motions.

23      So Ethicon, the defendants here, have moved to admit the

24   FDA evidence, specifically the FDA certification, pursuant to

25   the Section 510(k) process, arguing that it is relevant to this

1    litigation because the Indiana Products Liability Act provides

2    a rebuttal presumption that a product is not defective and the

3    manufacturer is not negligent where the product complied with

4    applicable codes, standards, regulations, or specifications.

5        So the Kaisers, as I have just referenced, have moved to

6    exclude the FDA evidence, first, because the MDL judge issued

7    numerous rulings that that type of evidence, the FDA

8    certification process, the 510(k) process, should not or will

9    not be admitted at trial.  And furthermore, that this type of

10   evidence is routinely excluded pursuant to Rule 403.

11       The MDL judge excluded the 510(k) evidence because the

12   clearance process that's sort of set out in the 510(k) process

13   does not speak directly to safety and efficacy and is of

14   negligible probative value; that's Docket Entry 146.  That

15   decision was affirmed by the Fourth Circuit in the *Bard* case,

16   81 -- I don't have the exact cite, but it is the *Bard* case from

17   the Fourth Circuit, 2016.

18       Now, it is important to note that the Fourth Circuit case

19   did not involve a state statute creating a rebuttable

20   resumption, and in Indiana there is a rebuttable presumption

21   under Indiana Code 34-20-5-1; that in a product liability case,

22   there's a rebuttable presumption that the product that caused

23   the physical harm was not defective and that the manufacturer

24   or seller of the product was not negligent if, before the sale

25   by the manufacturer, the product was in conformity with

1    generally recognized state of the art or it complied with

2    applicable codes, standards, regulations, or specifications.

3         In other words, if there's some, essentially, safety

4    standard that's mandated by the United States or an agency of

5    the United States or by the State of Indiana and the product in

6    question conforms with those safety standards, then there's a

7    rebuttable presumption that it is safe, and the jury is

8    instructed as such.

9         Now, the important question here is:  How does the State

10   of Indiana and the Courts in Indiana apply that presumption?

11   And from our research, I think that the Courts in Indiana and

12   Indiana Court of Appeals has interpreted the presumption

13   narrowly.

14        It has found that for evidence of compliance with

15   governmental standards to be relevant, the standard itself must

16   relate to a risk or the product defect at issue; that's the

17   *Wade* case, 966 N.E.2d 186 at 194.  It is Indiana Court of

18   Appeals from 2012.

19        So for this provision to apply to Ethicon, the

20   governmental standard at issue here, the 510(k) certification

21   process, must relate to the risk or the product defect at

22   issue, in other words, the safety of the Prolift implant.

23        And as I mentioned earlier, there's a pattern jury

24   instruction that Indiana has that if the presumption applies

25   there's a particular jury instruction, 2329, that should be

1   given to the jury; and the jury would decide the case under

2   that presumption if it applies.  But I do think that the Courts

3   in Indiana apply that presumption narrowly.

4       So what are we talking about here?  This 510(k) process

5   comes from 21 U.S.C. § 360c, where the various devices that are

6   intended for human use are designated into one of three

7   classes, and the Prolift device is a Class II device.  And the

8   process, you know, in a general sense, is that -- in fact, in

9   the FDA's own words "A 510(k) is a premarket submission made to

10  the FDA to demonstrate that the device to be marketed is at

11  least as safe and effective, that is, substantially equivalent

12  to, legally marketed devices that are not subject to the more

13  rigorous standards of the PMA."  That's from

14  21 C.F.R. 807.92(a)(3).

15      The bottom line seems to me that the Supreme Court has

16  held in *Medtronic v. Lohr*, 518 U.S. 470, they have made it very

17  clear, that this 510(k) process is focused on equivalence.  It

18  is not focused on safety.  And if it is focused on equivalence

19  and not safety, then the presumption doesn't apply in the State

20  of Indiana because the whole basis for the presumption is that

21  it is a safety regulation, essentially.

22      The point that they make in *Lohr* is, in evaluating, sort

23  of, the rigorous process that a device goes through for

24  approval.  When it is a Class III device, I think the Supreme

25  Court in *Lohr* said that the FDA spends roughly 1200 hours

1    evaluating the device; whereas, if it is a Class II device, it

2    is a much less rigorous review, and it gets about, I think the

3    Supreme Court said, about 20 hours of oversight by the FDA.

4    And that's what prompted the Supreme Court to conclude that the

5    510(k) process is really about equivalence; it is not about

6    safety specifically.

7         And so in the face of that language from the Supreme

8    Court, which it reiterated less than a decade ago in the *Riegel*

9    case, 552 U.S. 312, it is a 2008 case, where the Court, again,

10   made the point that when you are talking about Class II devices

11   and devices that have been cleared for the market through the

12   510(k) process, it hasn't -- it doesn't go through the rigorous

13   review that a Class III device goes through.

14        And, again, the Supreme Court said, That while the 510(k)

15   is focused on equivalence, not safety, premarket approval, and,

16   in other words, approval for Class III devices, is focused on

17   safety, not equivalence.

18        So it is interesting to note that this evidence -- as far

19   as I can see, it really has never been admitted anywhere in a

20   product liability case.  I may be wrong on that, but I can find

21   no cases where the 510(k) evidence has been admitted to, you

22   know, help show that the product is safe.

23        And, in fact, it's been specifically excluded even in

24   states where there is a rebuttable presumption.  See, for

25   example, the *Eghnayem* case, E-G-H-N-A-Y-E-M, versus *Boston*

```
 1    Scientific, 873 F.3d 1304; that's an Eleventh Circuit case from
 2    2017.  It's a case that's applying Florida law, and Florida law
 3    does have a rebuttable presumption similar to Indiana.
 4         Also cite to the Adams case, 177 F.Supp.3d.  It is a case
 5    decided by the MDL judge that's applying Texas law excluding
 6    the FDA 510(k) evidence; and under Texas law, there is also a
 7    rebuttable presumption, again, similar to Indiana.
 8         The bottom line here seems to me to be that this would be
 9    a lot of -- this would be a side show if I admitted this
10    evidence, and it has, I think, very little probative value
11    that -- it has the -- because the 510(k) process really only
12    inquires about the equivalency of the product, not the safety
13    of the product, I think it has low probative value.  But
14    there's a very real risk of confusing the issues for the jury,
15    misleading the jury, and unfairly prej -- leading to unfair
16    prejudice to the plaintiff, that the jury might put undue
17    weight on this type of evidence.
18         I think the probative value is substantially outweighed by
19    those dangers of confusion of the issues, misleading the jury,
20    and unfair prejudice.  And so I don't think this is an area
21    that's worth exploring at trial because it is going to, I
22    think, sidetrack the trial for very little benefit; and I think
23    it is inadmissible for all the reasons I have said in all
24    events.  So the 403 ruling is really just a belt-and-suspenders
25    view of it, and it is my honest view of it, that it will hijack
```

1    the trial and not be worth it.

2         So that's how I'm handling it -- I'm not being

3    particularly articulate here.  I'm going to put my ruling in

4    writing so you have a more robust explanation for why I'm

5    excluding the evidence so it is preserved.  If there's a

6    plaintiffs' verdict here and an appeal, you'll be able to

7    explore the issues with the Circuit.

8         So that's how I'll handle -- we're handling docket -- two

9    docket entries, just for the record, 245 and 248.  245 is

10   granted, and 248 is denied.

11        Okay.  The next one I want to talk about is Docket Entry

12   246.  This is the plaintiffs' motion in limine to bar evidence

13   of the plaintiff's unrelated medical conditions.

14        So as I understand it, plaintiff is seeking to exclude

15   evidence of her, what they say are, unrelated medical problems

16   unless there's a foundation of a connection between those

17   problems and her present injury.

18        So who is going to speak to this one?

19             **MR. PLOUFF:**  I am, Judge.

20             **THE COURT:**  Mr. Plouff.

21             **MR. PLOUFF:**  This one I will speak a little more on,

22   Judge.  The motion has a very narrow focus to it.  We are not

23   trying to keep out her prior medical history; that's not --

24   that's fair game.  If they want to say, Well, she's really not

25   so bad now because she wasn't able to do some things before the

Case: 18-2944   Document: 25   Filed: 03/01/2019   Pages: 166

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| BARBARA KAISER and<br>ANTON KAISER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CAUSE NO. 2:17-CV-114-PPS |
| v. | ) |
| | ) |
| JOHNSON & JOHNSON and<br>ETHICON INC., | ) |
| | ) |
| Defendants. | ) |

### OPINION AND ORDER

On November 28, 2017, I heard oral argument on Ethicon's four Motions for

Final Ruling on Outstanding *Daubert* Issues. DE 249, 253, 257, 258. At the oral

argument, the Parties informed me that, in light of my rulings on Plaintiffs' *Motion in

Limine* to Exclude FDA 510(k) Evidence, DE 244, and Ethicon's Motion to Admit FDA

Evidence, DE 248, the Plaintiffs, Barbara and Anton Kaiser, agreed that they will not be

calling Peggy Pence, Ph.D. to testify at trial. The Parties also informed me that they

agreed that Dr. Uwe Klinge will not be testifying as to the topics on which Ethicon

sought to exclude his testimony. I, therefore, denied as moot, Ethicon's motions for

final ruling as to Peggy Pence, Ph.D. and Prof. Dr. Med. Uwe Klinge. [DE 274.]

That leaves two of the Kaisers' experts for my consideration: Dr. Iakovlev and

Dr. Elliott. As for Dr. Iakovlev, I indicated at oral argument, and confirmed in a

subsequent Order, that Ethicon's Motion for Final Ruling as to Dr. Vladimir Iakovlev,

DE 258, was conditionally granted and he would be prohibited from testifying

regarding one of his opinions.  I told the parties that I would put my reasons in writing, and this is that opinion.  As for Dr. Elliott, after hearing the Parties' argument regarding the admissibility of some of his opinions it was clear to me that I needed additional briefing to resolve the issues.  I have now received that briefing.

Let's start with the basics.  The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 (1993).  *See Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  Rule 702 provides, in relevant part, that if "scientific, technical or other specialized knowledge will help the trier of fact[,] . . . a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion . . . ."  Fed. R. Evid. 702.  The Rule "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case."  *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).

Under this framework, this Court must act as a gatekeeper for expert testimony, determining prior to admission whether the testimony is both relevant and reliable. *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).  In conducting this inquiry, the Court is to focus solely on principles and methodology, not on the conclusions that they generate.  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007).  "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom

2

A11

testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

I will begin with Dr. Iakovlev. Dr. Iakovlev is a clinical pathologist designated by the Kaisers to provide general expert opinions about the Prolift product. Ethicon sought to exclude Dr. Iakovlev's opinion that Prolene, Ethicon's proprietary blend of polypropylene, antioxidants, and other additives used in its mesh products, degrades *in vivo* based on his "degradation bark theory." [DE 256.] Here's how Ethicon characterizes that particular opinion of Dr. Iakovlev:

> Dr. Iakovlev uses histological stains on pathology specimens containing Prolene mesh. After staining, Dr. Iakovlev examines the specimens using a light microscopy, and observes a "bark" that he believes consists of degraded Prolene polypropylene.

[*Id.* at 2-3 (citations omitted).] Ethicon argues that "[t]his theory has no basis in any scientific literature or theories, and is wholly unreliable." [*Id.*]

Dr. Iakovlev's "bark" theory was first brought to the attention of Judge Joseph Goodwin, the judge overseeing this massive MDL. Judge Goodwin found, and Ethicon does not appear to contest, that Dr. Iakovlev's testimony on degradation, generally, is supported with reference to scientific literature and internal Ethicon documents and is admissible. The present issue is whether Dr. Iakovlev's manner of corroborating the scientific literature by performing his own tests is reliable or not.

3

An expert's opinion must be the product of reliable principles and methods. *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010). "The Supreme Court has identified the following factors as pertinent to this inquiry:  (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether it has been generally accepted within the relevant scientific community."  *Id.* (citing *Daubert*, 509 U.S. at 593).  "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it."  *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)

When the issue was first raised before Judge Goodwin, he found that he had "insufficient evidence to evaluate the methodology Dr. Iakovlev actually employed to examine mesh samples that allegedly degraded *in vivo*" and reserved ruling on this issue until Dr. Iakovlev's methodology could be examined firsthand at trial.  [DE 258-3 at 8.]  At the time that Judge Goodwin took up this issue, it appeared that Dr. Iakovlev was running tests to support his methodology, but they had not yet been completed. [*See* DE 264-4 at 10-11; DE 258-2 at 5-7.]  So the matter was deferred by Judge Goodwin so that Dr. Iakovlev's tests could be finished.

The case was remanded to me for trial, and Ethicon has now re-raised the issue of the admissibility of Dr. Iakovlev's "degradation bark theory."  Ethicon contends that it remains unsupported.  In their cursory, two sentence response, the Kaisers unhelpfully refer me to their briefing filed a year and a half earlier in the MDL Court, when Dr. Iakovlev had not completed his testing.  [DE 264 at 2.]  That briefing is

effectively useless to me in addressing the issue identified by Judge Goodwin—that there is "insufficient evidence to evaluate the methodology." When I asked the Kaisers' counsel at oral argument on the *Daubert* motions whether anything had changed, he conceded that Dr. Elliott hasn't "presented any new evidence that would substantiate his methodology." [DE 276 at 116-117.]

As such, there is no evidence before me to demonstrate that Dr. Iakovlev's "degradation bark theory" is the product of reliable principles and methods. Testing on his theory has not been completed, it has not been subjected to peer review or publication, the rate of error is unknown, and it has not been generally accepted within the relevant scientific community. There simply isn't enough evidence that Dr. Iakovlev's thesis is supported by reliable principles and methods to allow him to testify regarding his "degradation bark theory." It is for these reasons that Ethicon's motion, DE 256, is granted. Dr. Iakovlev will be permitted to testify regarding his degradation opinions generally, but may not rely on his "degradation bark theory" as support for his opinions.

Next I turn to Dr. Daniel Elliott. Dr. Elliott is a pelvic surgeon and urogynecologist designated by the Kaisers to provide general expert opinions about Prolift. Ethicon originally sought to exclude several of Dr. Elliott's opinions: (1) that nonsynthetic mesh procedures are a safer alternative for the surgical treatment of stress urinary incontinence; (2) that other synthetic mesh devices offer a safer alternative; (3) the adequacy of Ethicon's research and testing; (4) alleged complications from the

Prolift procedure; and (5) certain product warning opinions. [DE 252.] The third and fourth issues were agreed to by the Parties at the oral argument, and therefore, were denied as moot. As to the third issue, the Parties agreed that Dr. Elliott only would testify regarding clinical studies and clinical trials and would not testify about biocompatibility testing or durability testing. [*See* DE 276 at 140-142.] As to the fourth issue, the Parties agreed that Dr. Elliott would not testify regarding potential complications from Prolift from which Mrs. Kaiser did not suffer. [*Id.* at 142-14.] The fifth issue also was agreed to at the oral argument. The Parties agreed that Dr. Elliott will testify regarding the risks associated with Prolift and whether those risks appeared in the relevant IFU, but he will not testify about what else potentially should have been included in the IFU. [*Id.* at 144-146.] This issue, therefore, is also denied as moot.

That leaves for my consideration the first two opinions of Dr. Elliott, both of which relate generally to whether there were safer alternative designs to the Prolift product. But before considering these two opinions, there is a predicate question to be answered: Is proof of a safer alternative design a necessary element of a design defect claim under Indiana law? The parties disagree on this fundamental point—Ethicon believes that it is a required element and the Kaisers argue that, while evidence of a safer alternative design is admissible to prove negligence, it is not required to produce such evidence. At the oral argument, I asked the parties to brief the issue which they have now done. I will address this issue first before turning to Dr. Elliott's specific opinions on the topic.

The Parties are in agreement that a negligence standard applies to design defect claims under the Indiana Products Liability Act. Specifically, the IPLA provides, "in an action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions." Ind. Code. § 34-20-2-2. But the IPLA did not always provide for a cause of action for negligent design defect.

Some background on the IPLA is necessary to fully understand how this issue has developed under Indiana law. In 1978, the Indiana Legislature enacted the IPLA. At the time, the IPLA provided that it "govern[s] all products liability actions, including those in which the theory of liability is negligence or strict liability in tort; provided however, that this chapter does not apply to actions arising from or based upon any alleged breach of warranty." Ind. Code § 33-1-1.5-1 (1978). While the IPLA codified most aspects of the Restatement (Second) on Torts § 402A regarding strict liability, it spoke nothing of the treatment of actions sounding in negligence. As a result, the IPLA left claims based on negligence to the common law. *See Corbin v. Coleco Industries, Inc.*, 748 F.2d 411, 416–17 (7th Cir. 1984) (discussing the history of the IPLA). In 1983, the IPLA was amended, removing the reference to negligence actions, presumably recognizing the confusion that was created by the Indiana Legislature in 1978. *See* Ind. Code § 33-1-1.5-1 (1983) ("[T]his chapter governs all actions in which the theory of

7

A16

liability is strict liability in tort.”); *Miller v. Todd*, 551 N.E.2d 1139, 1143 (Ind. 1990) (discussing the history of the IPLA); *Moore v. Sitzmark Corp.*, 555 N.E.2d 1305, 1308 (Ind. App. 1990) (”[A]n action [for negligent design] is not subject to the terms of the Indiana Product Liability Act; rather, it is a common law action.”).

In 1995, the IPLA was amended yet again.  The idea was to bring all product liability actions under one umbrella.  The 1995 version specifically applies to “all actions brought by a user or consumer against a manufacturer or seller for physical harm caused by a product regardless of the substantive legal theory or theories upon which the action is brought.”  *See* Ind. Code § 33-1-1.5-1 (1995); P.L. 278-1995, Sec. 1 (effective July 1, 1995).  The 1995 amendments brought some much needed clarity to product liability cases in Indiana by eliminating strict liability claims for all design defect and failure to warn claims and instead imposing a negligence standard in all such cases.  It did so by adding the “reasonable care” language, quoted above, that remains in effect today.  *See* Ind. Code § 33-1-1.5-3 (1995); P.L. 278-1995, Sec. 1 (effective July 1, 1995).  In 1998, the IPLA was amended once more, but this amendment did nothing more than move the IPLA to Title 34.  *See* Ind. Code §§ 34-20-1-1 to 34-20-9-1.

What this history shows us is that, until 1995, the standard for product liability claims sounding in negligence was established by the common law.  During that time, the Courts held that, under Indiana law, a plaintiff “must offer a safer, more practicable product design than the design in question” to succeed on a negligent design defect claim.  *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir. 1995) (citing *Miller v.*

*Todd*, 551 N.E.2d 1139, 1143 (Ind. 1990)).  Therefore, until July 1, 1995, a plaintiff was required to show that a safer alternative design to succeed on a negligent design defect claim.

I cite to *Whitted* for this explanation quite intentionally.  It was decided on June 29, 1995, *before* the 1995 amendments establishing the negligence standard for design defect and failure to warn cases went into effect.  Yet *Whitted*, or in a few circumstances its contemporaries or progeny, is the case relied upon in most of the authority on which Ethicon relies for its assertion that proof of safer alternative design continues to be a required element of a negligent design defect claim.  *See, e.g., Simmon s v. Philips Elec. N. Am. Corp.*, No. 2:12–CV-39-TLS, 2015 WL 1418772 (N.D. Ind. Mar. 27, 2015) (quoting *Whitted*); *Hathaway v. Cintas Corp. Serv. Inc.*, 903 F. Sup.. 2d 669, 675 (N.D. Ind. 2012) (quoting *Whitted*); *McClellon v. Thermo King Corp.*, 2013 WL 6571946, at *10 (S.D. Ind. 2013) (quoting *Whitted* and citing *Barnard v. Saturn Corp., a Div. of General Motors Corp.*, 790 N.E.2d 1023, 1032 (Ind. App. 2003), which relies on a 1989 Indiana Court of Appeals case applying the old statute); *Hartman v. EBSCO Industries, Inc.*, 2013 WL 5460296, at *7 (N.D. Ind. 2013) (quoting *Rodefer v. Hill's Pet Nutrition, Inc.*, No. IP 01–123–C H/K, 2003 WL 23096486, at *9 (S.D. Ind. Nov. 7, 2003), which cites *Whitted*).  In fact, it appears that all of the authority cited by Ethicon in support of its argument that a safer alternative design is a *prima facie* element of a negligent design defect claim traces back to pre-1995 amendment to the IPLA.

9

Admittedly, the Indiana Legislature was not particularly clear in 1995 regarding whether it intended to completely do away with the safer alternative design requirement. As a result, many federal and state courts in Indiana held course and continued to require it as an element of a plaintiff's negligent design defect claim. But matters changed in 2010 when the Indiana Supreme Court finally addressed the issue. In *TRW Vehicle Safety Systems, Inc. v. Moore*, 936 N.E.2d 201 (Ind. 2010), the plaintiff brought a negligent design defect claim, among others, against the defendant seatbelt manufacturer, TRW, and the defendant vehicle manufacturer, Ford, after the plaintiff's decedent was ejected through the sunroof of his vehicle when his seatbelt developed slack in a rollover that followed a tire failure. *TRW Vehicle Safety Systems, Inc.*, 936 N.E.2d at 208. The jury apportioned 5% of the fault to TRW and 31% of the fault to Ford. *Id.* The Court of Appeals reversed, finding insufficient evidence to support the jury's verdict. *Id.* The Indiana Supreme Court disagreed.

Ford and TRW argued that the evidence presented at trial was insufficient because it failed to establish the requisite standard of care and prove that their conduct fell below that. *Id.* at 208-209. Specifically, they argued that plaintiff failed to present evidence of the proper standard of care, to offer testing, data, studies, or other evidence to show a safer, more practicable product design, and to rebut evidence that its proposed alternative design itself presented safety concerns. *Id.* at 209. In response, the Indiana Supreme Court explained:

10

Case 18-2974   Document 3E   Filed 02/01/2019   Pages 166

> The Indiana Product Liability Act generally imposes strict liability for physical harm caused by a product in an unreasonably dangerous defective condition. Ind. Code § 34–20–2–1. For actions based on an alleged product design defect, however, the Act departs from strict liability and specifies a different standard of proof: '[T]he party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product.' Ind. Code § 34–20–2–2. Thus the statute itself prescribes the applicable standard of care. We decline to require proof of any additional or more particular standard of care in product liability actions alleging a design defect.

*Id.* at 9. The opinion included a footnote at the end of the last sentence that reads:

> The American Law Institute recommends a different approach, prescribing specific sub-elements of a claim for strict product liability based on design defect. It views a product as 'defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.' Restatement (Third) of Torts: Products Liability § 2(b) (1997). Our legislature did not adopt this analytical framework but instead enacted in 1998 a negligence standard for product liability claims based on defective design. *See* Ind. Code § 34–20–2–2.

*Id.* at 209 n.2. The Indiana Supreme Court, therefore, plainly held that proof of alternative design is not required under Indiana law. It may, however, be probative evidence of the defendant's use of reasonable care. *Id.* at 209.

One would think that *TRW* put to bed the question of whether, under Indiana law, a safer alternative design is a necessary element of a design defect claim. But in the eight years that followed that decision, many state and federal courts in Indiana

11

continued to find that proof of alternative design is required for a design defect claim,

citing to *Whitted* or its progeny in support of that assertion.  These courts are, therefore,

relying on outdated common law, which was superseded by the negligence standard

spelled out in the 1995 amendments to the IPLA as confirmed by the Indiana Supreme

Court in *TRW*.  My job as a district judge sitting in a diversity case is to apply the law as

the highest court of the state has announced it.  *See State Farm Mut. Auto. Ins. Co. v. Pate*,

275 F.3d 666, 669 (7th Cir. ,2001 ("[A] United States district court sitting in diversity

must apply the law of the state as it believes the highest court of the state would apply

it if the issue were presently before that tribunal." (internal citation omitted)).  And the

Indiana Supreme Court could not have been any clearer in *TRW* in holding that proof of

an safer alternative design is not required under the IPLA.  As the Indiana Supreme

Court correctly pointed out in *TRW*, the Indiana Legislature could have adopted the

standard set out in the Restatement (requiring proof of safer alternative design), but it

chose not to.  *TRW Vehicle Safety Systems, Inc.*, 936 N.E.2d at 209 n.2.  It has not chosen to

amend that language to add in a safer alternative design requirement in the eight years

since the Indiana Supreme Court decided *TRW*.

What nails the point home that proof of a safer alternative design is not required

under Indiana law is the fact that the Indiana Model Civil Jury Instructions do not say a

single thing that suggests that proof of a safer alternative design is an element of a

negligence product liability claim.  *See* Indiana Model Civil Jury Instruction 2305.  One

would think that if proof of a safer alternative design was required in Indiana design

defect cases, the Indiana Model Civil Jury Instructions would reflect that fact. Yet they don't say boo about it.

Other courts have read *TRW* in the same way as I do. In *Hammons v. Ethicon, Inc. et al.*, No. 1305003913, 2016 WL 6821815 (Pa. Com. Pl. Sept. 30, 2016), a case involving an Indiana woman implanted with Ethicon's Prolift device, the Court of Common Pleas of Pennsylvania held that proof of an alternative design is not a required element under Indiana law. Citing and quoting *TRW*, that court ultimately held that, under Indiana law, "[t]estimony of an alternative design can be probative evidence as to the issue of the defendant's failure to use reasonable care and can support a reasonable inference of negligent design but is not requirement." *Hammons*, 2016 WL 6821815 at *5.

Likewise, in *Bailey v. Cottrell, Inc.*, 721 S.E.2d 571 (Ga. Ct. App. 2011) a Georgia case interpreting Indiana law, the court held that Indiana specifically has rejected a risk utility test in favor of a common law negligence analysis. One of the factors under the risk utility test is whether there is a safer alternative design. But as the Georgia Court of Appeals recognized, the risk utility test was jettisoned in Indiana in favor of a straight-forward negligence approach. In arriving at that conclusion, the Georgia court cited to the Indiana Supreme Court's analysis in *TRW* and its explicit rejection of the Restatement (Third) of Torts: Products Liability § 2(b) (1997). *Bailey*, 721 N.E.2d at 374-75 (citing *TRW Vehicle Safety Systems v. Moore*, 936 N.E.2d at 209, n.2.**).**

While the road to *TRW* admittedly was rocky, and confusion still remains in this state, I believe that the Indiana Supreme Court has made itself clear. As a result, I agree with the Kaisers that proof of safer alternative design is not a *prima facie* requirement of their case. To hold otherwise would be in contradiction of the clear Indiana Supreme Court precedent established in *TRW*, to which I am bound.

That said, while the Kaisers are not required to prove safer alternative design, evidence of it is probative of the issue of the Ethicon's failure to use reasonable care under the circumstances in designing Prolift. *See TRW*, 936 N.E. 2d at 209-210. This brings us to the first two issues of Ethicon's *Daubert* motion. Ethicon argues that Dr. Elliott should be precluded from testifying that nonsynthetic mesh procedures, such as abdominal sacrocolpopexy, are a safer alternative for the surgical treatment of stress urinary incontinence. [DE 252 at 2-3; DE 280 at 7.] Ethicon argues that a proffered safer alternative design must be a product, not a procedure. I agree.

Back when negligent design defect claims were creatures of common law and proof of safer alternative design was required, a plaintiff was required "to show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *See Whitted*, 58 F.3d at 1206 (7th Cir. 1995) (quoting *Pries v. Honda Motor Co., Ltd.*, 31 F.3d 543, 546 (7th Cir. 1994). This standard, generally speaking, remains. In other words, if a plaintiff chooses to put on evidence of a safer alternative design to show that the manufacturer was negligent, they are also required to present evidence that their proposed safer alternative design is

14

economically feasible. *See, e.g.*, *TRW*, 936 N.E. 2d at 209-210 (holding that there was

sufficient evidence to support the jury's verdict for the plaintiff because, among other

things, there was testimony that the defendant had been aware of the problem and that

an alternative, safer design was both technologically and economically feasible).

At the risk of stating the obvious, design defect cases focus on the design of the

*product* and if there was a feasible way to change the product to make it safer and avoid

the injury at issue. I have found no cases in this jurisdiction, and the Parties have not

pointed me to any, that consider a procedure or non-product as a relevant safer

alternative design. That is likely because evidence of a procedure that could have been

performed without the use of the product at issue does nothing to inform the jury on

the issue of whether there was a safer alternative design *of the product*.

For these reasons, evidence of non-mesh treatment alternatives is inadmissible as

proof of a "safer alternative design." However, that does not render this evidence

inadmissible altogether. Certainly, it is admissible as part of the back story of this case,

specifically as evidence of the options that were presented to Mrs. Kaiser to treat her

pelvic organ prolapse and the history of the development of Prolift. The Parties do not

contest this. Furthermore, the availability of non-mesh treatment alternatives also

speaks to the whether Ethicon was negligent in its design of Prolift and may be

considered in determining whether Ethicon exercised reasonable care under the

circumstances in designing the product. So while non-mesh surgical treatment

alternatives cannot be characterized as a "safer alternative design" by Dr. Elliott, it

amounts to much ado about nothing now that I have held that the Kaisers need not

offer proof of a safer alternative design in the first place.

The final issue is whether Dr. Elliott should be precluded from testifying that

other synthetic mesh devices offer safe alternatives.  [DE 252 at 5.]  Ethicon argues that

Dr. Elliott should be precluded from testifying that other synthetic mesh devices were

safer than Prolift on the basis that he does not believe that any safer alternatives exist

because Dr. Elliott does not believe that any device containing mesh is practical,

feasible, or reasonable.  I disagree.  The MDL Court found that Dr. Elliott is competent

to testify about the alleged benefits of lighter weight/larger pore-size mesh.  [DE 257-3

at 10.]  The fact that he evidently does not believe that any such devices are safe does

not preclude him from evaluating their safety on a comparative basis.  His opinions on

mesh, generally, speak to the weight to be given to his testimony on this point, not its

admissibility.  Ethicon will be free to cross-examine Dr. Elliott regarding his views of

mesh devices generally and regarding any inconsistent testimony or statements he has

given.  Accordingly, this portion of Ethicon's motion is denied.

## Conclusion

For the reasons discussed above, and at the oral argument held on November 28,

2017, Ethicon's Motion for Final Ruling as to Vladimir Iakovlev, M.D., DE 258, is

**GRANTED** and Dr. Iakovlev is prohibited from testifying about his degradation bark

theory.  Furthermore, as I explained above, under Indiana law, the Plaintiffs are not

*required* to prove that a safer alternative design to Prolift existed as an element of their

design defect claim.  It is, however, *relevant* to the Plaintiffs' design defect claim and they may, therefore, offer evidence of safer alternative designs in support of that claim. Dr. Elliott's testimony regarding non-mesh surgical treatments is inadmissible as proof of a "safer alternative design."  It is, however, admissible as it relates to Ethicon's alleged failure to exercise reasonable care under the circumstances in designing Prolift, generally.  Finally, Dr. Elliott's testimony that other synthetic mesh devices offer safe alternatives is admissible.  Ethicon's Motion for Final Ruling as to Daniel Elliott, M.D., DE 257, therefore, is **GRANTED IN PART AND DENIED IN PART** for the reasons stated in this Opinion and Order.

      **SO ORDERED**.

      ENTERED: February 7, 2018.

                     s/ Philip P. Simon
                    **PHILIP P. SIMON, JUDGE**
                    **UNITED STATES DISTRICT COURT**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION
 3   BARBARA KAISER, et al.,       )   Cause No.:
                                   )   2:17-CV-000114-PPS
 4              Plaintiffs,        )
                                   )
 5          vs.                    )
                                   )
 6   ETHICON, INC. and JOHNSON &   )   Hammond, Indiana
     JOHNSON,                      )   March 8, 2018
 7                                 )
                                   )
 8              Defendants.        )
                                   )
 9   _____
10                      VOLUME 9
                 TRANSCRIPT OF JURY TRIAL
11         BEFORE THE HONORABLE PHILIP P. SIMON
12   APPEARANCES:
13   For the Plaintiffs:    THOMAS O. PLOUFF
                            Costello, McMahon, Burke & Murphy
14                          150 N. Wacker Drive, Suite 3050
                            Chicago, Illinois 60606
15                          (312) 541-9700
16                          JEFFREY M. KUNTZ
                            Wagstaff & Cartmell
17                          4740 Grand Avenue, Suite 300
                            Kansas City, Missouri 64112
18                          (816) 701-1100
19                          EDWARD A. WALLACE
                            Wexler Wallace
20                          55 West Monroe, Suite 3300
                            Chicago, Illinois 60603
21                          (312) 346-2222
22   For the Defendants:    KATHLEEN A. GALLAGHER
                            Beck Redden LLP
23                          1221 McKinney Street, Suite 4500
                            Houston, Texas 77010
24                          (713) 951-6208
25
```

Page 1641

1  APPEARANCES (CONTINUED):
2  For the Defendants:     MARY NOLD LARIMORE
                Ice Miller, LLP
3               One American Square, Suite 2900
                Indianapolis, Indiana 46282
4               (317) 236-2407
5               DANIEL R. HIGGINBOTHAM
                Thomas Combs & Spann
6               P.O. Box 3824
                300 Summers Street, Suite 1380
7               Charleston, West Virginia  25338-3824
                (304) 414-1800
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1642

1        (The following proceedings were held in open court
2  beginning at 9:01 a.m., reported as follows:)
3        DEPUTY CLERK:  All rise.
4        THE COURT:  All right.  You can be seated.
5        Good morning, everyone.
6        Okay.  I just wanted to give you that last ruling.
7  I am going to deny the state of the art instruction.  I just
8  don't think there's sufficient evidence to present to the jury
9  that the defendant has, you know, presented evidence that this
10  Prolift and the way it was designed, for purposes of this case,
11  was, quote-unquote, the best technology reasonably feasible at
12  the time it was manufactured.
13       The references to state of the art were, I think, so
14  fleeting in this case that, if anything, it just confuses the
15  issue for the jury, and I just don't think there's sufficient
16  evidence to instruct on that, so that request of the defendants
17  is overruled.
18       Okay.  Is everybody ready to proceed?
19       MR. WALLACE:  Your Honor, the defendants raised one
20  issue with our slides.  We're going to need about five minutes
21  or so to clean it up.  I think we have worked out our
22  differences so we don't have to bring it to you.
23       THE COURT:  Okay.  That's fine.
24       MR. PLOUFF:  Judge, I would just ask -- I know that
25  there's an hour and a half for the closing from your

Page 1643

1  discussions last night.  I want Mr. Kuntz to have a half an
2  hour, and I'm not sure if I'm going to run over or not.
3  Ordinarily, I would have asked for 15 minutes a day for
4  evidence, which would give me two hours, but I don't really
5  think I want that it.  It is just that if I go over a little
6  bit I would like to still be able to keep half an hour for him.
7        Is that going to be an issue?
8        THE COURT:  Well, as I said last night, I'm not a
9  super kind of clock-watcher on this, but I feel like my job is
10  to come to the rescue of the jury at some point.
11       MR. PLOUFF:  Okay.
12       MR. KUNTZ:  We'll get it done in an hour and a half.
13       THE COURT:  So if I feel like it's getting repetitive
14  or -- so I'm going to give you a little bit of flexibility, but
15  I will start warning you that -- I will let you know,
16  Mr. Plouff, that you are at an hour now, just to let you know.
17       MR. PLOUFF:  I'm bringing it up in an abundance of
18  caution.
19       MR. WALLACE:  All right.
20       MS. PEPKE:  Can I address you?
21       THE COURT:  So do you guys want to have a few minutes
22  to try to sort that out?
23       MS. GALLAGHER:  If we could, Your Honor, and then we
24  have another issue.
25       THE COURT:  Okay.  Yeah.

Page 1644

1        Ms. Pepke, you wanted to address the court on something?
2        MS. PEPKE:  I do, Your Honor.
3        On the final verdict form that we received last night, we
4  have an objection that runs across sections 1, 2, 4, with the
5  wording.
6        Currently, it reads --
7        THE COURT:  I don't even have a copy of it in front of
8  me.
9        Ally, do you have a copy of it?
10       Why don't you tell me what it says.  I think I remember it.
11       MS. PEPKE:  Sure.
12       Currently, it says:  The jury has to unanimously find in
13  favor of Ethicon and Johnson & Johnson, and that type of
14  language runs through those three instructions, and the
15  implication is that we have some burden to establish our claim.
16       And we would suggest that it instruct the jury -- or it
17  read:  On Mrs. Kaiser's design defect claim, we, the jury,
18  unanimously find that Ms. Kaiser has established her claim.
19  Yes or no.
20       THE COURT:  I don't care.  Do you guys care?
21       MR. JACKSON:  I prefer to keep it just the way it is
22  on the form right now, Your Honor.
23       THE COURT:  I mean, it's going to take me about 10
24  minutes to redo this.  I think it is such a marginal
25  distinction you are making, but I don't care.

Page 1645

1    MS. PEPKE: We stand on our objection.
2    THE COURT: Fair enough.
3    So tell me what language you want.
4    MS. PEPKE: The front language stays the same. So:
5    On Ms. Kaiser's design defect claim, we, the jury, unanimously
6    find that Mrs. Kaiser has established her claim. And then the
7    blanks, instead of the names, would just say "yes" blank, "no"
8    blank, and then that type of language would follow through on
9    the failure to warn claim and the consortium claim.
10    THE COURT: All right. Why don't you give that
11    language to Allyson and we'll make those changes, and then you
12    guys can sort this issue out.
13    MR. PLOUFF: We don't have a clean set yet, right,
14    Judge?
15    THE COURT: No. We're copying them right now.
16    So, I guess, tell the jury we won't start until 9:30.
17    That's why we have these conferences the night before, and
18    that's why I would expect everybody to be here, to avoid
19    keeping these people who have been here for two weeks.
20    MS. PEPKE: Yes, Your Honor.
21    (A recess was had at 9:06 a.m.)
22    (The following proceedings were held in open court
23    beginning at 9:22 a.m., reported as follows:)
24    DEPUTY CLERK: All rise.
25    THE COURT: Clarence, do you want to call the jury.

Page 1646

1    You can be seated.
2    (Jury in at 9:24 a.m.)
3    THE COURT: All right. You can be seated.
4    Ladies and gentlemen, please accept our apologies for that
5    delay. There was a matter I had to take up, so it is nobody's
6    fault. I appreciate your patience.
7    You have heard all of the evidence that you can consider in
8    this case, and now the parties will have an opportunity to make
9    their final arguments. I just, again, warn you that what the
10    lawyers say is not evidence and you should disregard what they
11    say unless it is supported by your collective memory of the
12    evidence.
13    So counsel for the plaintiff will go first, followed by
14    counsel for the defendant, followed by a rebuttal from counsel
15    for the plaintiff.
16    So with that, Mr. Plouff, you may proceed with your final
17    argument.
18    MR. PLOUFF: May it please the Court, counsel, members
19    of the jury: Good morning.
20    Every single medical society has come out against the
21    vaginal placement of mesh for pelvic organ prolapse, POP,
22    repair. Yet, Ethicon continues to defend its product as being
23    safe.
24    No physician --
25    MS. GALLAGHER: Objection, Your Honor. It's a

Page 1647

1    Williams-State Farm.
2    THE COURT: I'm sorry?
3    MS. GALLAGHER: It's a Williams-State Farm.
4    THE COURT: I don't understand that reference. Do you
5    want to approach the bench?
6    MS. GALLAGHER: Yes.
7    (Bench conference.)
8    MS. GALLAGHER: This is the point that we worked on
9    this morning. They cannot say that we cannot come into
10    courtrooms and defend ourselves. We have a constitutional
11    right to do that. And to argue that that is improper is a
12    constitutional violation in the string of cases on what you can
13    and cannot do in punitive arguments.
14    THE COURT: This is the issue we talked about on the
15    punitive damages?
16    MS. GALLAGHER: They have a right to come to court to
17    defend their product.
18    MR. PLOUFF: Right, but I didn't say that. I'm just
19    saying they come in -- they're saying they're defending it on
20    the basis it's safe.
21    THE COURT: Okay. You understand that point, that
22    they have a right to be here defending their product?
23    MR. PLOUFF: Right.
24    THE COURT: And so just proceed.
25    MR. PLOUFF: Okay.

Page 1648

1    (End of bench conference.)
2    MR. PLOUFF: Ethicon still says that Prolift is safe,
3    even though the medical societies have come out against it. No
4    physician continues to implant Prolift and other vaginal mesh
5    placement kits like it. Prolift and these other kits and the
6    complications, is how these medical societies have come out
7    against it. There are just too many complications.
8    Prolift's been discontinued and Prolift was an unreasonably
9    dangerous product.
10    The medical literature speaks against the safety of Prolift
11    and other vaginal mesh products.
12    If your verdict determines that Prolift was an unreasonably
13    dangerous product, then your verdict will be consistent with
14    what all the medical societies now say.
15    If your verdict is that this product is safe, then that
16    will be contrary to what every medical society has concluded.
17    And these are all the medical societies -- excuse me --
18    ACOG, AUGs, NICE, EEU, Canadian Urological Association, medical
19    societies from around the world, that have concluded that these
20    products are unsafe.
21    Dr. Bales now knows that the risk of the products outweigh
22    the complications. Barb Kaiser knows that the risks outweigh
23    the benefits. And Ethicon knew from the beginning that the
24    risks outweighed the benefits.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| BARBARA KAISER and | ) |
| ANTON KAISER, | ) |
| | ) |
| Plaintiffs, | ) |
| | )   CAUSE NO. 2:17-CV-114-PPS |
| v. | ) |
| | ) |
| JOHNSON & JOHNSON and | ) |
| ETHICON INC., | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Prior to the trial of this matter, I heard oral argument on various motions *in limine* filed by the Parties.  At the hearing, I denied Ethicon's Motion to Admit FDA Evidence, DE 248, and granted the Kaisers' mirror image motion to exclude FDA evidence, DE 244.  I provided a detailed explanation from the bench on the reasons for those rulings, but I also told the Parties that a written opinion would follow.  [DE 276 at 34-40.]  This is that opinion.

While this case was before him as part of the MDL, Judge Goodwin excluded evidence regarding the FDA's §510(k) clearance process.  [*See, e.g.*, DE 146.]  Judge Goodwin explained:

> I have repeatedly excluded evidence regarding the FDA's section 510(k) clearance process in these MDLs, and will continue to do so in these case[sic], a position that has been affirmed by the Fourth Circuit.  *In re C. R. Bard, Inc.*, 81 F.3d 913, 921–23 (4th Cir. 2016) (upholding the determination that the probative value of evidence related to section 510(k) was substantially outweighed by its possible prejudicial impact under Rule 403). Because the section 510(k) clearance process

does not speak directly to safety and efficacy, it is of negligible probative value. *See In re C. R. Bard*, 81 F.3d at 920 ("[T]he clear weight of persuasive and controlling authority favors a finding that the 510(k) procedure is of little or no evidentiary value."). Delving into complex and lengthy testimony about regulatory compliance could inflate the perceived importance of compliance and lead jurors "to erroneously conclude that regulatory compliance proved safety." *Id.* at 922. Accordingly, expert testimony related to the section 510(k) process, including subsequent enforcement actions and discussion of the information Ethicon did or did not submit in its section 510(k) application, is **EXCLUDED**.

[*Id.*]

The issue of the admissibility of FDA §510(k) evidence was reanimated before me because the Indiana Product Liability Act provides a rebuttable presumption that a product is not defective, and the manufacturer is not negligent, where the product complied with applicable codes, standards, regulations, or specification. *See* Ind. Code § 34-20-5-1. Ethicon argues that evidence regarding the fact that Prolift was cleared for marketing through §501(k) review was relevant to this litigation because of the IPLA's rebuttable presumption and, in fact, mandated application of the presumption to this case.

Before I explain why I agree with Judge Goodwin, and the majority of the other courts that have addressed this issue, some background on the §510(k) process is necessary. The §510(k) review process originates from the Medical Device Amendments of 1976 (MDA) to the Federal Food, Drug, and Cosmetic Act. The MDA was enacted in order to "impose[ ] a regime of detailed federal oversight" of medical devices. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008). Under the MDA, certain

devices must complete a thorough premarket approval (PMA) process with the FDA before they may be marketed, including all devices that cannot "provide reasonable assurance of [their] safety and effectiveness" under less stringent scrutiny, and that are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" or "present[ ] a potential unreasonable risk of illness or injury." *Id.* at 317; 21 U.S.C. § 360c(a)(1)(C).  The PMA process requires the applicant to demonstrate a "reasonable assurance" that the device is both "safe and effective under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344 (2001) (quoting 21 U.S.C. § 360e(d)(2)(A), (B)).

However, an exception to the PMA requirement exists for medical devices that were already on the market prior to the MDA's enactment in 1976; these devices are allowed to remain on the market until the FDA initiates and completes PMA review for them.  *See* 21 U.S.C. § 360e(b)(1)(A); *Buckman*, 531 U.S. at 345.  In addition, to prevent the monopolistic power that this exception might bestow on the manufacturer of the predicate device, the MDA also allows other manufacturers to piggyback on earlier products by allowing them to market devices that are shown to be "substantially equivalent" to pre–1976 devices that are exempt from the PMA requirement.  *Buckman*, 531 U.S. at 345; 21 U.S.C. § 360e(b)(1)(B)).  The §510(k) process is the method by which a manufacturer demonstrates substantial equivalence.  *Id.*

3

While the MDA provided this initial framework, the Safe Medical Devices Act of 1990 provided firmer footing for this loosely designed process. The SMDA finally codified the definition of substantial equivalence that the FDA had developed administratively through the experience of clearing devices for the 14 years since the enactment of the MDA. *See* 21 U.S.C. §360c(i). In addition, the SMDA ended the legal necessity to cite a pre-MDA predicate device, so that devices cleared after the enactment of the MDA could be used as predicates without construction of a clearance chain back to a pre-MDA predicate device. *See* 21 U.S.C. §360c(f). While this allowed the state of the art to evolve more freely, it created a more tangential relationship between FDA clearance and the safety-focused PMA process.

Returning to the case at hand, in September 2007, Ethicon submitted its §510(k) notice to the FDA for Prolift. [DE 248-4.] The FDA found Prolift "substantially equivalent . . . to legally marketed predicated devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act that do not require approval of a premarket approval application," classifying Prolift as a Class II device and clearing it to proceed to market in May 2008. [DE 248-5.] The notice explicitly stated that "FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies." [*Id.*]

4

Ethicon argues that evidence of this clearance is relevant to this action because it entitles Ethicon to the rebuttable presumption found in Ind. Code § 34-20-5-1. I disagree. Indiana Code § 34-20-5-1 provides:

> In a product liability action, there is a rebuttable presumption that the product that caused the physical harm was not defective and that the manufacturer or seller of the product was not negligent if, before the sale by the manufacturer, the product:
>
> (1) was in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, and labeled; or
>
> (2) complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved by the United States or by Indiana, or by an agency of the United States or Indiana.

This presumption has been interpreted narrowly. While it is clear from its wording that the first part of the presumption relates to safety of the product, the Indiana Court of Appeals has explicitly found that in order "for evidence of compliance with governmental standards to be relevant, the standard itself must relate to the risk or product defect at issue." *Wade v. Terex-Telect. Inc.*, 966 N.E.2d 186, 194 (Ind. Ct. App. 2012); *see also Rogers ex rel. Rogers v. Cosco, Inc.*, 737 N.E.2d 1158, 1163 (Ind. Ct. App. 2000) (finding that compliance a Federal Motor Vehicle Safety Standard warranted the application of the presumption, which the plaintiff then needed to rebut to succeed on her claims under the IPLA). This makes sense, logically, given that whether a product is defective under the IPLA turns on whether it is "unreasonably dangerous" to any

5

A34

user or consumer.  *See* Ind. Code 34-20-2-1.  As such, for the presumption to apply in this case, Ethicon would have to show that the standard with which it conformed or complied—the §510(k) process—spoke to safety.  The problem for Ethicon, as shown below, is that the §510(k) process speaks to equivalency, not safety.

While it may seem counterintuitive that this aspect of the FDA's clearance process does not speak to the safety of the device, that is the generally accepted interpretation of the §510(k) process by courts in this country.  This includes those courts handling cases in states with rebuttable presumptions.  *See, e.g., Eghnayem v. Boston Scientific Corp.*, 873 F.3d 1304 (11th Cir. 2017) (applying Florida law); *Tingey v. Radionics*, No. 04-4216, 193 Fed. App'x 747, 755, 2006 WL 2258872, at *6 (10th Cir. Aug. 8, 2006) (applying Utah law); *Adams et al. v. Boston Scientific Corp.*, 177 F. Supp. 3d 959 (S.D. W. Va. 2016) (applying Texas law); *Williams v. Boston Scientific Corp.*, No. 2:12-CV-02052, 2016 WL 1448860, at *3 (S.D. W. Va. Apr. 12, 2016) (applying Wisconsin law); *Lewis v. Johnson & Johnson*, 991 F. Supp. 2d 748, 761 (S.D. W. Va. 2014) (applying Texas law).

It all starts with *Meditronic, Inc. v. Lohr*, 518 U.S. 470, 492 (1996), where the United States Supreme Court explained that "the §510(k) process is focused on *equivalence*, not safety" and the design of the device "has never been formally reviewed under the MDA for safety or efficacy."  *Id.* at 493.  As the Court explained, "substantial equivalence determinations provide little protection to the public.  These determinations simply compare a post–1976 device to a pre–1976 device to ascertain whether the later device is no more dangerous and no less effective than the earlier

6

device.  If the earlier device poses a severe risk or is ineffective, then the later device

may also be risky or ineffective." *Id.*

The §510(k) process is a cursory one when compared to the strenuous PMA

review.  To illustrate this point, in *Lohr*, the Supreme Court noted that "[i]n contrast to

the 1,200 hours necessary to complete a PMA review, the §510(k) review is completed in

an average of only 20 hours.  As one commentator noted: 'The attraction of substantial

equivalence to manufacturers is clear.  Section 510(k) notification requires little

information, rarely elicits a negative response from the FDA, and gets processed very

quickly.'" *Id.* at 479 (quoting Adler, The 1976 Medical Device Amendments: A Step in

the Right Direction Needs Another Step in the Right Direction, 43 Food Drug Cosm. L.J.

511, 516 (1988)).

In *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), the Supreme Court expanded on

its analysis in *Lohr*.  The Court explained that the PMA process "*is* federal safety

review," as opposed to §510(k) review, which is a test for substantial equivalence.  *Id.* at

323.  As the Court explained, "[w]hile §510(k) is focused on equivalence, not safety,

premarket approval is focused on safety, not equivalence." *Id.* (quotations marks and

citations omitted).

This is a distinction with a difference as it relates to this case because, as I

discussed above, for the IPLA presumption to apply, the standard with which Prolift

conformed or complied must speak to safety.  Because §510(k) is focused on

equivalency and not safety, it is not relevant to the application of the presumption in this case and does not mandate its application.

Furthermore, under Federal Rule of Evidence 403, a court may "exclude relevant evidence if its probative value is substantially outweighed" by the danger of, among other things, confusing the issues, misleading the jury, and wasting time. I agree with Judge Goodwin that the §510(k) evidence does not speak directly to safety and efficacy and, therefore, is of very little probative value. I believe that introduction of evidence regarding the §510(k) process potentially would have confused the jurors regarding the meaning and importance of §510(k) clearance, possibly resulting in the jurors erroneously concluding that §510(k) clearance proved safety.

What's more, the trial would have been completely sidetracked with the introduction of the FDA evidence. If the evidence regarding Prolift's §510(k) clearance had been admitted into evidence, almost assuredly, Prolift's *whole* FDA story would have been told to the jury, including evidence that after the Prolift device was marketed, it later received FDA scrutiny and was subsequently removed from the market after a series of exchanges with the FDA regarding its safety. This would require the introduction of additional evidence and testimony from regulatory experts and Ethicon employees. When balancing the probative value of the evidence against these dangers and the needless consumption of time, I find that excluding the evidence is appropriate.

8

Case: 18-2944   Document: 25   Filed: 02/01/2019   Pages: 166

**Conclusion**

For the reasons discussed above, and at the hearing held on November 28, 2017,

Ethicon's Motion to Admit FDA Evidence, DE 248, is **DENIED** and the Kaisers' Motion

in Limine to Exclude FDA §510(k) evidence, DE 244, is **GRANTED.**

      **SO ORDERED**.

      ENTERED: March 16, 2018.

                 _s/ Philip P. Simon_____
                **PHILIP P. SIMON, JUDGE**
                **UNITED STATES DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BARBARA KAISER and ANTON KAISER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 2:17-cv-00114-PPS-JEM |
| v. ) | |
| ) | |
| JOHNSON & JOHNSON and ETHICON, ) | |
| INC., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

This is a products liability case where Barbara Kaiser claimed to have been

substantially and permanently injured by a mesh product that was implanted in her

vagina to treat her pelvic organ prolapse. The mesh product was designed and

manufactured by defendants Johnson & Johnson and Ethicon, Inc. After a two week

trial, the jury agreed with Mrs. Kaiser and found in her favor on her failure to warn and

design defect claims. The jury awarded Mrs. Kaiser $10 million in compensatory

damages and $25 million in punitive damages. The jury found in the defendants' favor

on the claim of loss of consortium brought by Anton Kaiser, Mrs. Kaiser's husband.

Defendants have filed a motion contesting the verdict, seeking judgment as a

matter of law on both the failure to warn and design defect claims, or in the alternative

a new trial, or in the alternative to that, a remittitur of the jury's damages award. [DE

416.] Because there was sufficient evidence for a reasonable jury to find in favor of Mrs.

Kaiser, I will deny defendants' motion for a judgment as matter of law and likewise

deny defendants' motion for a new trial. Similarly, because I find the jury's compensatory damages award was neither monstrously excessive nor the product of passion or prejudice, I will deny Ethicon's request for a remittitur of the jury's compensatory damages award.

The jury's punitive damage award, however, is another story. I find the punitive damages award excessive and unreasonable under controlling law. As such, I will grant defendants' motion for remittitur of the jury's $25 million punitive damage award.

## Background

Defendants Ethicon and Johnson & Johnson are corporations which, among other lines of business, design, market, and sell medical devices. Ethicon is a wholly owned subsidiary of Johnson & Johnson. For ease of reference I will refer to both defendants as "Ethicon." One of the devices sold by Ethicon was the Prolift Pelvic Floor Repair System. Prolift is a vaginal mesh which was implanted in Mrs. Kaiser's pelvis in January 2009 to treat her pelvic organ prolapse condition. Mrs. Kaiser subsequently experienced various issues including vaginal pain, pelvic pain, pain during intercourse, bladder spasms, and bowel issues. All of these problems associated with the mesh necessitated a second surgical procedure to have the mesh removed from Mrs. Kaiser's vagina, or at least as much of it as could be removed. There was evidence that once the mesh is implanted it becomes very difficult, if not impossible, to have it all removed; it grows into the tissue, hardens and causes substantial pain.

Mrs. Kaiser alleged in her complaint that her injuries were the result of Prolift's

-2-

A40

Case 18-2944   Document 25   Filed 02/21/2019   Pages: 166

defective design and that Ethicon did not adequately warn Mrs. Kaiser's surgeon (Dr. Bales) of the risks associated with Prolift. The case was originally filed in the United States District Court for the Southern District of West Virginia, where a consolidated Multi-District Litigation related to Prolift and other vaginal mesh products is pending. [DE 1.] On March 28, 2017 the case was transferred here because all pretrial proceedings had concluded, and the case was ready for trial. [DE 160.]

A jury trial began on February 26, 2018 and each side put on extensive evidence, including multiple witnesses, both fact and expert, both live and through videotaped deposition testimony. Trial concluded on March 8, 2018 and after several hours of deliberations, the jury returned a verdict in favor of Mrs. Kaiser, awarding her $10 million in compensatory damages and $25 million in punitive damages. [DE 405.] Ethicon timely filed the present motion seeking judgment as a matter of law, or in the alternative a new trial, or in the alternative of that, a remittitur of the jury's damages awards.

## Legal Standard

It is important to note at the outset the posture and standard applicable to defendants' motions. Federal Rule of Civil Procedure 50 governs motions for judgments as a matter of law. Defendants are entitled to a judgment as a matter of law only if I find "that a reasonable jury would not have a legally sufficient evidentiary basis to find" in favor of Mrs. Kaisser. Fed. R. Civ. P. 50(a)(1). In making this determination, I do not approach the case with new eyes, examining the evidence and the jury's verdict as

though I am the fact finder receiving the evidence for the first time. Instead, I may only disregard the jury's verdict "if no reasonable jury could have found in [Mrs. Kaiser's] favor." *Erickson v. Wisc. Dept. of Corrections*, 469 F.3d 600, 601, (7th Cir. 2006). "This is obviously a difficult standard to meet." *Waite v. Bd. of Trustees of Ill. Cmty. Coll. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005). What makes it such a daunting standard is that the Supreme Court has instructed that I "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000).

In considering the present motion for judgment as a matter of law, it is not my role to "re-weigh the evidence presented at trial or make credibility determinations." *Black & Decker Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2007 WL 108412, at *1 (N.D. Ill. Jan. 12, 2007) (citation omitted). As the Supreme Court has succinctly put it, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The standard applicable to Ethicon's motion for a new trial is similar but distinct. Federal Rule of Civil Procedure 59(a) governs a motion for a new trial and states that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. Proc. 59(a)(1)(A). The Seventh Circuit has explained, "'[a] motion for a new trial should succeed 'only if the verdict is

-4-

against the manifest weight of the evidence.'" *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003) (quoting *Lowe v. Consol. Freightways of Del., Inc.*, 177 F.3d 640, 641 (7th Cir. 1999); *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) ("[N]ew trials granted because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."). Defendants "must demonstrate that no rational jury could have rendered a verdict against them." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006) (citation omitted).

Once again, in making this determination, I "must view the evidence in a light most favorable to [Mrs. Kaiser], leaving issues of credibility and weight of evidence to the jury." *Id.* "[I]t is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Latino*, 58 F.3d at 315. "Even when evidence is contradictory, '[i]t's the jury's job—not the district court's job or the job of a panel of appellate judges—to figure out who's telling the truth.'" *United States v. Hassebrock,* 663 F.3d 906, 920 (7th Cir. 2011) (citation omitted).

## Discussion

This was a close case with conflicting expert testimony. On the one hand, it is certainly true that defendants put forth evidence which supported their theory of the case: that Prolift was a safe product, that all necessary warnings were fully disclosed to the necessary individuals, and that Mrs. Kaiser's injuries could not be traced to any harm caused by the vaginal mesh. But it is equally clear the jury did not believe or find

defendants' evidence persuasive enough to render a verdict in their favor. On the contrary, the jury obviously believed Mrs. Kaiser and the witnesses who testified that Prolift was a defective product, that Ethicon knew of the risks associated with Prolift but chose not to disclose them to surgeons using the product, and that Mrs. Kaiser's injuries were the result of her having Prolift surgically implanted in her. Given the substantial evidence on both sides of the ledger, it was up to the jury to decide whose story was more believable. With these general thoughts in mind, I will now turn to the various motions brought by Ethicon.

### A. Judgment as a Matter of Law as to Failure to Warn

Defendants' central argument concerning why Mrs. Kaiser's failure to warn claim must fail is one of causation. Ethicon argues that Kaiser failed to offer sufficient evidence at trial that Dr. Bales, the surgeon who implanted the Prolift device into her, was not adequately warned of risks related to Prolift. [DE 416 at 10-16.] It is the sufficiency of the warnings to Dr. Bales — not Mrs. Kaiser — that is at issue here. This is because under the so-called "sophisticated or learned intermediary doctrine" warnings for prescription drugs and medical devices "need only be directed to doctors, not patients who are the ultimate users." *Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 549 (Ind. Ct. App. 1979). Typically, this is a question of fact for the jury to determine because "the intermediary's alleged sophistication may be more or less reasonable given the product's nature, complexity and associated dangers, the likelihood that the intermediary will communicate warnings to the ultimate consumer, the dangers posed

to the ultimate consumer by an inadequate or nonexistent warning, and the feasibility of requiring the manufacturer to directly warn the product's ultimate consumers." *Nat. Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 164 (Ind. Ct. App. 1997).

In support of their argument, defendants rely primarily upon Dr. Bales's testimony. But Dr. Bales' testimony was in flux; he said different things at different times in his deposition. It's worth pointing out that Dr. Bales was not subpoenaed to testify at the trial despite the fact that he was within the subpoena power of the Court. I found this curious, but both parties chose instead to simply rely on his deposition testimony, a portion of which was read to the jury. It is true, as the defendants correctly note, that Dr. Bales's testimony was not entirely favorable to Mrs. Kaiser. For example, he testified that he did not read the Instructions for Use ("IFU") before every surgery. [DE 395, Ex. H, Bales Tr. at 116:19-118:1.] But Dr. Bales also testified that he read the IFU for Prolift multiple times, followed it when implanting Prolift, and that the IFU influenced his decision to implant Prolift in Mrs. Kaiser. [*Id.* at 19:05-19:21; *id.* at 19:23-20:09.]

On the issue of whether he would have done anything differently had he known at the time of Mrs. Kaiser's surgery what he later found out, Dr. Bales' testimony waxed and waned. On the one hand, when asked generally if he "would have done anything differently with respect to Ms. Kaiser's . . . surgery" he responded, "No, not looking back, I don't think I would have done anything differently." [*Id.* at 84:9-1, 85:6-10.] On the other hand Dr. Bales specifically testified that once he realized that the

-7-

complications from Prolift were happening a "little too frequently" and the "risks started to become a little more than you would like and the benefits are not abundantly clear," he started recommending against the continued use of vaginal mesh. [*Id.* at 51:15-52:6.] It was in this context that Dr. Bales provided the following critical piece of testimony: he concluded that it was "fair to say that in hindsight, had I seen potential problems that occurred, I may not have started employing the Prolift." [*Id.* at 22:16-23.] This was the clinching testimony relating to causation that allowed the failure to warn claim to go to the jury. So while Dr. Bales said some things that were contradictory, it was ultimately for the jury to evaluate his testimony and decide what weight, if any, to put on any particular piece of evidence.

In sum, there was evidence showing that Dr. Bales read and reviewed the Prolift IFU many times prior to Mrs. Kaiser's surgery. There was also evidence that Dr. Bales was familiar with some of the risks associated with Prolift prior to Mrs. Kaiser's surgery, but not all of them. In that regard, the most damning testimony from Dr. Bales was his statement that if he knew at the time of Mrs. Kaiser's surgery what he later found out about the problems associated with Prolift, he would not have used the device. In other words, after learning more about the Prolift after implanting it in Mrs. Kaiser, he began to have doubts concerning the efficacy of the product compared to its risks. This was compelling testimony from an experienced surgeon that the jury was entitled to credit.

Defendants likewise argue that Prolift's warnings were sufficient as a matter of law because risks associated with Prolift were fully disclosed in literature and commonly known to pelvic floor surgeons like Dr. Bales. [DE 416 at 11-12.] But Dr. Bales and Kaiser's expert Dr. Elliott testified to the contrary — that they were not aware of every risk claimed in January 2009 or that such risks were necessarily generally known amongst pelvic floor surgeons. [DE 395, Ex. H, Bales Tr. at 22:16-19; Trial Tr. 610:3-15 (testimony of Dr. Elliott).] The jury heard testimony from Dr. Elliott that the frequency, severity and permanence of certain complications were not disclosed within the IFU. [Trial Tr. at 398:4-399:6; *id.* at 388:7-390:19.] It was the role of the jury, as the fact finder, to determine whether the warning was adequate under the sophisticated intermediary doctrine. *Downs*, 685 N.E.2d at 163 ("Whether a manufacturer has discharged its duty under the sophisticated intermediary doctrine is almost always a question for the trier of fact."). And the jury decided that the warning was inadequate in this case.

Defendants further criticize the testimony of Mrs. Kaiser's experts, Dr. Elliott and Dr. Rozenzweig, for testifying that they expect all risks related to a medical device to be disclosed within the IFU. [DE 416 at 11.] Defendants argue that this testimony put forth an impermissibly high standard— higher than what is required under the law. But defendants' arguments suffer from a fatal flaw; plaintiffs' experts did not testify as to the legal standard applicable to a failure to warn or opine on the law. The jury instructions stated the correct legal standard, namely that a manufacturer need only

Case: 18-2944   Document: 35   Filed: 02/01/2019   Pages: 166

disclose "reasonable warnings about the dangers of the product when the seller, by exercising reasonable diligence, could have made those warnings available to the user or consumer." [Trial Tr. 1744:15-19.] There is no reason to believe that the jury disregarded those instructions in reaching its verdict. *See Schandelmeier-Bartels v. Chicago Park Dist.,* 634 F.3d 372, 387 (7th Cir. 2011) ("We assume that the jury followed the instructions as they were provided.").

In sum, there was sufficient evidence for a reasonable jury to conclude that Ethicon failed to warn Dr. Bales of the necessary risks related to Prolift. The law does not require a plaintiff to offer unequivocal evidence at a trial or proof beyond a reasonable doubt, only sufficient evidence that a reasonable jury could find in its favor. *See* Fed. R. Civ. P. 50(a)(1). For the reasons I have just stated, Mrs. Kaiser met that standard here on the failure to warn claim.

### B. Judgment as a Matter of Law as to Design Defect

On the design defect claim, defendants raise four arguments as to why they are entitled to a judgment as a matter of law: First, that they were entitled to a state of the art presumption under Indiana law; second, that the evidence offered by Kaiser failed to establish that Prolift was in fact defective; third, that Kaiser failed to establish that her injuries were caused by Prolift; and fourth, for the first time before me, Ethicon raises a conflict preemption defense, arguing that the FDA's requirements that new or altered products receive some form of FDA clearance before they can be marketed conflicts with Mrs. Kaiser's state law claim. I am not persuaded by any of these arguments.

-10-

## 1. State of the Art Presumption under Indiana Law

The Indiana Products Liability Act (IPLA) allows for a defendant to avail itself of a rebuttal presumption that its product was not defective if it was designed and manufactured "in conformity with the generally recognized state of the art applicable to the safety of the product at the time the produce was designed, manufactured, packaged, and labeled." Ind. Code § 34-20-5-1. The statute does not define "state of the art" but courts have defined it to mean "the best technology reasonably feasible." *Indianapolis Athletic Club, Inc. v. Alco Standard Corp.*, 709 N.E.2d 1070, 1074 (Ind. Ct. App. 1999). In order to avail itself of the presumption, a defendant must put forth "[e]vidence of the existing level of technology, industry standards, the lack of other advanced technology, the product's safety record, [or] the lack of prior accidents . . . in order to prove that a product is state of the art." *Wade v. Terex-Telelect, Inc.* 966 N.E.2d 186, 192 (Ind. Ct. App. 2012) (citing *Weller v. Mack Trucks, Inc.*, 570 N.E.2d 1341, 1343 (Ind. Ct. App. 1991). A defendant must make a showing that no other similarly advanced technology existed at the time the product was designed and manufactured. *Wade*, 966 N.E.2d at 193-194.

On this issue, this case is similar, albeit the inverse, to the facts before the Indiana Court of Appeals in *Wade*. In that case, the trial court actually gave the "state of the art" jury instruction but the Court of Appeals found that to be improper and reversible error because the defendants failed to offer sufficient evidence at trial which would meet their burden to make use of the rebuttable presumption. The court in *Wade* held that the

-11-

A49

defendant was not entitled to the rebuttable presumption in part because they

manufactured products which both had and did not have the design defect in question

(a lack of interior step in a "bucket" attached to a vehicle used by electrical workers to

repair power lines). *Wade*, 966 N.E.2d at 194-195 ("The fact that Terez manufactured a

liner with an interior step at the time that the liner at issue was manufactured shows

that there was other advanced technology available.").

     I was guided by *Wade* in my decision not to give a state the art instruction. At the

time Prolift was launched, defendants manufactured another vaginal mesh material,

known as Ultrapro. This existence of an alternative belies any notion that Prolift was

truly **the** state of the art at the time. It is true that certain witnesses did testify that

Prolift was in their opinion a good product and "better than anything that has been out

there before." [DE 387 Hinoul Tr. 1282:22-1283:1.] But there was competing testimony

that even at the time Prolift was launched, it was contemplated that the mesh material

used in Prolift would be replaced, and potentially by Ultrapro, another mesh product

produced by Ethicon. [DE 395, Ex. E, Hinoul Tr. 891:2-892:3; DE 395, Ex. I, Arnaud Tr.

367:7-368:5.]

     Likewise, there was evidence that at the time Prolift first began to be marketed,

defendants had not conducted any clinical trials of Prolift in humans. [DE 395, Ex. E,

Hinoul Tr. 200:9-200:12; *id.* at 726:21-726:25; *id.* at 727:1-727:4.] Thus, there was no

evidence which Ethicon did or could have introduced showing Prolift's specific safety

track record at the time it was brought to market. *See Wade*, 966 N.E.2d at 194 ("Terex

-12-

introduced no evidence regarding the product's safety record and the lack of prior accidents pertaining to the buckets . . .""). Given that defendants did not present sufficient evidence to warrant the rebuttal presumption and jury instruction on state of the art, they cannot sufficiently show that they were entitled to judgment as a matter of law on this same issue.

### 2. Lack of Design Defect

Defendants next argue that all of Mrs. Kaiser's complications "were well known to pelvic floor surgeons, including Dr. Bales." [DE 416 at 19.] Without any unknown or undisclosed risk, a product cannot have been unreasonably dangerous. *Id.* But as I did above, I must reject this argument relating to Dr. Bale's knowledge because, while there was testimony indicating that Dr. Bales appreciated many risks associated with Prolift, there was additional testimony, both from Dr. Bales himself and Dr. Elliott that both he and the pelvic floor surgeon community were not fully apprised of every risk associated with Prolift. [DE 395, Ex. H, Bales Tr. at 22:16-19; Trial Tr. 610:3-15.] Thus it was not unreasonable as a matter of law for the jury to find for Kaiser on this element of her claim.

Defendants' main argument on this element, however, is that I reconsider my prior ruling on whether proof of a safer alternative design is an element of a design defect claim under Indiana law. [DE 416 at 19-20.] My prior ruling [DE 329 at 6-14], that such proof is not an element of a design defect claim under Indiana law, was dictated by the Indiana Supreme Court's decision in *TRW Vehicle Safety Systems, Inc. v. Moore*,

936 N.E.2d 201 (Ind. 2010). In *TRW*, the Indiana Supreme Court squarely rejected any

such requirement based upon the language of the IPLA. *TRW*, 936 N.E.2d at 209 ("Thus

the statute itself prescribes the applicable standard of care. We decline to require proof

of any additional or more particular standard of care in product liability actions

alleging a design defect."); *id.* at 209, n.2 (noting that Indiana legislature declined to

adopt the America Law Institute's "different approach" which requires proof of safer

alternative design as an element of a design defects claim). Notwithstanding some loose

language in several cases to the contrary, it remains my view the *TRW* settles the issue

of whether evidence of a safer alternative design is necessary in a design defect case

brought under Indiana. The Indiana Supreme Court has stated explicitly that such proof

is not required. That's the end of the matter from my point of view.

What's more, defendants have not offered any additional basis for me to

reconsider my ruling but instead state that they have done so only "to preserve the

issue" while repeating their prior arguments. [DE 416 at 19.] Nor have they provided

any persuasive reason as to why I should depart from Indiana law as decided by

Indiana's highest court. Since this issue was squarely decided in *TRW* and there has

been no intervening change in the law or other manifest error, I decline to reconsider

this issue or find it a basis for a judgment as a matter of law in defendants' favor. *Cain v.*

*Grams*, No. 09-CV-145-BBC, 2009 WL 2408342, at *1 (W.D. Wis. July 31, 2009) ("[A]

motion to reconsider should not be used to rehash previous arguments.") (citing *Oto v.*

*Metro Life Insurance Co.,* 224 F.3d 601, 606 (7th Cir. 2000)); *Lock Realty Corp. IX v. U.S.*

*Health, LP,* No. 3:06-CV-487RM, 2010 WL 148296, at *1 (N.D. Ind. Jan. 13, 2010) ("[T]he court's orders are not mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

### 3. Causation

Ethicon next argues that Mrs. Kaiser failed to offer sufficient evidence that Prolift was the actual cause of her injuries. On this argument, defendants seem to misunderstand what was required, arguing that Kaiser "failed to **rule out** other plausible causes" or that Kaiser's "treating physicians could not say **with certainty** that mesh was the cause of her pain." [DE 416 at 20 (emphasis added).] Kaiser's burden as to causation is not one of absolute certainty or to prove that Prolift was the sole cause of her injuries. *Smith v. Beaty*, 639 N.E.2d 1029, 1034 (Ind. Ct. App. 1994) ("The defendant's act need not be the sole cause of the plaintiff's injuries."); *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 814 (7th Cir. 2012) ("Indiana design defect law does not require absolute certainty on every aspect of causation[.]"). Instead, Kaiser was required to put forth sufficient evidence that a reasonable jury could find in her favor that Prolift caused her injuries.

She did that. Dr. Rosenzweig testified as to specific defects he found with Prolift which lead it to "band, contract, deform, rope, [and] curl" which then caused Kaiser's injuries, including pelvic pain and pain with sexual intercourse. [Trial Tr. 658:13-6:59:7.] Likewise, Dr. Johnson, who removed Mrs. Kaiser's vaginal mesh, testified that the Prolift mesh, along with scar tissue, was the likely cause of Kaiser's pelvic pain and pain associated with sexual intercourse. [DE 395, Ex. D, Dr. Johnson Tr. 48:8-49:25.] The jury

-15-

was entitled to, and apparently did, believe these statements by plaintiffs' medical
experts and witnesses. This was not unreasonable and therefore the jury's verdict may
not be aside on this basis.

### 4. Conflict Preemption

Ethicon argues that because FDA regulations "unequivocally require a
manufacture to submit a new Section 510(k) premarket notification before marketing" a
new or changed device, they cannot be held liable under state tort law for any supposed
design defect of Prolift. [DE 416 at 22; *see also* 21 C.F.R. § 807.81(a)(3) (listing when
premarket approval for medical devices is required).] This argument, which defendants
unsuccessfully raised before the MDL court but never previously before me, *see Mullins
v. Ethicon, Inc.*, 147 F. Supp.3d 478 (S.D.W. Va. 2015), does not persuade me that
defendants are entitled to judgment as a matter of law.

Preemption is a legal doctrine rooted in the Constitution's Supremacy Clause,
namely that Congress may preempt or invalidate state laws through federal legislation.
*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015). Preemption can be express or
implied. There are two kinds of implied preemption, one known as field preemption
(not at issue here) and another, known as conflict preemption. *Id.* Conflict preemption
occurs where "compliance with both state and federal law is impossible" or a state's law
"stands as an obstacle to the accomplishment and execution of the full purposes and
objectives of Congress." *Id.* (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100
(1989)). If this occurs, state law must give way; it is preempted by the federal law.

-16-

The Supreme Court has enunciated two guiding principles on this issue. First, I must begin with a presumption against preemption because "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (citation and internal quotation marks omitted). Second, I must focus on Congressional intent and purpose, examining "the text and structure of the statute at issue." *CXZ Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Bearing these in mind, it is clear that Congress has not intended or evidenced a purpose to abrogate state product liability claims for design defects through the 510(k) process for medical devices.

Section 510(k) review was created by Congress through the passage of legislation called the Medical Device Amendments of 1976 as an exception to the FDA's more rigorous premarket approval process. The intention of this exception was to avoid allowing existing manufacturers to have a temporary monopoly within a medical device market while new products were subject generally to the premarket approval process. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 476 (1996). In *Lohr*, the Court explicitly stated that Congress did not intend to preempt the traditional state law regime of design defect liability through the Section 510(k) process. "There is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents. That status quo

included the possibility that the manufacturer of the device would have to defend itself

against state-law claims of negligent design." *Lohr*, 518 U.S. at 494.

Ethicon tries to argue around this facially dispositive language in *Lohr* by

pointing me towards more recent Supreme Court precedent, which has held state tort

law claims preempted in the context of generic pharmaceutical labeling. *PLIVA, Inc. v.

Mensing*, 564 U.S. 604 (2011); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472 (2013). But

Ethicon's reliance on these generic drug labeling cases is inapposite because in those

cases, the Court focused and primarily based its holdings on the fact that federal law

mandates generic drugs maintain the same label as the brand name equivalent. *PLIVA*,

564 U.S. at 620 ("Federal law does not dictate the text of each generic drug's label, but

rather ties those labels to their brand-name counterparts."). This distinction matters.

Federal law specifically mandates the contents of the labels on generic drugs, and a

generic drug manufacturer cannot get around these requirements and thus, any state

product liability law attempting to require otherwise is preempted. *See Bartlett*, 570 U.S.

at 486 ("[F]ederal law prevents generic drug manufacturers from changing their

labels."). There is no similar Congressional mandate in the field of medical devices like

Prolift.

Taken to its logical conclusion, Ethicon's argument would effectively exempt all

medical devices from state design defect liability if the safer alternative design was not

already pre-cleared by the FDA, under the Section 510(k) or another regulatory scheme.

As the MDL court which addressed this issue before me said, this would "destroy state

-18-

tort liability for any product subject to even the least rigorous federal regulatory

scheme." *Mullins*, 147 F. Supp. 3d at 481. Absent controlling precedent extending *PLIVA*

and *Bartlett* beyond the confines of generic drug labeling, I cannot find that medical

device manufacturers like Ethicon are immune from state tort liability simply because

their product is subject to some federal regulatory oversight. This is especially true

given that the Supreme Court made clear in *Lohr* that the Section 510(k) regime for

medical devices is decidedly not an issue of safety and that "[t]here is no suggestion in

either the statutory scheme or the legislative history that the § 510(k) exemption process

was intended to do anything other than maintain the status quo . . . [including] state-

law claims of negligent design." *Lohr*, 518 U.S. at 494.

### C. Defendants' Motion for a New Trial

Having found all of defendants' arguments in favor of a judgment as a matter of

law unpersuasive, defendants ask in the alternative that I grant them a new trial. First,

defendants claim that a new trial is warranted because the jury's verdict was against the

weight of evidence and because I refused to instruct the jury as to the state of the art

presumption. As discussed above, neither of these arguments were persuasive as to

Ethicon's motion for a judgment as a matter of law. Given that the applicable standards

are nearly the same, I find them unpersuasive here as well for all of the same reasons.

*Compare Erickson*, 469 F.3d at 601 (judgment as a matter of law may be granted only "if

no reasonable jury could have found" in nonmoving party's favor) *with*, *King*, 447 F.3d

-19-

at 534 (new trial may be granted only when moving party has "demonstrate[d] that no rational jury could have rendered a verdict against them").

Before continuing, however, I must make a further observation concerning Ethicon's motion for a new trial. In order to repackage these arguments in support of a new trial, Ethicon cites to a footnote within the Supreme Court's decision in *Tibbs v. Florida*, 457 U.S. 38, n. 11 (1982) for the proposition that I need not defer to the jury or view evidence in a light favorable to Kaiser. Instead, Ethicon states that I may substitute my views for those of the jury and "may weigh the evidence and in so doing evaluate for [myself] the credibility of the witnesses" in determining whether to grant a new trial. [DE 416 at 20.] This is an incorrect statement of law. *Tibbs* was a case concerning whether the Double Jeopardy clause prohibits a state from retrying a criminal defendant who has his conviction set aside by a state appellate court based upon "the weight of the evidence." It does not speak to the standard on a motion for a new trial under Federal Rule of Civil Procedure 59. Instead, I may only weigh evidence "to determine if it's against the *manifest* weight of evidence." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (italics in original). "The district court, however, cannot grant a new trial just because it believes the jury got it wrong." *Id.* (citation omitted).

### D. Defendants' Motion for a New Trial Based Upon Evidentiary Rulings and Jury Instructions

Defendants further argue they are entitled to a new trial based upon various evidentiary rulings and the instructions given to the jury. In reviewing these claims now after the fact, I "must be guided by the principle that 'civil litigants are entitled to a fair trial, not a perfect one'; the Court should decline to order a new trial 'unless there was an error that caused some prejudice to the substantial rights of the parties.'" *Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 861 (E.D. Wis. 2015) (quoting *Lemons v. Skidmore,* 985 F.2d 354, 357 (7th Cir. 1993)). Each argument is addressed in turn, but none warrant a new trial whether on their own or collectively. *See Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993) (holding that clearly erroneous evidentiary rulings during trial were so numerous that a new trial was necessary).

### 1. Exclusion of FDA-related Evidence

At trial, Ethicon was precluded from introducing evidence relating to the FDA's premarket clearance process for medical devices, known as Section 510(k) review. They now say that was an error. But Ethicon's motion is simply a rehash of many of the same arguments I previously rejected. [DE 407.] And none of these arguments lead me to believe that my prior ruling was in error.

Ethicon does raise one new argument, premised on a recent ruling from another court: *In re Bard IVC Filters Prods. Liab. Litig.*, 289 F. Supp. 3d 1045 (D. Ariz. 2018). Of course, a district court opinion is not binding precedent. And that is especially so when the opinion concerns an entirely different product (inferior vena cava filters), in a

-21-

lawsuit under a different state's (Georgia) law. But I will nonetheless explain why I don't think the analysis in *Bard* is applicable to this case.

In *Bard*, the court allowed, over plaintiffs' objections, for Section 510(k) evidence to be admitted. The court found that compliance with the Section 510(k) process was relevant to whether the manufacturer acted reasonably under Georgia law and the risk-utility test that is used there. The court further found that "any potential confusion can be cured, if necessary, by a limiting instruction regarding the nature of the 510(k) process." *Bard*, 289 F. Supp.3d at 1049. Essentially, the ruling was based on Federal Rule of Evidence 403 and the balancing explicit in that rule.

The decision to allow the admission of the Section 510(k) evidence was a judgment call. Indeed, in making that determination, the district court recognized the limited probative value Section 510(k) evidence has in a products liability case. *Id.* at 1048 ("The 510(k) process may not speak directly to the applicable standard of care under Georgia law, but it does have probative value in the determination of this action."). And it further cited other authority which likewise noted that the Section 510(k) process "has minimal probative value" in a products liability case. *See Winebarger v. Boston Sci. Corp.*, No. 3:15CV211-RLV, 2015 WL 5567578 (W.D.N.C Sept. 22, 2015).

What makes the *In re Bard* decision most inapposite is that its ruling is premised on the fact that Georgia law does not hold "that only safety regulations" are relevant in design defect cases. 289 F. Supp. 3d at 1048 (discussing *Doyle v. Volkswagenwrk Aktiengesslschaft*, 481 S.E.2d 518 (Ga. 1997)). As discussed at length above, that is not the

-22-

law in Indiana, where a close connection between the relevant standard and safety is

required. *Wade*, 966 N.E.2d at 194 ("[F]or evidence of compliance with governmental

standards to be relevant, the standard itself must relate to the risk or product defect at

issue[.]"); *see also* Ind. Code § 34-20-5-1.

When faced with a similar question as the one posed to the judge in *Bard,* I found

that the Section 510(k) testimony would only confuse the jury and given the likelihood

of confusion and extensive trial time necessary to explain the issues, any probative

value was outweighed. [DE 407.] Defendants suggest my ruling had "no factual basis"

because studies critical of Prolift (which triggered the FDA's post-clearance concerns

resulting in Prolift being removed from the market) were not directly related to the

Section 510(k) process. [DE 416 at 34-35.] But this framing of the issue ignores the

additional basis for excluding the Section 510(k) evidence from trial under FRE 403: it

was more prejudicial to **both** parties than probative to either. As explained, that

evidence would not be probative of the key issue—*i.e.* safety. And allowing that

evidence in, along with the rest of the FDA story, would likely have been even more

harmful than beneficial to Ethicon. As I stated in my prior ruling:

> If the evidence regarding Prolift's §510(k) clearance had been
> admitted into evidence, almost assuredly, Prolift's whole FDA
> story would have been told to the jury, including evidence that
> after the Prolift device was marketed, it later received FDA
> scrutiny and was subsequently removed from the market after
> a series of exchanges with the FDA regarding its safety. This
> would require the introduction of additional evidence and
> testimony from regulatory experts and Ethicon employees.
> When balancing the probative value of the evidence against

these dangers and the needless consumption of time, I find that
excluding the evidence is appropriate.

[DE 407 at 8.]

As noted, it would not have been sensible, nor fair to the plaintiffs, to allow Ethicon

to parade in a bunch of witnesses to talk about the FDA's Section 510(k) process and argue

to the jury that this evidence shows how safe its product was, only to exclude the very

prejudicial testimony about how the FDA strongly questioned the safety of the Prolift after

the fact. What would have been sauce for the goose would have been sauce for the gander.

I was not going to allow a one-sided presentation of Prolift's "FDA story." So I decided that

the best approach was to exclude the FDA evidence altogether. This approach allowed the

jury to focus on the critical issues in the case — was the product defective in its design and

warnings? — without being distracted by the FDA side-show.

### 2. Lack of Curative Instruction after Plaintiffs' Closing Arguments

The next asserted error is that I did not issue a curative instruction after

plaintiffs' rebuttal argument in which counsel rhetorically asked "Where is that

industry standard?" that would justify or support Ethicon's decision to market Prolift

without having conducted clinical trials in women prior to putting the product on the

market. [DE 416 at 36.] Ethicon says that this was a misleading reference because

plaintiffs' counsel knew there was an industry standard set by the FDA but that

evidence had been excluded (as noted in the above section). In essence, Ethicon claims

that it was precluded from telling the jury "the FDA didn't make us" do such testing.

-24-

Ethicon focuses on three specific statements made by plaintiffs' counsel during closing argument that Ethicon says caused great prejudice. They misleadingly suggest that all three were made during the "rebuttal closing argument." [DE 416 at 28.] In fact, two of the three offending statement were made during initial closing argument. [Trial Tr. 1653.] Ethicon concedes as much in its reply brief but nonetheless argues that "[r]egardless of when made, once the statements were made the only recourse was to grant a mistrial or provide a curative instruction[.]" [DE 422 at 13,n.5.] But the timing is important because there was no contemporaneous objection made to any of the statements, or attempt at a sidebar at the conclusion of plaintiffs' initial closing but prior to Ethicon's closing.

The Seventh Circuit has placed a high hurdle for Ethicon to clear in order to secure a new trial based on statements made during closing arguments. That is because "[c]losing arguments are the time in the trial process when counsel is given the opportunity to discuss more freely the weaknesses in his opponent's case and to highlight the strength of his own." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 731 (7th Cir. 1999) "[I]mproper comments during closing argument rarely rise to the level of reversible error." *Probus v. K–Mart, Inc.*, 794 F.2d 1207, 1210 (7th Cir. 1986). "To warrant a new trial, '[s]tatements made during closing argument must be plainly unwarranted and clearly injurious to constitute reversible error.'" *Jones*, 188 F.3d at 730 (quoting *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 644 (7th Cir. 1995)).

-25-

As noted above, Ethicon's counsel did not object during closing arguments. Instead, they waited until after all closing arguments concluded, including its own closing and plaintiffs' rebuttal had concluded. It was only then that they objected. And *how* they objected was a bit odd. No one from the defense team that was actually sitting at counsel's table lodged the objection. Instead, an attorney for Ethicon who was seated in the rear of the courtroom came rushing to the front of the courtroom with her arm in the air trying to get my attention. I was frankly taken aback by this. This occurred while I was in the process of telling the jury how I would go about reading the final instructions to them. *[See* Trial Tr. at 1737.] It seemed to me at the time that whatever the lawyer wanted to bring to my attention could wait and thus I instructed Ethicon's attorney to "please sit down" while I continued to address the jury. *Id.*

It is true, as Ethicon argues, that there may be valid strategic reasons not to object at "the very moment [opposing counsel] utters the comments at issue." *See United States v. Solis-Jordan*, No. 97 CR 814, 1999 WL 410038, at *6 (N.D. Ill. June 2, 1999) (cited by Ethicon). I'm not sure I see those concerns in this case. It would have been very simple for counsel who was seated at counsel table to simply ask if they could approach the bench just after the offending comments were made during the closing arguments. Indeed, defense counsel had no issue objecting contemporaneously during plaintiffs' closing at other times. [Trial Tr. 1646:25-1647:6.] Had defense counsel objected here, I would have allowed them to approach, and I could have dealt with the issue on the

-26-

spot during the argument if necessary. So there is no doubt Ethicon's counsel had ample opportunity to object before they actually did.

What's more, I think it was fair for me to expect that the Ethicon lawyer who would be lodging the objection would be the one who was actually doing the closing argument, not a lawyer seated in the back of the courtroom. Indeed, I made it clear to the parties prior to trial that I have a "one lawyer rule" that requires that objections be made by the lawyer responsible for that part of the trial whether it be the opening statements, the examination of witnesses or closing argument. That was especially important in this case where each side had at least a half-dozen lawyers assigned to it. It would have been a free for all to allow any lawyer to object at any time.

In sum, had defendants' counsel objected contemporaneously, or after plaintiffs' initial closing but before their own closing, and sought a sidebar to discuss their concerns, it may have been possible to address in a targeted fashion then and there, or to instruct plaintiffs' counsel not to make similar statements during rebuttal. But that did not happen and instead, defendants waited, and thus the only possible instruction to give would have come long after the offending statements were made, likely long after the jury had forgotten all about them.

Regardless, I am not convinced that any curative instruction would have been proper, let alone sufficiently necessary as to result in harm great enough to warrant a new trial in this case. I would have been required to explain to a jury, after the fact, the basis of my prior evidentiary rulings excluding Ethicon's proffered FDA-related

evidence. This would likely only confuse the jury, for the same reasons that such FDA-related evidence was excluded in the first place. Furthermore, this would have only served to highlight plaintiffs' counsel's errant statements during the closing, no doubt to Ethicon's detriment.

Defendants are somewhat misleading in implying that all FDA-related evidence would have been in their favor. As noted above, if I had allowed evidence of the FDA's Section 510(k) substantial equivalence process to come in, I would likewise have had to include the entirety of the proffered FDA evidence, including evidence of the FDA's later safety focused concerns and defendants' decision to withdraw Prolift from the market in response to those concerns. While I cannot know if the admission of this FDA evidence would have altered the jury's verdict, it was and remains my ruling that the evidence was not sufficiently relevant to the claims in this lawsuit to be deemed admissible.

Finally, it is hard to imagine that the few fleeting comments by plaintiffs' counsel made a difference in a complicated trial spanning two weeks time. Simply put, Ethicon has not met its burden under the demanding standard at play here. The motion for a new trial based on improper argument during closing must therefore be denied.

### 3. Testimony of Dr. Meng Chen Regarding TVT

Prior to trial, Ethicon sought to exclude certain documents authored by Ethicon Associate Medical Director Dr. Meng Chen, but did not seek to bar her testimony in full. [DE 234 at 19-20 (motion *in limine* to exclude "evidence or argument regarding post-sale

-28-

company documents authored by Dr. Meng Chen"); DE 279 (plaintiffs' motion to admit); DE 288 (defendants' opposition).] These documents related to "TVT", a vaginal mesh product sold by defendants prior to Prolift entering the market and which was made using the same polypropylene material as Prolift. At trial, Ethicon objected to deposition testimony from Dr. Chen because I limited defense counsel's cross-examination of plaintiffs' expert Dr. Elliott concerning TVT only to issues related to development of Prolift. [Trial Tr. 495:9-15 ("THE COURT: . . . I very specifically asked what the intention was as it relates to the TVT product, and the way it was pitched to me was: Well, it's very necessary to talk about the TVT in the development of a Prolift product, and that's what we're intending to talk about the TVT. This is getting beyond that.").]

I allowed Dr. Chen's testimony in a limited fashion because I found testimony concerning complications with TVT, a separate but similar device, was relevant to defendants' decisions to use polypropylene mesh material in Prolift as well. [Trial Tr. 1053:1-5 ("THE COURT: I do think that polypropylene and how it is made and the fact that it is used in the Prolift is relevant to this case; that it sort of sets the framework for the development of the sling, kind of led to the development of the Prolift.").] That is what Dr. Chen's testimony concerned. Ethicon offers nothing in the way of new argument on its belated objection to having Dr. Chen's testimony barred in full and I see no occasion to revisit my ruling or grant a new trial on this basis.

-29-

## 4. Failure to Warn and Causation Jury Instructions

Ethicon submits that two specific jury instructions contained misstatements of law which prejudiced it by either misleading or confusing the jury. Specifically, Ethicon claims that it was prejudicial error to exclude its proposed qualifier "not commonly known" in Instruction 20 as to Mrs. Kaiser's failure to warn claim, and in rejecting its additional instruction as to general and specific medical causation. [DE 416 at 40-41.] "To obtain a new trial based on incorrect jury instructions, [Ethicon] must establish that (1) the instructions did not accurately state the law, and (2) the error prejudiced [it] because the jury was likely to be misled or confused." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 733 (7th Cir. 2013). This is a high bar to clear and Ethicon has not convinced me that the jury instructions contained any actual misstatements of law whatsoever, but instead continues to simply press its own linguistic preferences which deviate from the Indiana Model Instructions.

Ethicon asked for a jury instruction which would state that their duty to warn was limited to risks "not commonly known" to pelvic floor surgeons. Without this additional qualifier to Instruction 20, Ethicon argues this resulted in an improper jury instruction which misleadingly suggested there was "a duty to warn of all potential risks of Prolift." [DE 416 at 40.] Taken in isolation, that could possibly have been a colorable argument, but jury instructions cannot be read in isolation and instead should be considered "as a whole" to determine whether or not they contain misstatements of law which may have misled or confused the jury. *Johnson*, 733 F.3d at 732. The substance

-30-

A68

of Ethicon's requested modification to Instruction 20 was already captured in

Instruction 22, which explained that: "A medical device is 'unreasonably dangerous' if

it exposes a patient to a risk of physical harm beyond that contemplated by an ordinary

user of the product who uses the product with ordinary knowledge about the product's

characteristics. An ordinary user of the product in this case is the community of pelvic

floor surgeons." [DE 402 at 23.] This instruction, coupled with Instruction 20, made clear

to the jury that they were to consider the knowledge of the community of pelvic floor

surgeons in determining whether or not Ethicon adequately warned this defined group

of "ordinary users" as to Prolift's risks. There was thus no misstatement of law and no

error.

Ethicon next challenges the jury instructions as to causation, claiming that my

exclusion of two if its proposed jury instructions on this issue meant that the jury

instructions contained misstatements of law which likely misled the jury. Instruction 25,

the causation instruction, from the Indiana Model Instructions stated that "A

manufacturer's conduct is legally responsible for causing an injury if: (1) the injury

would not have occurred without the conduct, and (2) the injury was a natural,

probable, and foreseeable result of the conduct. This is called a "responsible cause."

There can be more than one responsible cause for an injury." [DE 402 at 26.]

Ethicon claims that this instruction fails to sufficiently capture specific causation.

But this instruction makes clear that a plaintiff must prove that "the injury would not

have occurred without the conduct." *[Id.]* That **is** specific causation. Adding an

additional requirement that "a different warning would have changed the treating

physician's treating decision," [DE 416 at 41], would have imposed an additional

requirement that is not an element of causation under Indiana law. *See Lapsley,* 689 F.3d

at 814; *see also Tucker v. SmithKline Beecham Corp.*, 701 F. Supp. 2d 1040, 1067 (S.D. Ind.

2010) (denying summary judgment on failure to warn because even if evidence was not

"definitive either way" on causation, there was sufficient evidence to submit the claim

to the jury because prescribing physician testified he would have "considered" a

stronger warning in making any prescribing decision). Second, Ethicon claims there

should have been an additional causation instruction as to "general causation" and

"specific causation" to capture that Mrs. Kaiser was required to show both that Prolift

was capable of causing her injuries and that Prolift did actually cause her injuries. In

essence, Ethicon argues that it would have preferred more parsed language on

causation, but does not actually make any showing as to how Instruction 25 contained

an incorrect statement of law. Greater detail—which presumably Ethicon hoped would

result in a jury being less likely to find Prolift was the cause of Mrs. Kaiser's

injuries—may have been Ethicon's preference, but it was not required under Indiana

law and the jury was sufficiently instructed as to what a plaintiff's burden is on matters

of causation in a product liability suit.

In sum, Instruction 25 accurately stated Indiana law on causation and Ethicon's

proposed additional parsing of this element would not have prevented juror confusion

but instead likely heightened it by implying elements and requirements which were not strictly elements of Mrs. Kaiser's claim.

### E. Compensatory Damages

Having found that the jury's verdict in favor of Mrs. Kaiser was not irrational in and of itself, I must now consider whether that same evidence supports the amount of money the jury awarded Mrs. Kaiser. Ethicon challenges the jury's award of $10 million in compensatory damages, arguing that it is "grossly excessive" and unsupported by the evidence. [DE 416 at 42.]

As to compensatory damages "the jury's award may be vacated and a new trial granted only if the verdict is 'monstrously excessive' or if there is 'no rational connection between the evidence on damages and the verdict.'" *Inks v. Healthcare Distributors of Indiana, Inc.,* 901 F. Supp. 1403, 1409 (N.D. Ind. 1995) (quoting *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 516 (7th Cir.1993)). "The verdict must stand unless there is no rational connection between the evidence and the jury's award." *Id.*

To determine whether this is the case, there are three key considerations: "(1) whether the award is 'monstrously excessive,' (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is comparable to those in similar cases." *Marion County Coroner's Office v. EEOC,* 612 F.3d 924, 930-31 (7th Cir. 2010). "A monstrously excessive verdict is one that is 'a product of passion and prejudice.'" *Adams v. City of Chicago,* 798 F.3d 539, 543 (7th Cir. 2015) (quoting *Fleming v. Cnty. of Kane,* 898 F.2d 553, 561 (7th Cir. 1990)). "In order to

Case: 18-2944    Document: 35    Filed: 02/01/2019    Pages: 166

determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact." *Adams*, 798 F.3d at 543. The third factor helps guide the determination of whether the award is excessive, but one cannot simply extrapolate that an award is excessive if it is greater than an award in a prior comparable cases. "Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Farfaras v. Citizens Bank & Tr. of Chicago,* 433 F.3d 558, 566–67 (7th Cir. 2006).

Mrs. Kaiser's injuries were non-economic in nature, consisting primarily of pain and suffering, and "these harms are difficult to monetize." *Maldonado v. Sinai Medical Grp., Inc.* 706 F. Supp.2d 882, 887 (N.D. Ill. 2010). Putting a number of long-term physical pain and suffering will never be an exact science. *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001) ("The problem of figuring out how to value pain and suffering is acute, however. Various solutions, none wholly satisfactory, have been suggested . . ."). Nor can we expect a jury to apply some sort of methodical calculation to the award in part because "[j]uries do not explain their reasoning process." *Id.*

To be sure, there was persuasive evidence from both Mr. and Mrs. Kasier that the pain and agony that she experiences on a daily basis from the mesh that remains in her body to this day is both real and debilitating.  She endured a second painful surgery in an effort to have the mesh removed, but much of it still remains. Mrs. Kaiser testified,

and her husband confirmed, that she lives in constant pain. For these injuries, the jury

determined $10 million was appropriate. While an eight figure sum is a lot of money

and larger than many other serious personal injury cases, it is not "monstrously

excessive" compared to other vaginal mesh personal injury cases. Ethicon makes much

of the fact that juries have awarded smaller amounts of damages in other Indiana cases

involving physical injury, many of which involved catastrophic physical injury. [DE 416

at 44 (citing *Westray v. Wright*, 834 N.E. 2d 173 (Ind. Ct. App. 2005) and *Mitchell v.*

*Baynes*, Monroe County Circuit Court (J. Verds. Repts Aug. 5, 2005).] Likewise, Ethicon

points me to several Indiana cases where minor injuries resulted in awards which were

reduced by the trial court. [*Id.* at 43.]

But I believe other vaginal mesh cases provide a more apt comparison, as this

case is but one of tens of thousands of vaginal mesh cases that has been filed, many of

which are still pending before the MDL Court in West Virginia. And many of these

have been tried, resulting in verdicts of several million dollars. Indeed, a Pennsylvania

appellate court recently affirmed a $5.5 million dollar compensatory (and $7 million

punitive damage) award against Ethicon in a Prolift case. *Hammons v. Ethicon, Inc.*, 2018

PA Super 172, 2018 WL 3030754 (Pa. Super. Ct. June 19, 2018); *see also Gross v. Gynecare*,

No. A-0011-14T2, 2016 WL 1192556, at *1 (N.J. Super. Ct. App. Div. Mar. 29, 2016)

(affirming multimillion dollar award in Prolift case).

The fact the jury's award here is higher than in many of the Indiana cases cited

by Ethicon, does not make this jury's compensatory damage award improper. "It is

entirely possible that another jury might have evaluated [Mrs. Kaiser's] damages more modestly, but that is not the standard." *Adams*, 798 F.3d at 543. "Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Farfaras,* 433 F.3d at 566–67. I am aware of no principle of Indiana law that would otherwise limit Mrs. Kaiser's damages.

The final aspect of compensatory damages to address is whether a reduction in the award is proper given that the amount the jury awarded was actually more than Mrs. Kaiser's counsel had requested. This is a tougher call. During closing arguments, plaintiffs' counsel asked for between $7 million and $9 million. [Trial Tr. 1675:2-7.] On one hand, there is something seemingly excessive about awarding Mrs. Kaiser more than her attorneys requested. But on the other hand, awarding her approximately 10-25% more does not seem ***monstrously*** excessive, given that the jury clearly felt that Mrs. Kaiser's physical pain and suffering justified a large damage award. Given that the jury's award was only slightly larger than what plaintiffs' counsel requested on a percentage basis, I will not reduce the amount of compensatory damages. *See, e.g., Davis v. Bamford, Inc.,* No. 8:11CV69, 2012 WL 3583184, at *3 (D. Neb. Aug. 20, 2012) (finding $7 million personal injury award not excessive under Nebraska law even though greater than requested in plaintiffs' closing argument given extent of physical injuries); *see also Jutzi-Johnson*, 263 F.3d at 761 (reversing verdict in favor of plaintiff and noting impropriety of $1.6 million award when plaintiff requested only $300,000 to $600,000).

-36-

## F. Punitive Damages

The next issue to consider is the award of punitive damages. Despite my reservations to the contrary, all parties agreed that the New Jersey Punitive Damages Act governed that discreet issue in this case. I raised the issue about the applicability of New Jersey punitive damages law at least twice prior to trial because I was a little mystified as to why New Jersey law would apply to a tort that took place in Indiana. But the parties insisted that they had come to an agreement that New Jersey law should apply to the punitive damages issue, and so I yielded.

There are two issues to be considered as it relates to punitive damages: first, was there sufficient evidence to support an award of punitive damages; and if so, should the amount be reduced? I will take those issues up next.

### 1. Was There Sufficient Evidence for Punitive Damages to be Awarded?

Under New Jersey law, punitive damages are allowed "if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15-5.12(a). Four factors apply: "(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) The conduct of the defendant upon learning that its initial conduct would likely cause

-37-

A75

harm; and (4) The duration of the conduct or any concealment of it by the defendant."

*Ceasar v. Flemington Car & Truck Country*, No. A-1464-12T3, 2014 WL 1613422, at *10–11

(N.J. Super. Ct. App. Div. Apr. 23, 2014).

"[C]ircumstances of aggravation and outrage, beyond the simple commission of

a tort, are required for an award of punitive damages. In other words, mere negligence,

however gross, is not enough." *Pavlova v. Mint Mgmt. Corp.*, 868 A.2d 322, 326 (N.J.

Super. Ct. App. Div. 2005) (citation omitted). In the products liability arena, whether

punitive damages are allowed "may turn on whether the manufacturer wantonly

disregarded a high probability that injury would occur once the defect manifested itself

in the situation that the plaintiff encountered." *Zakrocki v. Ford Motor Co.*, No. L-10179-

02, 2009 WL 2243986, at *23 (N.J. Super. App. Div. July 29, 2009). Put another way,

"where the manufacturer knew of the dangers created by its product and failed to warn

users of serious health hazards," punitive damages may be allowed. *Gross v. Gynecare*,

No. L-6966-10, 2016 WL 1192556, at *26 (N.J. Super. Ct. App. Div. 2016).

Ethicon raises various arguments in support of its position, namely that Prolift

was a useful product, which met a real demand amongst surgeons, was an

improvement over previously available vaginal meshes, and "underwent an extensive

design, design validation, and design verification process." [DE 416 at 24-25.] This may

all well be very true and Ethicon certainly submitted evidence in support this. But there

was also evidence that Ethicon was aware of the dangers and problems associated with

Prolift but chose to launch it any way, and that after further problems continued to arise

-38-

once on the market, Ethicon continued to market it as-is without disclosing these risks

to surgeons.

For example, there was testimony that nearly a year before Prolift's launch, there

were concerns about mesh shrinkage. [Trial Tr. 359:4-360:4; Ex. P0521.] At launch,

Ethicon knew that Prolift's mesh would need to be replaced with a new type of mesh,

but the product was marketed nonetheless. [Trial Tr. 364:2-22.] This was not disclosed

to surgeons performing procedures with Prolift. [*Id.*] Indeed, in an internal Ethicon

email from October 2008, years after Prolift was launched and approximately three

months before Mrs. Kaiser had her surgery, refers to this problematic mesh material as

the "best of a bad lot." [DE 395, Ex. A, Robinson Tr. 552:16-554:2.] And the IFU, the key

place where risks related to Prolift should have been disclosed in order to apprise

surgeons, failed to reference the known likely types of pain, including pain associated

with intercourse as experienced by Mrs. Kaiser. [Trial Tr. 393:3-17, 397:1-12; DE 395, Ex.

B Klinge Tr. 1018:2-24.] The jury was entitled to credit this evidence.

Lastly, it is worth noting that appellate courts in other states (applying New

Jersey law of punitive damages) have affirmed substantial punitive damage awards on

similar facts in Prolift vaginal mesh cases. *Gross*, 2016 WL 1192556, at *1 (affirming $7.76

punitive damage award in Prolift vaginal mesh case); *Hammons*, 2018 PA Super 172

(affirming $7 million punitive damage award in Prolift vaginal mesh case). While these

decisions do not by any means dictate or control the outcome here, they mollify any

notion that the jury here behaved irrationally or contrary to New Jersey law.

-39-

## 2. Should the Punitive Damage Award be Reduced?

The final issue to address is whether, having accepted that Mrs. Kaiser was entitled to punitive damages as a matter of law, a remittitur of the $25 million amount awarded is necessary. I have thus far found all of Ethicon's arguments unpersuasive and upheld the jury's verdict, but on this issue I must cut the other way. The amount of the jury's punitive damage award is not reasonable and justified in this case.

Independent review by the trial court of any punitive damage award is mandatory under New Jersey law. "Before entering judgment for an award of punitive damages, the trial judge **shall** ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct." N.J. Stat. Ann. § 2A:15-5.14(a) (emphasis added); *Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.*, 975 F. Supp. 681, 699 (D.N.J. 1997), *aff'd and remanded*, 181 F.3d 446 (3rd Cir. 1999) (holding that New Jersey Punitive Damages Act mandates "greater judicial scrutiny of jury awards than had existed under the common law"). The statute further empowers me to reduce or eliminate the award "[i]f necessary to satisfy the requirements" listed in the previous sentence. *Id.*

The New Jersey Punitive Damages Act further imposes a statutory cap on punitive damages. Under this law, punitive damages can be no more than five times the compensatory damages. N.J. Stat. Ann. § 2A:15–5.14(b). Of course, the jury's $25 million award is within this cap, representing "only" 2.5 times the jury's compensatory

-40-

A78

damages award. But, as other courts applying New Jersey's punitive damages regime have noted, when considering multi-million dollar awards, "the ratio alone is of little assistance" because "one naturally expects a much lower ratio when a substantial award of compensatory damages has been made[.]" *Inter Med. Supplies,* 975 F. Supp. at 701.

There is also a constitutional component to my review of the punitive damages awarded. In that regard, when evaluating punitive damages awards, the Supreme Court has instructed me to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citation omitted).

As discussed, there was evidence which tended to show Ethicon was well aware of known risks associated with Prolift and either recklessly or intentionally concealed those risks for years. The jury further heard many details of Mrs. Kaiser's physical pain and suffering which were the result of defendant's conduct. Furthermore, the jury heard evidence regarding defendants' net worth (both are multi-billion dollar corporations), but also heard evidence regarding defendants' actual profits made off of Prolift in Indiana. The punitive damages in this case were only to address them as to Indiana (as opposed to nationwide or in other states given the many other pending

lawsuits involving Prolift against defendants). *See Philip Morris USA v. Williams,* 549

U.S. 346, 353 (2007) (reiterating holding that states may not impose their policy

preferences as to punitive damages on neighboring states). Importantly, defendants'

profitability from Prolift was a little over $150,000 in Indiana. [Trial Tr. 1060:2.] This fact

gives me pause and causes doubt as to the reasonableness of the punitive damage

award in this case given that New Jersey law requires that "[t]he profitability of the

misconduct of the defendant" to be an express consideration in determining the amount

of punitive damages to award. N.J. Stat. Ann. § 2A:15-5.12(c)(2). Thus while "[a]n

otherwise valid award of punitive damages will not be set aside unless 'manifestly

outrageous' or 'clearly excessive,'" I believe this is such a case. *Smith v. Whitaker*, A.2d

243, 254 (N.J 1999) (citations omitted). That is because "an award of punitive damages

does not logically depend on the extent of the injury sustained by an individual

plaintiff. Rather, 'the amount of such an award is determined from the perspective of

the defendant.'" *Id.* at 255 (citations omitted). Here, while the jury heard evidence and

the parties stipulated to defendants' net worth being $70 billion, the award of $25

million represents over 166 times the amount of relevant profits earned by defendants

which from the perspective of the defendant is clearly excessive.

     Having determined that a remittitur is warranted, I must now determine a

number. Admittedly, this remains an inexact science but there remains guidance as to

what the punitive damages award should be. Here, the jury's $10 million compensatory

award is sizable and larger than many other Prolift vaginal mesh verdicts. And "[w]hen

compensatory damages are substantial, then a lesser ratio, perhaps only equal to

compensatory damages, can reach the outermost limit of the due process guarantee."

*Campbell,* 538 U.S. at 425. I believe this statement from the Supreme Court is applicable

here, given the size of the compensatory damage award in this case. *See also Davids v.*

*Novartis Pharm. Corp.,* 977 F. Supp. 2d 171, 184 (E.D.N.Y. 2013) (applying New Jersey

Punitive Damages Act in products liability case) ("[G]iven the large compensatory

damages awarded in this case, the Court finds that requires a further reduction in the

punitive damages award from five times the compensatory damages to twice the

compensatory damages[.]"); *Inter Med. Supplies,* 975 F. Supp. at 701 (remitting $106

million dollar punitive damage award to $50 million under New Jersey law when

compensatory damages were approximately $48 million); *Ceasar,* 2014 WL 1613422, at

*15 (affirming remittance of punitive damages to $3 million from $5.5 million when

compensatory damages were $2 million).

      Given the foregoing authority, I will remit the jury's original $25 million punitive

damage award to a 1:1 ratio, or $10 million. This is a reasonable award, in line with both

the Supreme Court's due process jurisprudence on punitive damages and the New

Jersey Punitive Damages Act. And given that Ethicon's profits in Indiana were

approximately $150,000, a $10 million award remains substantial, which serves New

Jersey's Punitive Damages Act's goal of ensuring that "the wrongdoing does not

become a cost of business for the defendant." *Tarr v. Bob Ciasulli's Mack Auto Mall, Inc.,*

943 A.2d 866, 872 (N.J. 2008); *Smith,* 734 A.2d at 255 ("[T]he amount awarded should be

-43-

A81

sufficient to serve the purpose of deterring future misconduct by defendant."); *see also Inter Med. Supplies*, 975 F. Supp. at 700 (reducing punitive damage award from $106 million to $50 million where profits realized from wrongful conduct were estimated at $97 million).

Of course, I cannot within my constitutional powers simply reduce the amount of punitive damages that the jury awarded by fiat. *Hetzel v. Prince William Cty., Va.*, 523 U.S. 208, 211 (1998) ("[I]n accord with the Seventh Amendment's prohibition on the reexamination of facts determined by a jury, a court has no authority, upon a motion for a new trial, 'according to its own estimate of the amount of damages which the plaintiff ought to have recovered, to enter an absolute judgment for any other sum than that assessed by the jury.'") (quoting *Kennon v. Gilmer*, 131 U.S. 22, 29 (1889); Wright & Miller, Fed. Prac. & Proc. Civ. § 2815 (3d ed.); *Inter Med. Supplies*, 975 F. Supp. at 702 ("A district court that finds the amount of an award of damages to be excessive cannot merely order a reduction in the award. The court can, however, order a new trial limited to the issue of damages, or condition the denial of a new trial on plaintiff's acceptance of the reduced damage award.") (citations omitted). Instead, having found the amount of punitive damages awarded in this case excessive, I will conditionally grant Ethicon's motion for a new trial as to the amount of punitive damages, subject to Mrs. Kaiser not accepting of a reduced $10 million punitive damage award. That is, Mrs. Kaiser now faces a choice: she can either accept a reduced punitive damage award

-44-

(and thus be awarded $20 million dollars in total compared to the original $35 million awarded by the jury) or I will order a new trial on the issue of punitive damages.

### Conclusion

Therefore, for the reasons stated above, the Court:

    A.   DENIES defendants Johnson & Johnson and Ethicon, Inc's motion for judgment notwithstanding the verdict; and

    B.   DENIES defendants Johnson & Johnson and Ethicon, Inc.'s motion for a new trial; and

    C.   DENIES defendants Johnson & Johnson and Ethicon, Inc.'s motion for remittitur of the jury's compensatory damage award; and

    D.   GRANTS defendants Johnson & Johnson and Ethicon, Inc.'s motion for remittitur of the jury's punitive damage award to $10 million.

Within 14 days, plaintiff shall inform defendants whether or not she will accept the remittitur and the parties will inform the Court within 21 days of their decision as to the remittitur of punitive damages.

SO ORDERED on August 8, 2018.

/s/ Philip P. Simon _____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

-45-

AO 450 (Rev. 01/09)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Northern District of Indiana

BARBARA KAISER and
ANTON KAISER

                       Plaintiff(s)

                   v.                    **Civil Action No.**     2:17cv114

JOHNSON & JOHNSON and
ETHICON INC

                       Defendant(s)

**AMENDED**

## JUDGMENT IN A CIVIL ACTION

The court has ordered that (*check one):*

**X**    Pursuant to the jury verdict, the Court has ordered that final judgment is entered in favor of Plaintiff, Barbara Kaiser, and against Defendants, Ethicon, Inc and Johnson & Johnson, as to Plaintiff, Barbara Kaiser's, design defect claim and failure to warn claim.

**X**    Pursuant to the jury verdict, the Plaintiff, Barbara Kaiser, shall recover compensatory damages from Defendants, Ethicon, Inc. And Johnson & Johnson, in the amount of ten million dollars ($10,000,000) plus post-judgment interest at the rate of 2.06 %.

**X**    Pursuant to the Opinion and Order dated August 8, 2018 and Plaintiff Barbara Kaiser's Notice of Acceptance of Remittitur filed August 10, 2018,  the Plaintiff, Barbara Kaiser, shall recover punitive damages from Defendants, Ethicon, Inc. and Johnson & Johnson, in the amount of ten million dollars ($10,000,000) plus post-judgment interest at the rate of 2.06 %.

**X**    Pursuant to the jury verdict, the Court has ordered that final judgment is entered in favor of Defendants, Ethicon, Inc and Johnson & Johnson, and against Plaintiff, Anton Kaiser, on Plaintiff, Anton Kaiser's, loss of consortium claim.

☐    the plaintiff recover nothing, the action is dismissed on the merits, and the defendant _____ recover costs from the plaintiff _____.

**X** Other:  Defendants, Johnson & Johnson and Ethicon Inc, are ordered to pay Plaintiff, Barbara Kaiser, Sixty-Two Thousand One Hundred Seventy-Four Dollars and Fifty Cents ($62,174.50) in taxable costs.

This action was (*check one):*

**X**   tried to a jury with Judge  Philip P. Simon   presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☐ decided  by  Judge _____

DATE:        8/21/18        ROBERT TRGOVICH, CLERK OF COURT

by    s/Monica Clawson _____
      *Signature of Clerk or Deputy Clerk*